UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

     v.

MICHAEL McCLAIN,
ANNE PRAMAGGIORE,
JOHN HOOKER, and
JAY DOHERTY

No. 20 CR 812

Hon. Harry D. Leinenweber

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL
AND FOR A NEW TRIAL**

MORRIS PASQUAL
Acting United States Attorney

AMARJEET S. BHACHU
DIANE MacARTHUR
SARAH STREICKER
JULIA K. SCHWARTZ
IRENE SULLIVAN

Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

# TABLE OF CONTENTS

**BACKGROUND** ......................................................................................................................... 2

**ARGUMENT** ............................................................................................................................... 6

    *I.*    ***The Defendants' Motions for Judgment of Acquittal Should Be Denied.*** ...................... *6*

        A.    Legal Standard for Judgment of Acquittal ................................................................. 7

        B.    The Government Presented Sufficient Evidence to Sustain Convictions on Count One. ..... 8

        C.    The Government Presented Sufficient Evidence to Sustain Convictions on the Conspiracy and Corruption Counts. ........................................................................................... 22

            1.    A *Quid Pro Quo* Is Not Required. ...................................................................... 22

            2.    Arguments Raised by Defendant Pramaggiore ................................................... 23

            3.    Arguments Raised by Defendant McClain ......................................................... 54

            4.    Arguments Raised by Defendant Hooker ........................................................... 59

            5.    Arguments Raised by Defendant Doherty .......................................................... 66

        D.    The Government Presented Sufficient Evidence to Sustain Convictions on the FCPA Related Counts. ......................................................................................................... 70

            1.    Arguments Raised by Defendant Pramaggiore ................................................... 70

            2.    Arguments Raised by Defendant McClain ......................................................... 76

            3.    Arguments Raised by Defendant Hooker ........................................................... 79

            4.    Arguments Raised by Defendant Doherty .......................................................... 81

    *II.*    ***The Defendants' Motions for a New Trial Should Be Denied.*** ..................................... *82*

        A.    Legal Standard for a New Trial ............................................................................... 82

        B.    The Court Committed No Error in The Jury Instructions. ........................................ 83

            1.    A *Quid Pro Quo* is Not an Element of § 666 ..................................................... 83

            2.    The Court Correctly Declined to Give Defendants' Proposed "Goodwill" Instruction. .... 88

            3.    The Court Correctly Declined to Give Defendants' Proposed "Good Faith" Instruction. 90

            4.    The Court Correctly Declined to Give Defendants' Instruction Concerning Vicarious Liability as Proposed. ........................................................................................... 91

            5.    The Court Did Not Err by Giving a *Pinkerton* Instruction. ................................. 93

            6.    The Instructions for 18 U.S.C. § 666 Did Not Need to Specify Madigan or Limit the "Things of Value" to "Legislation." .................................................................... 95

            7.    The Court Properly Declined to List the Documents Alleged to Be False. ........... 97

            8.    The Court Properly Instructed the Jury Regarding § 666(c). ............................... 98

            9.    The § 666 Instructions Properly Instructed the Jury as to the Requisite Intent. ......... 100

          10.    The Court Properly Rejected Defendants' Proposed Revisions to the Pattern Instructions Regarding Speculation. ..................................................................... 101

11.  The Court Correctly Declined to Give Defendants' Proposed Definition of "Official Duty." ........................................................................................................................... 103

12.  The Verdict Forms Did Not Create Error. .................................................................. 105

C.  The Court Did Not Commit Any Evidentiary Error Warranting a New Trial. ................. 106

1.  The Court Properly Excluded Expert Lee Drutman. ................................................... 106

2.  The Court Properly Excluded Evidence that Pramaggiore Requested an Investigation of ComEd Lobbyists. ............................................................................................................ 107

3.  The Court Properly Excluded Evidence that Defendant Pramaggiore Denied Speaker Madigan's Request for Polling Questions. ....................................................................... 109

4.  The Court Correctly Barred Pramaggiore from Defining Bribery. ............................. 111

5.  The Court Properly Excluded Improper and Irrelevant Lay Opinion Testimony. ........ 113

6.  Evidence of Campaign Contributions was Proper. ..................................................... 117

7.  The Court Properly Permitted Questioning About Pramaggiore's Interview. ............... 119

8.  The Government Did Not Threaten Joe Dominguez. .................................................. 128

9.  The Government's Brief Misstatement During Closing Was Immediately Cured. ........ 132

10.  The Government's Rebuttal Argument Was Entirely Proper. ...................................... 135

11.  The Court Properly Admitted Marquez's Statement to Doherty Regarding Rate Legislation. ....................................................................................................................... 140

12.  The Court Properly Admitted Doherty's Text Message to Ray Nice. ........................... 143

13.  The Court Properly Admitted Emails from Janet Gallegos. ....................................... 144

14.  Considering the Trial Record as a Whole, Any Error Was Harmless. ......................... 148

**CONCLUSION** ...................................................................................................................... **149**

**INTRODUCTION**

The UNITED STATES OF AMERICA, by and through its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully submits this consolidated response in opposition to the post-trial motions filed by defendants Michael McClain (R. 265, 266), Anne Pramaggiore (R. 263, R. 264), John Hooker (R. 262), and Jay Doherty (R. 270, R. 271).

At trial, the government presented voluminous evidence of defendants' eight-year scheme to confer benefits on former Speaker of the Illinois House of Representatives Michael Madigan, including jobs, vendor contracts and subcontracts, and monetary payments for Madigan's associates and political allies, which were corruptly intended to ensure ComEd's legislative success in Springfield. Defendants' motions for judgment of acquittal under Federal Rule of Criminal Procedure 29 ignore the overwhelming evidence presented over seven weeks of trial and the deferential standard that must be applied in the context of a Rule 29 motion. Considering the evidence in the light most favorable to the government, there was ample evidence to convict all four defendants on all charges in the indictment.

Defendants' motions for new trial under Federal Rule of Criminal Procedure 33 are similarly ill-founded. Defendants misconstrue the Seventh Circuit's recent precedent in *United States v. Snyder*, 71 F.4th 555 (7th Cir. 2023). Contrary to their creative reading, the *Snyder* court reaffirmed its past precedent, and recognized that "we have refused to 'import an additional, specific *quid pro quo* requirement into the elements' of § 666." *Id.* at 579 (quoting *United States v. Agostino*, 132 F.3d 1183, 1190

1

(7th Cir. 1997)). *Snyder* made it clear yet again that the jury instructions in this case were correct. Defendants' other evidentiary and legal challenges similarly fail. There is no basis to grant a new trial.

## BACKGROUND

### *Indictment*

Commonwealth Edison Company ("ComEd"), a company headquartered in Chicago, delivered electricity to customers across northern Illinois. ComEd was a subsidiary of Exelon Corporation ("Exelon"), a utility services holding company that provided energy to customers in multiple states.

Count One of the indictment charged that between 2011 and 2019, the defendants—former ComEd lobbyist Michael McClain, former ComEd CEO Anne Pramaggiore, former ComEd Vice President of Legislative and External Affairs and ComEd external lobbyist John Hooker, and former ComEd consultant Jay Doherty—participated in a conspiracy to commit an offense against the United States. Specifically, the coconspirators agreed to confer a stream of benefits on Speaker of the House Michael J. Madigan, intending to corruptly influence and reward Madigan's efforts to assist ComEd with respect to legislation affecting ComEd's business. The indictment also charged that the conspirators sought to conceal this illegal activity by falsifying books and records to disguise the true nature of benefits provided to Madigan.

Counts Two, Five, Six, and Eight of the indictment charged the defendants with corruptly offering and agreeing to give things of value, with the intent to

influence and reward Michael Madigan in connection with state business, in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

Counts Three, Four, Seven, and Nine charged the defendants with falsifying or causing to be falsified the books and records of ComEd and Exelon, in violation of the Foreign Corrupt Practices Act of 1977, Title 15, United States Code, Sections 78m(b)(5) and 78ff(a) (the "FCPA") and Title 18, United States Code, Section 2. The charges are summarized in the table below.

| Count | Defendants | Violations | Description |
|---|---|---|---|
| 1 | McClain Pramaggiore Hooker Doherty | 18 U.S.C. §§ 371, 2 | Conspiracy to commit an offense against the United States<br>• Object 1: Violation of 18 U.S.C. § 666(a)(1)(b)<br>• Object 2: Violation of 18 U.S.C. § 666(a)(2)<br>• Objects 3 and 4: Violation of 15 U.S.C. §§ 78m(b)(5), 78ff(a) |
| 2 | McClain Pramaggiore | 18 U.S.C. §§ 666(a)(2), 2 | Corruptly offering a thing of value, related to the ComEd contract with Reyes Kurson |
| 3 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the 2017 JDDA contract |
| 4 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the January to March 2018 JDDA contract |
| 5 | McClain Pramaggiore | 18 U.S.C. §§ 666(a)(2), 2 | Corruptly offering a thing of value, related to ComEd's Board position for Ochoa |
| 6 | McClain Pramaggiore | 18 U.S.C. §§ 666(a)(2), 2 | Corruptly offering a thing of value, related to the 2018 amendment of the JDDA contract (payment of Michael Zalewski) |
| 7 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the 2018 amendment of the JDDA contract |
| 8 | McClain Pramaggiore Hooker Doherty | 18 U.S.C. §§ 666(a)(2), 2 | Corruptly offering a thing of value, related to the 2019 renewal of the JDDA contract |
| 9 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the 2019 JDDA contract |

3

*Trial*

At trial, the evidence established that defendants conferred on Madigan an enormous volume of benefits, including jobs, vendor contracts and subcontracts, and monetary payments for Madigan's associates and political allies. Those benefits were conferred for the purpose of corruptly influencing and rewarding Madigan in connection with ComEd's legislative agenda. Those benefits fell into the following categories, which are discussed in greater detail in the sections that follow:

<u>First</u>, members of the conspiracy arranged for Madigan's associates to be hired as ComEd "subcontractors," who did little or no work for ComEd. Those "subcontractors" included Frank Olivo, a former Alderman of the 13th Ward, which formed part of Madigan's legislative district; Ray Nice and Ed Moody, who were 13th Ward precinct captains; Michael Zalewski, the former Alderman of the 23rd Ward, which also formed part of Madigan's legislative district; and former legislator Eddie Acevedo. Through this subcontractor arrangement, these Madigan allies reaped approximately $1.3 million in payments even though they were effectively ghost payrollers.

Defendants concealed the nature of the payments to the Madigan subcontractors, including by falsifying internal records and by using intermediaries such as defendant Jay Doherty's consulting company (Jay D. Doherty & Associates or "JDDA"), Shaw Decremer Consulting, and the John Bradley Law Firm to indirectly pay Madigan's associates.

4

*Second*, members of the conspiracy caused ComEd to retain Reyes Kurson, a law firm whose leading partner, Victor Reyes, was particularly valuable as a fundraiser for Madigan's political operation, and continued to do so after being told that reducing the firm's hours would provoke an adverse reaction from Madigan—even though there was not sufficient work to justify the firm's continued retention.

*Third*, members of the conspiracy caused Juan Ochoa to be appointed to ComEd's board of directors at Madigan's request, despite reservations expressed by other ComEd officials.

*Fourth*, members of the conspiracy caused ComEd to set aside summer internship positions for, and gave preferential treatment to, individuals identified by McClain and associated with Madigan and the 13th Ward.

*Fifth,* members of the conspirators arranged for numerous other hires and appointments at Madigan's request.

On April 11, 2023, just before the close of the government's case-in-chief and the conclusion of all evidence, defendants filed Rule 29 motions for judgment of acquittal, arguing that the evidence was insufficient as to the charges against them. R. 213, 214, 215, 218, 220, 238, 240, Tr. 5127:16-19.[1] The Court rejected defendants' arguments, finding the evidence presented by the government sufficient to proceed on all counts. R. 222; Tr. 3884:24-3887:15; 5127:20-25.[2]

---

[1] The trial transcript is referred to herein as "Tr."

[2] At the end of the day on April 11, 2023, the government indicated that it was approximately 5 to 10 minutes from resting its case-in-chief. The parties agreed that defense would file its written Rule 29 motions and the Court would rule on those motions before the government

5

On May 2, 2023, after approximately seven weeks of trial, a jury returned verdicts of guilty against all defendants on Count One and against the defendants named in Counts Two through Nine.

### Post-Trial Motions

Each defendant filed separate post-trial motions, seeking judgments of acquittal on various counts and a new trial on other grounds of claimed error. R. 262-266, R. 270-271. For the reasons discussed below, the motions should be denied.

## ARGUMENT

### I.     The Defendants' Motions for Judgment of Acquittal Should Be Denied.

As explained below, the government presented abundant evidence supporting defendants' guilt. The defendants make essentially the same arguments this Court rejected in denying the defendants' motions for judgment of acquittal under Rule 29. Tr. 3884:24-3887:15; 5127:20-25. In doing so, the defendants ignore the standard applied to a motion for judgment of acquittal and fail to analyze the evidence in the light most favorable to the government. The Court should reject defendants' renewed sufficiency arguments for the same reasons it rejected defendants' Rule 29 motions. The defendants' position is even weaker than at the end of the government's case-in-chief, as Anne Pramaggiore and John Hooker's testimony was plainly false and undermined the defenses they sought to pursue. As Judge Learned Hand explained long ago, the jury's impression of a witness's credibility "may satisfy the tribunal, not

---

formally rested. Tr. 3865:1-3866:10, 3867:14-3868:7. The government rested its case-in-chief on April 12, 2023. Tr. 3906:21.

only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952). The jury had ample reason to reject their testimony and their interpretation of the government's evidence.

### A.      Legal Standard for Judgment of Acquittal

A motion for a judgment of acquittal challenges the sufficiency of the evidence to sustain a guilty verdict against a defendant. Fed. R. Crim. P. 29. A defendant faces "a nearly insurmountable hurdle" in contending that the jury had insufficient evidence to find him guilty. *United States v. Armbruster*, 48 F.4th 527, 531 (7th Cir. 2022). In reviewing a motion for a judgment of acquittal, this Court reviews the evidence presented to the jury in the light most favorable to the government and makes all reasonable inferences in the government's favor. *See United States v. Cejas*, 761 F.3d 717, 726 (7th Cir. 2014). This Court may overturn the jury's verdict "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (internal marks omitted). It was the jury's role to weigh the evidence and assess the witnesses' credibility; courts do not "second-guess the jury's assessment of the evidence." *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008).

### B. The Government Presented Sufficient Evidence to Sustain Convictions on Count One.

The government's evidence established that the defendants conspired: (1) to corruptly influence and reward Michael Madigan in connection with his official duties as the Speaker of the Illinois House of Representatives, in order to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and to defeat of legislation unfavorable to ComEd and its business; (2) to create false contracts, invoices, and other books and records to disguise the true nature of benefits paid to Madigan's associates; and (3) to circumvent internal controls. Below is a brief summary of the evidence of the Count One conspiracy, before turning to the defendants' individual arguments. Based on this evidence, considered in the light most favorable to the government and drawing all inferences in its favor, the jury's verdict is easy to sustain.

### *Defendants Corruptly Arranged to Hire Madigan Allies as Subcontractors*

Over the course of approximately eight years, ComEd paid $1.3 million dollars to former Speaker Michael Madigan's political allies, who did little to no work for ComEd. GX876. These no-show subcontractors—who were paid indirectly through intermediaries such as JDDA—included former Alderman Frank Olivo, precinct captain Ray Nice, precinct captain Ed Moody, former Alderman Mike Zalewski, and former legislator Eddie Acevedo. Consistent with the recordings and documentary evidence, cooperator Fidel Marquez confirmed his—and the defendants'—corrupt intent when he testified that the defendants paid the subcontractors at the request of Speaker Madigan to benefit the company's legislative agenda in Springfield and

8

that he did not expect the subcontractors to do any work for ComEd. *E.g.,* Tr. 1903:14-1904:13 (Marquez did not expect Olivo and Nice to do work for ComEd because they were brought on to gain favor with Madigan so that he would be helpful to ComEd's legislative agenda); Tr. 1959:2-13 (Marquez understood Pramaggiore did not expect the subcontractors to do any work based on his conversations with her); Tr. 2023:12-14 (Marquez understood Pramaggiore did not want to interfere with the subcontractors and get Madigan's "nose out of joint"); Tr. 2027:4-12 (stating Marquez understood Hooker to say that, if ComEd discontinued the subcontractor relationship, it would signal to Madigan that he did not have to support ComEd legislation).[3]

These subcontractor payments were made and discontinued at Madigan's direction. As with Madigan's other illegal demands, McClain acted as the conduit to convey them to ComEd officials, ensured that the demands were complied with, monitored the payment of the Madigan associates, and oversaw adjustments when necessary during the conspiracy. For example, on May 16, 2018, Madigan told McClain to talk to Pramaggiore about adding former Alderman Michael Zalewski as a ComEd subcontractor. GX21. That same day, following Madigan's direction, McClain asked Pramaggiore if she had given more thought to adding Zalewski as a subcontractor. GX22. Without hesitation, Pramaggiore confirmed that she had told Marquez to add Zalewski: "Yeah, I told Fidel [Marquez] to hire him. To get it done."

---

[3] *See also* Tr. 1866:24-1867:6 (Marquez testified that Pramaggiore indicated that "having Michael Madigan negatively disposed towards ComEd . . . could make our bills difficult to pass or it could even lead to a bill being defeated"), *id.* at 1874:7-22 (Marquez was concerned about the reaction not fulfilling Madigan's requests would cause, because he was concerned Madigan would be negatively disposed toward ComEd's legislative agenda);

*Id*. Later that same day, McClain told Marquez that ComEd would pay Zalewski "five," or $5,000, per month. GX23. In doing so, McClain summarized the value of each of the Doherty subcontractors—not as legitimate lobbyists, but to Madigan's political operation. For example, McClain told Marquez, "Ray Nice, he's, um, one of, um, he's one of the top three precinct captains, and he also trains, uh, people how to go to door to door." *Id*. Later that same afternoon, McClain called Madigan to confirm that Madigan—with Pramaggiore's blessing—would give Zalewski the good news. GX25.

The conspirators intentionally structured the payments in a way that allowed them to deny responsibility if law enforcement ever questioned what work, if any, Madigan's associates were performing. In the same call where McClain told Hooker that Madigan had asked for Zalewski to "work under Jay Doherty," Hooker bragged about having set up the subcontractor arrangement with McClain to conceal the payments; Hooker described the arrangement as being "off the beaten path" because there's "just no flow through there." GX12. In another call, McClain and Hooker joked that they were "creative" in the arrangement they had set up with the Madigan subcontractors. GX17. Ultimately, Zalewski was engaged as a subcontractor under the Doherty contract, just like the other Madigan subcontractors. Tr. 1953:25-1955:13. And just like the other subcontractors, Zalewski did no work for ComEd. Tr. 1954:25-1956:4.

Ed Moody, another of the Madigan associates who was paid indirectly by ComEd, testified at trial, and confirmed that the ComEd's subcontractor payments

were designed to give Madigan a way to pay his most valuable political allies. Moody testified about his success working for Madigan's political operation, and that Madigan ranked him and his twin brother, Fred, first among all precinct captains and workers. *See, e.g.,* Tr. 3648:21-3651:6. Moody explained that Madigan rewarded him for his political efforts by arranging for him to receive payments from ComEd lobbyists—first McClain, then Doherty, then Shaw Decremer, and finally John Bradley—even though he performed little or no work. Tr. 3617:13-3618:16. Ed Moody testified that he created some monthly reports for Mike McClain—essentially, make-work—and that he understood the purpose of the payments from McClain was "to stay active in my politics." Tr. 3680:22-3682:12, 3689:25-3692:16.[4] After he started getting paid by Doherty in 2014, the only work he did for his ComEd paychecks was work for Madigan's political organization knocking door-to-door. Tr. 3699:8-13; 3714:15-21. And when Moody finally was cut off from payment because he became Cook County Recorder of Deeds, it was Madigan, not ComEd, who made the decision to cut him off. GX109. McClain delivered the news, though he also told John Bradley, who was paying Moody on behalf of ComEd at that point, that he should characterize the final payment he made to Moody as a holiday "bonus." GX111. This, of course, was a lie, because Moody never did a single iota of work for Bradley, much less anything that would entitle him to a "bonus." Tr. 3762:1-12.

---

[4] On cross examination, Moody testified that he had performed an additional 225 hours of canvassing work for McClain. Tr. 3790:7-3796:8 This work did not compare to his political work, and any ComEd related work ceased after Moody was switched to the other intermediaries, including Doherty. Tr. 3817:15-3818:1; 3714:7-3719:19; 3729:25-3730:1; 3736:2-25; 3743:8-19; 3762:1-12.

In defendants' discussions about whether to renew Doherty's contract in 2019, after new ComEd CEO Joe Dominguez took over after Pramaggiore's promotion, the conspirators specifically explained in recordings that these payments at Madigan's request were critical to ComEd's legislative success. When Fidel Marquez and John Hooker met to discuss the subcontractor arrangement in January 2019, Hooker told Marquez that "me and McClain was, I was the one that created it," referring to the subcontractor arrangement. GX118; Tr. 2001:1-11. Hooker strategized with McClain about how to explain the subcontractors to Dominguez, Pramaggiore's successor as ComEd CEO: "with the Jay Doherty stuff . . . you got a little leg up," a reference to the advantage ComEd gained with its legislative agenda as a result of the bribes paid to Madigan allies. GX148. He added, referencing the need for concealment of the subcontractor arrangement: "that which is understood need not be mentioned." GX148.

A recorded meeting between Marquez and Doherty on February 13, 2019, again confirmed that the subcontractor payments were kept secret and that they were linked to ComEd legislation. When Marquez asked Doherty about the work the subcontractors performed, Doherty responded, "[T]hey keep their mouth shut . . . [D]o they do anything for me on a day to day basis? No." GX129. Doherty also told Marquez that Hooker set up the first payments to Olivo in 2011 and that every 6 or 8 months Hooker would call Doherty to check on the subcontractors and report back to Madigan. *Id*. When Marquez asked Doherty if the subcontracts should be renewed even though the subcontractors did not work, Doherty expressly linked the

subcontractor payments to ComEd's legislative success: "Your money comes from Springfield, right?" He followed up: "[I]f it ain't broke, don't fix it with those guys." *Id.*

Similarly, Anne Pramaggiore directly tied the subcontractor payments to ComEd's fortunes in Springfield when she discussed the subcontractor arrangement with Marquez. On February 18, 2019 (after she had been promoted to be CEO of Exelon Utilities, a position that gave her oversight authority over ComEd's operations, Tr. 1990:9-16, 4635:7-14), she instructed Marquez to wait to change Doherty's contract (including payments to the ghost payrollers) until the legislative session ended, saying:

> [L]et's not do it until after the session's over. Let's look at this in terms of going forward to next year because we do not want to get caught up in a, you know, disruptive battle where, you know, somebody gets their nose out of joint and we're trying to move somebody off and then we get forced to give 'em a five-year contract because we're in the middle of needing to get something done in Springfield.

GX131.

Defendants' other efforts to conceal the subcontractors further demonstrated the illicit nature of the arrangement. Janet Gallegos (Doherty's administrative assistant) and Elizabeth Lynch (Director of Corporate Accounting at Exelon) testified that Doherty's invoices said nothing about subcontractors. *See, e.g.*, Tr. 2811:18-20; 2853:2-6; 3489:20-3489:23. Gallegos and Carrie Bourque (principal category manager for Exelon, who created and executed contracts for ComEd consultants) likewise testified that the contracts between Doherty and ComEd said nothing about the

subcontractors. *See, e.g.*, Tr. 2889:16-18; 3295:19-3298:20; 3304:6-19; 3309:25-3310:10. Lynch further testified that ComEd's internal accounting records also said nothing about the subcontractors, and instead stated that the payments to the intermediaries were for categories such as "legislative services," without any mention of the fact that a substantial portion would be passed on to Madigan associates. *See, e.g.*, Tr. 3503:4-7; 3505:10-12; 3507:3-10; 3509:5-8; 3511:4-13.

Doherty's contract was under the ComEd CEO's budget, which meant that from time to time, Pramaggiore was required to sign a "single source justification" form that explained why it was necessary to pay for Doherty's services at the rate invoiced. On two occasions, Pramaggiore signed single source justification forms that provided false explanations for why Doherty was being paid hundreds of thousands of dollars each year. GX484; GX868. Rather than making plain that a substantial portion of the money was destined for Madigan's associates, the forms made it appear that the payments were just for Doherty on account of his expertise. *Id.* Because Pramaggiore—the CEO of the company—attested to the importance of Doherty, this further insulated the illegal activity from discovery by others involved in the company's audit function.

The false statements made to justify the mid-year addition of former Alderman Zalewski to Doherty's payroll in 2018 was a particularly egregious example. On June 29, 2018, Doherty signed a contract amendment increasing monthly payments from ComEd to JDDA by $5,000 per month, to $37,500 per month. That contract amendment falsely stated that JDDA was retained for June 1, 2018 to January 13,

14

2019 to provide "Government and Public Affairs Professional Services for the following: City Council, Department heads and Mayor's Office, plus expanded role with Cook County Board President's office and Cook County Commissioners Department Heads." GX544*; see also* GX546. This amendment was for the sole purpose of adding payments to Zalewski; Zalewski performed no work in relation to the Cook County Board President or Commissioners, and the internal documentation in ComEd's books and records said nothing about Zalewski.

As a result of defendants' circumvention of ComEd's internal controls, ComEd's books and records did not accurately reflect that a large portion of the money that Doherty received from ComEd went to the Madigan subcontractors, and that the true purpose of these payments was to bribe Madigan.

As to the subcontractors, the evidence at trial thus demonstrated that (i) Madigan associates were paid huge amounts of money in return for no work; (ii) payments were made and discontinued at Madigan's direction; (iii) conspirators boasted about the hidden, "off the beaten path" nature of the indirect payments, which allowed them to deny responsibility if federal law enforcement ever questioned what work, if any, Madigan's associates were performing; (iv) conspirators specifically explained in recordings that making and keeping Madigan happy—to ensure that the company's legislative agenda was not disrupted—was the reason to continue to pay the ghost payrollers, even though they did no real work; (v) the conspirators caused the falsification of internal company documentation to falsely describe the nature of payments destined for the ghost payrollers; and (vi) the

15

payments to Madigan's do-nothing associates continued to flow as the company sought substantial legislative action in Springfield.

### *Defendants Corruptly Arranged for Juan Ochoa's*
### *Appointment to the ComEd Board*

Numerous interceptions and emails demonstrated defendants' corrupt intent to influence Madigan by securing Juan Ochoa's appointment to the ComEd Board of Directors at Madigan's request. The evidence reflected there was internal resistance within ComEd to the appointment of Ochoa; the resistance was stiff enough that Pramaggiore offered to find another placement for Ochoa within the company that would pay Ochoa $78,000 a year—an offer she conveyed to Madigan through McClain. GX15. Despite the internal resistance and challenges to Ochoa's appointment, Madigan told McClain to "continue to support" and "go forward with" Ochoa's appointment to the Board, because he wanted to stay in good favor with Congressman Gutierrez, who had recommended Ochoa to Madigan. GX15; GX21; Tr. 3531:15-18. McClain passed that message to Pramaggiore, who confirmed she would "keep pressing" to get Ochoa appointed to the Board, as Madigan requested. GX22.

Madigan and McClain discussed that Madigan would call Ochoa and Congressman Gutierrez himself to deliver the news himself—showing not only that Madigan was the driving force behind the appointment, but the irregular nature of the process involved in making this decision. GX64. Pramaggiore knew Madigan would be calling Ochoa himself. *E.g.,* GX3; GX548, GX63, GX128.

Pramaggiore kept pushing to move the Ochoa appointment along. *E.g.,* GX550, GX551, GX554. Pramaggiore took credit for the push to appoint Ochoa and

16

overcoming the resistance she had experienced: "I got that done." GX65. She told McClain when it was all but official that Ochoa should be on the board, although she "didn't want to put it in writing," GX90, *see also* GX128.

Just like the payments to the subcontractors, securing the Board seat for Ochoa benefited Madigan because it furthered his political interests. Tr. 1650:13-1651:9 When McClain told her he appreciated her efforts regarding Ochoa, Pramaggiore's response recognized that the appointment was linked to ComEd's legislative agenda: "[Yo]u take good care of me and, and so does our friend and I will do the best that I can to, to take care of you." GX90. And take care of Madigan ("our friend") she did—Ochoa was appointed to the ComEd Board in April 2019. Tr. 3542:4-5. Just like the subcontractor payments, the defendants linked the appointment to the ways Madigan could benefit ComEd in terms of its legislation in Springfield.

### *Defendants Corruptly Arranged for Reyes Kurson's Contract*

Defendants further corruptly arranged for Reyes Kurson to be retained as one of ComEd's outside attorneys, and to ensure that the firm had a contract guaranteeing a set number of hours of work. The reason was not Reyes Kurson's bona fides—in fact, Nicole Nocera, Pramaggiore's chief of staff—testified that Reyes Kurson's work for ComEd was sub-par. Tr. 3394:17-3395:25. Instead, Reyes Kurson was engaged on favorable terms because Victor Reyes was one of Madigan's top fundraisers. Tr. 1180:1-12; 1182:11-19.

ComEd first engaged Reyes Kurson in 2011, at a time when defendants sought to influence and reward Madigan in connection with the Energy Infrastructure

Modernization Act ("EIMA") legislation. Tr. 1180:23-1182:10. When the contract came up for renewal in 2014, Pramaggiore told General Counsel Tom O'Neill to go forward, despite O'Neill telling her that "there is not a ton of work" for them to do. Tr. 1188:6-20. And in 2016, when Tom O'Neill sought to reduce the number of hours that ComEd guaranteed Reyes Kurson, McClain looped in Pramaggiore and Hooker to make sure the contract was negotiated on favorable terms—all while ComEd was working to get its Future Energy Jobs Act ("FEJA") legislation passed. Tr. 1202:9-1205:20, 1141:13-1142:1 (discussing the multi-year effort to pass FEJA from late 2014/early 2015 to the end of 2016).

In a January 2016 email, McClain raised to Pramaggiore and Hooker that ComEd was trying to cut Reyes' hours. He said to them: "I know the drill and so do you. If you do not get involve[d] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend. Our Friend will call me and then I will call you." GX318. McClain threatened that such a step would "provoke a reaction from our Friend," or Madigan. *Id*. This email vividly demonstrated what motivated McClain, Hooker, and Pramaggiore in contract negotiations with Reyes Kurson: influencing and rewarding Speaker Madigan, to avoid an adverse outcome in the General Assembly. *Id*. Pramaggiore acted quickly, apologizing for the delay, before responding, "I am on this." GX320. Just ten days later, she reported back to McClain: "I asked Fidel [Marquez] and Tom [O'Neill] to address this." GX321. The project manager for the passage of FEJA, Marc Falcone, was enlisted to ensure that the law firm got what it wanted—even though Falcone was responsible for ensuring that

18

nothing was an obstacle to the passage of FEJA and had nothing whatsoever to do with the retention of law firms by the company. Tr. 1228:18-1230:15.

As promised, ComEd renewed the contract with Reyes Kurson in 2016. Tr. 1252:7-12. ComEd did the same for 2017, after Pramaggiore again stepped in to ensure the renewal. Tr. 1257:11-13; GX393.

### *Defendants Corruptly Arranged for the Hiring of 13th Ward Interns*

Defendants set aside summer internship positions for, and gave preferential treatment to, individuals identified by McClain and associated with Madigan's Ward, the 13th Ward. Unlike any other ward in Chicago, a set number of intern slots were reserved for 13th Ward candidates. GX431; Tr. 2088:2-2092:9. ComEd also routinely waived eligibility requirements, such as GPA requirements, that were ordinarily required of its interns so that 13th Ward candidates would be hired. Tr. 2091:10-22; 2156:4-2157:8. The evidence showed that ComEd hired these interns to influence and reward Madigan, even when they lacked the requisite credentials. *E.g.,* GX226. For example, McClain recommended Jackie Sweeney for an accounting internship on behalf of Madigan. When ComEd's Chief Financial Officer asked if there was "pressure to hire her or just fairly consider," Marquez confirmed that there was "pressure to hire." Tr. 2116:18- 2118:2; GX294. The evidence also showed that

19

Pramaggiore and Hooker were well aware of the 13th Ward intern "pathway," as McClain called it. GX425 (referring to the intern program as "our Friend's pathway").

### *Defendants Corruptly Arranged for Other Hires At Madigan's Request*

Defendants arranged for numerous other hires and appointments at Madigan's request. For example, Madigan, through McClain, requested that ComEd hire Kathy Laski. Defendants bent over backwards to arrange for her to be hired, even though she struggled with interview questions, refused to do basic aspects of ComEd's work, and was unqualified for the job. Tr. 2237:13-2251:5. Despite all this, there was such a "strong need" to hire Laski that it made it to Pramaggiore's "radar." Tr. 2243:4-2244:24; GX 354.

In other instances, McClain passed on job requests from Madigan for individuals who could not pass basic entry level examinations. *E.g.,* GX276; GX271. Yet defendants continued to press for these individuals to be hired. These additional requests and actions were additional evidence of defendants' corrupt scheme to influence and reward Madigan. The degree to which ComEd provided jobs to unqualified candidates in order to influence Madigan vividly demonstrated that these decisions were not made in the ordinary course.

### *Connection of the Hires to ComEd's Legislative Success*

Described above are merely a few examples of the many requests McClain presented to ComEd, on behalf of Madigan. As many calls and emails demonstrated— and as Fidel Marquez confirmed when he testified—the defendants corruptly sought to make these hires to ensure that Madigan would act favorably with regard to

ComEd legislation in Springfield and not place obstacles in the way of ComEd's legislative agenda.

A call between McClain, Pramaggiore, and Hooker on February 20, 2019, underscored the corrupt nature of these hires. GX136. In that call, the three defendants discussed who would become the primary point of contact with Madigan, given that McClain had retired from lobbying and Pramaggiore had moved to Exelon Utilities. *Id.* According to McClain, that person would have to know that "when they get the call . . . they gotta snap to and, and do it right away." *Id*. Pramaggiore agreed. McClain further expressed concern that Dominguez, ComEd's new CEO, would think "that this is a *quid pro quo* and that he's wired." *Id.*

In a later call, McClain again referred to the "code" they used with Madigan, in which a request to "take a look at this resume" really means, "Will you drop and do and try to get this done as fast as possible." GX139.

The defendants' efforts to bribe Madigan paid off through a string of legislative successes. ComEd got EIMA passed in 2011, with Madigan's vote. Tr. 791:3-12; 1459:18-23. Scott Vogt—Vice President for Strategy and Energy Policy for ComEd— testified that Madigan's support was critical to moving the EIMA legislation forward: he allowed the bill to proceed through committees to the House floor, and the bill likely would have died without his support. Tr. 817:6-16. Just two years later, Senate Bill 9 was enacted into law, again with Madigan's support. Tr. 824:23-24; 1135:3-1136:6. And in December 2016, Madigan helped to push for the final votes needed to pass FEJA, as Will Cousineau testified and as emails and calls corroborated. *E.g.*,

GX19, GX628; Tr. 1621:2-1625:7. As witness after witness testified, major legislation could not move without Madigan's support, and the company viewed this support as critical. *See, e.g.*, Tr. 817:6-9 (Scott Vogt regarding EIMA); Tr. 845:21-846:5 (Vogt regarding FEJA); Tr. 1459:18-20 (Tom O'Neill regarding EIMA); Tr. 1833:5-17 (Marquez explaining that the Speaker's vote was critical to passing legislation).[5] In short, there was ample evidence from which the jury could find that the defendants conspired to corruptly offer things of value to Madigan for the purpose of ensuring the passage of legislation affecting ComEd.

### C. The Government Presented Sufficient Evidence to Sustain Convictions on the Conspiracy and Corruption Counts.

The government turns to the sufficiency arguments presented by each defendant as to the conspiracy and corruption counts: Count One (in part), Two, Five, Six, and Eight. Defendants' efforts to nitpick each piece of the government's case ignores the vast body of evidence that the jury relied upon to convict.

#### 1. A *Quid Pro Quo* Is Not Required.

Defendants yet again argue that a violation of 18 U.S.C. § 666 requires the government to prove a *quid pro quo*. Pramaggiore and McClain make this argument in support of their Rule 29 motions. R. 266 at 5-6 (McClain); R. 264 at 9 (Pramaggiore). All defendants make this argument in support of their Rule 33 argument. The government address that argument in detail in Section II.B.1, below.

---

[5] *See also, e.g.,* Tr. 436:11-14 (Sente, testifying about Madigan's control over legislation); Tr. 563:22-565:7 (Drury, testifying that Madigan "had the ultimate authority over legislation and its movement through the Illinois House," could block bills he did not want passed, and "was the most powerful politician in Illinois").

In a decision handed down after trial in this matter, the Seventh Circuit again reaffirmed its prior holdings that have "refused to import an additional, specific *quid pro quo* requirement into the elements of § 666." *United States v. Snyder*, 71 F.4th 555, 579 (7th Cir. 2023). This Court's prior rulings declining to import a *quid pro quo* requirement onto § 666 were correct. *E.g.*, R. 83; Tr. 3885:10-25. In any case, for the reasons discussed below, there is sufficient evidence for the jury to conclude that there was in fact a *quid pro quo* with Madigan concerning the passage of legislation affecting ComEd.

### 2. Arguments Raised by Defendant Pramaggiore

#### a. Ample Evidence Established that Actions Pramaggiore Took Were In Connection with Legislation.

Pramaggiore first argues that there was insufficient proof that defendants bestowed benefits on Madigan for the purpose of influencing and rewarding her "in connection with legislation impacting ComEd." R. 264 at 9-14. Ample evidence in the record supported the jury's conclusion to the contrary.

Take, for example, Pramaggiore's own words. When she spoke to Marquez about renewing the Doherty contract for 2019, she explained that it should be renewed because, otherwise, the company would be "forced" to give someone a five-year contract "in the middle of needing to get something done in Springfield." GX 131. Marquez confirmed that, at the time of this call, ComEd was working to pass the "Skinny Bill" rate legislation (Tr. 2024:2-7), and that events in Springfield would not be a legitimate reason to change the Doherty contract, as Doherty did not lobby in Springfield. Tr. 2022:13-15. As if this were not enough, Marquez confirmed that the

23

payments to the subcontractors—who did little to no work for ComEd for eight years—were for the purpose of corruptly influencing Madigan so he could help ComEd's legislative agenda. *See, e.g.*, Tr. 1904:10-1905:14.

Pramaggiore similarly acknowledged the "understanding" ComEd had developed with Madigan, when she told Doherty in an October 2014 email that it had been a "long path" with Madigan and that "relationships always require care." GX268. She continued: "Thanks for your help in creating an understanding," a coded reference to Doherty's payment of the Madigan subcontractors. *Id.*

Pramaggiore was also acutely aware of the connection between Reyes Kurson's contract renewal and ComEd's success with its FEJA legislation in 2016. On January 18, 2016—contemporaneous with FEJA negotiations—McClain wrote ComEd General Counsel Tom O'Neill with a historical record of the hours that Reyes Kurson billed and questioned whether ComEd intended to offer Reyes Kurson less than 850 hours per year during the renewal. GX 315. McClain copied Fidel Marquez and John Hooker, neither of whom had a role in ComEd's legal department or was typically involved in law firm negotiations but who were working on FEJA. *Id.*; Tr. 1200:5-21.

On January 20, 2016, McClain included Pramaggiore in the discussion:

> I know the drill and so do you. If you do not get involve[d] and resolve this issue of 850 for his law firm per year, then he will go to Our Friend. Our Friend will call me and I will call you.
>
> Is this a drill we must go through?
>
> For me, Hook[er] and I am sure for you I just do not understand why we have to spend valuable minutes on

24

> items like this when we know it will provoke a reaction from our Friend.

> I just felt compelled to not follow the chain of command and inform you.

GX320. Pramaggiore knew exactly what was being threatened when McClain said that Madigan would have an adverse "reaction" if the Reyes Kurson contract did not get renewed: Madigan would negatively impact ComEd's legislation. In fact, Pramaggiore did not ignore McClain's message but quickly responded, "Sorry. No one informed me. I am on this" (GX320), and immediately forwarded McClain's email to O'Neill with no further text. GX318; Tr. 1209:23-1210:5. In O'Neill's experience, Pramaggiore took "action to avoid provoking problems with Speaker Madigan." Tr. 1205:18-20. This was certainly an example.

Later, after more follow-up from McClain, Pramaggiore said, "I asked Fidel [Marquez] and Tom [O'Neill] to address this." GX 321. O'Neill testified that he asked Pramaggiore whether he had to renew the Reyes Kurson contract even though there was not enough work for the firm, and Pramaggiore answered "yes." Tr. 1188:8-20.

On March 5, 2016, McClain again wrote O'Neill, copying Marquez, about the Reyes-Kurson contract. Specifically, he said he "talked with our Friend"—again, a reference to Madigan—and asked if ComEd would consider increasing the Reyes Kurson contract by another 10 hours. GX 327. On, April 29, 2016, when McClain sent O'Neill the Reyes Kurson contract language with a note "This does it," he copied Mark Falcone, project manager for FEJA, who was close with Pramaggiore and whose job involved removing any obstacles to the passage of FEJA—not managing the head of

the law department. GX 334; Tr. 1228:17-1230:15. O'Neill testified, "What I understood is that Mark worked closely with Anne, and Mark was paying attention to this; and it told me that Anne was paying attention to this." Tr. 1230:13-15. In short, O'Neill's testimony made it crystal clear that he felt pressure from his boss, Anne Pramaggiore, to retain Reyes Kurson on the terms Madigan wanted, as directed by McClain.

The jury also heard from Fidel Marquez about the intern slots reserved for candidates from Chicago's 13th Ward "as a request from and in favor for Michael Madigan" so that ComEd could stay in a "favorable light for [ComEd's] legislative agenda." Tr. 2088:3-2089:12. ComEd routinely waived eligibility requirements, such as GPA requirements, that were ordinarily required of its interns. Tr. 2091:10-22. Emails confirmed that ComEd hired these interns to influence and reward Madigan, even if they lacked the requisite credentials. Take, for example, McClain's April 16, 2013, email to Marquez, in which he copied Pramaggiore:

> Fidel,
>
> We offered our friend six summer jobs. . . .
>
> Attached is a request for a person to work in our legal department this year. He will not learn very much and he will not be able to contribute much, if anything, but that is still the ask.
>
> Oh, he asked if this one could be in addition to the six. I said "sure."

GX226. Marquez confirmed that it was not "typical, ordinary practice to offer a block of jobs to a political official." Tr. 2096:25-2097:3. This was done because Madigan

controlled ComEd's legislative agenda, and Pramaggiore and the other defendants knew it.

Pramaggiore's tremendous efforts to appoint Juan Ochoa to the ComEd Board of Directors, discussed above, were connected to ComEd legislation. When McClain told Pramaggiore that Madigan wanted her to "keep pressing" for Ochoa despite internal resistance, Pramaggiore said she would do exactly that—she would "keep pressing," as Madigan requested. GX22. When she was receiving pushback about the Ochoa appointment, Pramaggiore complained to Marquez: "I don't have the luxury of being incensed about it. Right thing for the company is to deal with it. So, we need to move forward so anyway, I'm gonna have to deal with that." GX71. From this, the jury could readily infer that Pramaggiore pushed for Ochoa's appointment to ensure ComEd's legislative success. Indeed, when McClain told her he appreciated her work regarding Ochoa, Pramaggiore confirmed this was what she meant: "[Yo]u take good care of me and, and so does our friend and I will do the best that I can to, to take care of you." GX90.[6]

Pramaggiore argues that, by introducing evidence of her thank you notes and flattery, the government encouraged the jury to convict based on "speculation or mere association" with Madigan. R. 264 at 11-12. This argument lacks merit. The jury was not required to view the evidence the way Pramaggiore would have it; indeed, this Court must review the evidence in the light most favorable to the verdict, not the

---

[6] Contrary to Pramaggiore's argument (R. 264 at 9 n.3), this call demonstrates that Pramaggiore made a hiring decision because of Madigan's past favorable action for ComEd, sufficient to support conviction under a gratuity theory. *See also* GX393.

defendant. Besides, the government's evidence did not stop at proving a friendship between Pramaggiore, Madigan, and McClain. Indeed—the sheer volume of the benefits discussed during the trial undermine any notion that Pramaggiore's words were mere flattery or puffery, or that the multi-million dollar benefits she orchestrated were merely acts of friendship or goodwill. *See, e.g., United States v. Rosen*, 716 F.3d 691, 703 (2d Cir. 2013). To the contrary, the recordings, emails, and testimony amply demonstrated that Pramaggiore and the other defendants linked the benefits conferred on Madigan with his assistance advancing ComEd's legislative agenda.

It is of no moment that no one testified at trial that Pramaggiore asked Madigan for special action, as Pramaggiore suggests. R. 264 at 10. Pramaggiore need not have made a direct ask to satisfy this element of the offense. As Hooker said, "that which is understood need not be mentioned." GX148; *see also United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) ("Few politicians say, on or off the record, 'I will exchange official act X for payment Y.'"). The abundant evidence pointed in a clear direction—not merely based on speculation, as Pramaggiore argues (R. 264 at 10-11)—that the massive benefits conferred on Madigan were intended to secure ComEd's good fortune in Springfield. Pramaggiore's—and the other defendants'— willingness to cater to Madigan's many demands and defendants' own conversations about those benefits showed that they were motivated by ComEd's legislative agenda.

Pramaggiore is wrong about the inferences that can be drawn from the timing benefits were conferred on Madigan. As the government argued, many of the critical

benefits conferred on Madigan were clustered at critical points in ComEd's legislative process. Below is a timeline presented to the jury during the government's closing argument, which shows the overlap in those critical dates.



EIMA is a good example. Although Madigan allowed a vote on EIMA in May 2011 and Olivo was first paid in August 2011, as Pramaggiore notes (R. 264 at 12), EIMA did not pass until the fall of 2011. Tr. 1049:1-10. Thus, at the time defendants first agreed to hire Olivo (and also Nice, who was paid later), EIMA was a hotly contested piece of legislation that had not been passed. In fact, the defendants not only agreed to hire the two Madigan subcontractors; they also arranged for the first Reyes Kurson contract on October 25, 2011, just one day before the Governor's veto of EIMA was overridden and the legislation thus passed its final hurdle in the General Assembly. Tr. 1185:16-1186:10; GX791; GX807. The fact that these two critical benefits were conferred on Madigan on the eve of EIMA's passage is strong evidence that the defendants bribed Madigan in late 2011 in order to secure Madigan's support for EIMA.

Pramaggiore also argues that the purpose of the scheme could not have been to influence Madigan in connection with legislation, because Madigan sometimes

acted favorably towards ComEd prior to the first bribes in 2011, and because Madigan sometimes took adverse action against ComEd while the scheme was ongoing. R. 264 at 12-13. The jury could easily conclude that the corrupt payments were meant to ensure ComEd's success on the big-ticket items—indeed, McClain explained during an intercepted call with a ComEd employee that Madigan would be advised of what ComEd's "bottom line" was, so that he would be on the same page with the company. GX138. And, when it came to the bottom line, ComEd reaped hundreds of millions of dollars in benefits from the legislation Madigan supported. Tr. 824:3-6; 827:12-22; 847:15-22.

Pramaggiore also argues that the government failed to present evidence of a "typical" bribery scheme—*i.e.*, one with a personal benefit to Madigan. R. 264 at 13. The cases Pramaggiore cites do not support the proposition that cash must flow directly into a politician's pocket to prove bribery. The jury instructions merely required that defendants give "a thing of value to another person" with corrupt intent. R. 249 at 37. Indeed, the jury heard ample evidence about how ComEd's payments to Madigan allies benefitted Madigan. For example, Ed Moody testified about his role as a top precinct captain bringing out votes for Madigan, and that he understood that the purpose of the payments he received from ComEd was to "stay active in my politics." Tr. 3651:3-6; 3692:14-16.

In fact, Moody testified that he saw Madigan while he was being paid through John Bradley, and "expressed to him that I was concerned that I had a contract that indicated that I would be doing work for ComEd and that I hadn't been given any

assignments." Tr. 3752:2-6. Madigan told him, "That's okay, what you're doing right now is what's important to me, it's what's important to John Bradley, it's what's important to ComEd." Tr. 3752:7-10. Moody understood this to mean that he should "keep doing my political work" and that "my political efforts would be an advantage to John Bradley and ComEd." Tr. 3752:11-14. A reasonable jury could conclude that those payments benefitted Madigan by rewarding Moody, a loyal member of his political operation, and ensuring that Moody would still have time and the incentive to continue working for Madigan. In fact, Moody understood that if he stopped working on Madigan's political campaigns, he "would lose the contract," or payments he was getting from ComEd. Tr. 3661:17-3662:11. If Pramaggiore's argument were to be accepted, bribery could be legalized by the simple expedient of ensuring that all payments benefitting a corrupt public official passed through the hands of others— such as his friends and relatives. That is obviously not the case.

Pramaggiore also argues that there was no need to bribe Madigan, because ComEd's legislation benefited the public interest. R. 264 at 13. This argument is frivolous because it suggests that so long as legislation provides a net benefit, efforts to procure its passage through bribery are immunized from prosecution. That is obviously not the case. In any case, the jury heard evidence that ComEd faced challenges in getting its legislation passed before 2011. *E.g.,* Tr. 791:15-795:18 (testimony of Vogt). And, as discussed in detail above, the jury heard abundant evidence that the defendants were extremely focused on the need to sway Madigan

31

with regard to legislation, from which the jury could readily conclude that they resorted to illegal means to do so.

Lastly, Pramaggiore argues that the government cannot rely upon a "stream of benefits" theory to prove a connection between the hires and legislation, because the Seventh Circuit has held that such a theory requires an existence of an agreement between the briber and the bribee. R. 264 at 14. Pramaggiore's argument is yet another attempt to inject a *quid pro quo* requirement into § 666. None of the cases she cites involve a § 666 charge. *See United States v. Solomon*, 892 F.3d 273, 275 (7th Cir. 2018) (convictions for wire fraud and honest services fraud); *Ryan v. United States*, 688 F.3d 845, 847 (7th Cir. 2012) (convictions for violating the Racketeer Influenced and Corrupt Organizations Act, the mail fraud statue, the Internal Revenue Code, and lying to federal investigators); *United States v. Silver*, 948 F.3d 538 (2d Cir. 2020) (convictions for mail fraud, honest services fraud, Hobbs Act violations, and money laundering). There is no such *quid pro quo* requirement, as discussed in Section II.B.1, below.

### b. Ample Evidence Proved Pramaggiore's Corrupt Intent.

Contrary to Pramaggiore's argument (R. 264 at 14-21), there was more than sufficient evidence in the record from which the jury could conclude that Pramaggiore acted corruptly.

Madigan's control, the defendants' clear understanding of the link between Madigan and the bank-rolled associates, as well as the duration and amount of the payments, all point to the corrupt nature of the benefits. *See Rosen*, 716 F.3d at 703

32

(affirming conviction and finding of *quid pro quo* based in part on evidence that payments far exceeded token gift amounts and were structured as monthly consulting payments as opposed to one-off gifts). So too does the fact that the subcontractors did little or no work for the payments. *See United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011) (finding a *quid pro quo* based in part on the fact that defendant "performed virtually non-existent consulting work for substantial payments"). And the corrupt intent underlying these benefits is demonstrated by the lengths the conspirators went to in order to conceal the true nature of payments made by the company. *See, e.g., United States v. Dial*, 757 F.2d 163, 170 (7th Cir. 1985) ("The defendants' elaborate efforts at concealment provide powerful evidence of their own consciousness of wrongdoing . . .").

Pramaggiore points to other individuals, including Fidel Marquez and Tom O'Neill, who did not believe that their actions were illegal to argue that Pramaggiore must have believed the same. R. 264 at 15. Judge Kendall rejected exactly this type of argument in *United States v. Benalcazar*, No. 09 CR 144, 2011 WL 4553027, at *11 (N.D. Ill. Sept. 29, 2011) (Kendall, J.). There, the defendant in a tax conspiracy case sought to introduce "evidence of other witnesses' lack of knowledge as to the legality of the scheme to serve as circumstantial evidence that he also lacked the necessary knowledge." *Id*. Judge Kendall "disallowed such testimony because one person's state of mind is irrelevant to what another person actually believed." *Id*. Moreover, even if the state of mind evidence of another person were relevant (and it is not), Marquez acknowledged that he appreciated his conduct was wrong, even though he did not

33

have knowledge of what the law was. Tr. 2608:21-24, 2758:18-23. And evidence someone else believed they had not committed any wrongdoing is not probative of charges under § 666, where mistake of law is not a defense. *See United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015). Setting aside these infirmities, the jury had more than sufficient evidence to conclude that Pramaggiore acted with corrupt intent with regard to each bribery count and the Count One conspiracy.

*Reyes Kurson (Count Two).* Count Two charged McClain and Pramaggiore with corruptly causing ComEd to give Reyes Kurson a contract in December 2016. Pramaggiore argues that the government did not establish her corrupt intent because ComEd General Counsel Tom O'Neill approved and renewed the contract in 2011 and 2016. R. 264 at 15-17.

Although O'Neill initially hired Reyes Kurson in 2011 (Tr. 1375:22-1376:1), the jury had evidence before it that Pramaggiore caused the renewal of the contract in December 2016, which was the focus of Count Two.

Moreover, Pramaggiore's knowledge and involvement in the Reyes Kurson contract leading up to December 2016 are probative as to her intent. In 2014, Pramaggiore instructed O'Neill to go forward with the firm, even though O'Neill wanted to cut the firm's hours because there was not sufficient work for the firm. Tr. 1188:6-18.

In early 2016, the project manager Mark Falcone, who was very close to Pramaggiore and who was tasked with ensuring no items impeded the passage of FEJA, was enlisted to make sure the Reyes Kurson contract situation was resolved

34

to McClain's satisfaction, even though Falcone had no role in supervising or approving law department contracts. Tr. 1228:3-1230:15.

Pramaggiore's emails were also compelling evidence of her intent to corruptly influence Madigan in connection with the renewal of Reyes Kurson's contract. McClain warned Pramaggiore by email of Madigan's adverse "reaction" if the contract was not renewed on favorable terms. GX320. Pramaggiore's servile response ("I am on this") demonstrated her willingness to ensure Madigan stayed happy with ComEd by providing a contract to a firm regardless of whether it was needed. GX320. Pramaggiore also forwarded this email to O'Neill (GX318), and just ten days later reported back to McClain: "I asked Fidel [Marquez] and Tom [O'Neill] to address this." GX321. The jury could easily conclude that Pramaggiore – O'Neill's boss – pushed him to renew the Reyes Kurson contract in early 2016.

And significantly, in December 2016 – the focus of Count Two – O'Neill was transitioning out of the General Counsel position and was therefore not in charge for the Reyes Kurson renewal. When McClain asked about the law firm contract, Pramaggiore told him it was on *her* agenda. In an email dated December 3, 2016, just two days after ComEd's FEJA legislation passed, Pramaggiore wrote: "Tom is transitioning into new role. Fidel and I are meeting on Monday to make our list. This will be on it." GX393. This email clearly shows Pramaggiore was involved in the decision to renew the Reyes Kurson contract in December 2016. And the timing makes clear that this hiring was not in the ordinary course; it followed right on the heels of ComEd's major legislation.

35

Pramaggiore claims that "if an experienced white collar defense attorney did not know that hiring the firm was forbidden, it is unreasonable to infer that Ms. Pramaggiore did know." R. 264 at 16. Whataboutism[7] is not a recognized defense to violations of § 666. The jurors were charged with determining Pramaggiore's intent, not O'Neill's. To illustrate the point, if the government had called witnesses to give their opinion that they thought what Pramaggiore did was indeed a crime, the defendants would have correctly and undoubtedly objected. It is improper to suggest that ignorance of the law—by Pramaggiore or anyone else—was a defense to the corruption charges, because willfulness was not an element of the offense.

In short, the jury had ample evidence to find that the retention of Reyes Kurson was not bona fide or in the usual course of business, and thus the 18 U.S.C. § 666(c) exemption did not apply to Count Two. As this Court recognized, "[a] company cannot use its payroll line on its accounting ledger to circumvent all Government oversight of public corruption." R. 83 at 6.

_Juan Ochoa (Count Five)_. Pramaggiore similarly argues that she lacked corrupt intent when she pushed for Ochoa's board appointment, because there were legitimate reasons to hire Ochoa. R. 264 at 17-19. The jury was not required to reach this conclusion from the record evidence. That evidence demonstrated that Ochoa's appointment was not a typical hiring recommendation, and that Pramaggiore's

---

[7] Whataboutism is the act or practice of responding to an accusation of wrongdoing by claiming that an offense committed by another is similar or worse. _See_ https://www.merriam-webster.com/dictionary/whataboutism#:~:text=%CB%8C(h)w%C9%99%2D,another%20is%20similar%20or%20worse (last visited Sept. 22, 2023).

decision had nothing to do with Ochoa's qualifications. Indeed, Madigan pulled the strings with regards to the Ochoa appointment; he directed Pramaggiore (through McClain) to "keep pressing" for Ochoa (after she offered to secure some other position that paid the same amount of $78,000 a year) (GX22), and, upon Pramaggiore securing Ochoa's appointment despite internal opposition, Madigan sought to deliver Ochoa the news. GX 64; *see also* GX3; GX548, GX63, GX128.

Pramaggiore kept pushing the Ochoa appointment (GX550, GX551, GX554), and took credit for the push to appoint Ochoa and overcoming the resistance she experienced: "I got that done." GX65. When McClain thanked her for her efforts, Pramaggiore expressed her corrupt intent to reward Madigan for his support of ComEd's legislation: "[Yo]u take good care of me and, and so does our friend and I will do the best that I can to, to take care of you." GX90. The jury had more than enough evidence before it to conclude that Pramaggiore was sending a $78,000 thank you to Michael Madigan for his support of legislation critical to ComEd. This was not, as had been suggested by counsel in opening statements, a mere "cup of coffee." Tr. 355:6-356:22.

Pramaggiore suggests that because Ochoa worked as a board member, including after the government's investigation of ComEd went overt in May of 2019, she could not have acted corruptly. But Madigan called Ochoa in April 2018 to tell him he would receive the appointment, more than a year *before* the government's investigation became overt. Tr. 3601:18-3602:5. As with the Reyes Kurson contract, the jury reasonably concluded that the Ochoa appointment was not bona fide or in

the usual course of business under 18 U.S.C. § 666(c). In addition, as with the Reyes Kurson contract, the jury was entitled to give little weight to Pramaggiore's contention that she could not have corrupt intent because she informed individuals like Tom O'Neill about Madigan's recommendation of Ochoa. Pramaggiore kept critical information about the bribery scheme from individuals, like O'Neill, and thus his intent has no meaningful bearing on Pramaggiore's. *See, e.g.*, Tr. 1302:8-10. There was ample evidence for the jury to conclude that Pramaggiore acted with corrupt intent with regard to Count Five.

*Michael Zalewski (Count Six)*. Pramaggiore argues that subcontractor Michael Zalewski was a legitimate hire, because he was qualified to work on the franchise agreement between ComEd and the City of Chicago regarding operating within the public right-of-way. R. 264 at 19-20; Tr. 1955:15-19. But the evidence at trial reflected that Zalewski—like everyone else secretly paid through Doherty— performed no work for ComEd. Nothing at all. In fact, negotiations regarding the franchise agreement ceased after Chicago's mayor decided not to run for re-election. Tr. 1955:20-1956:4. Despite that agreement being dead in the water, the payments to Zalewski continued unabated—that is, until the investigation went public. Moreover, the jury did not hear any evidence that Pramaggiore even knew Marquez had considered using Zalewski for the franchise agreement. Instead, the evidence demonstrated that Pramaggiore signed off on Zalewski's hiring because he was yet another Madigan subcontractor to be added to the "roster," who would be paid to do no work. GX22.

In May 2018, when McClain asked Pramaggiore about paying Zalewski at Madigan's request, Pramaggiore linked him with other subcontractors "hanging out there," meaning doing little to no work, and expressed concern that the new ComEd CEO might ask questions about this arrangement: "[Y]ou know when Dominguez comes in, he's gonna look at all this stuff and . . . we got a lot of people hanging out there and so one question Fidel and I had was, is there anybody who, you know, we could sorta take off the roster?" GX22. The fact that Pramaggiore knew that Dominguez might question the subcontractor arrangement shows she knew it was not above board. In addition, Pramaggiore's own false testimony about the Zalewski episode, including her ham-fisted efforts to suggest she did not realize Zalewski was a Madigan hire, permitted the jury to conclude that she not only was lying, but that her contention that she lacked any corrupt intent was false as well. *Dyer*, 201 F.2d at 269. Based on this and all the other evidence at trial, there was plenty of evidence from which the jury could reasonably conclude that Pramaggiore knew that ComEd had hired Zalewski, like the other subcontractors, not for legitimate reasons but to corruptly influence and reward Madigan.

*2019 JDDA Renewal (Count Eight)*. Regarding the 2019 JDDA contract, Pramaggiore contends that the government did not establish corrupt intent because she had started her new role at Exelon before the contract was finalized and because she advised Marquez to tell Dominguez the subcontractors were not doing any work. R. 215 at 20. A rationale jury was entitled to reject these arguments.

First, the jury knew that Pramaggiore remained deeply involved in Illinois after she became Exelon Utilities' CEO, including with regard to Doherty's contract. Tr. 4635:9-14. Second, Pramaggiore's clumsy efforts to explain away her conversation with Marquez on February 18, 2019 (admitted as GX131) stretched reason, and the jury was certainly not required to accept her account. Contrary to Pramaggiore's strained interpretation, Pramaggiore implored Marquez *not* to tell Dominguez what was really going on with the Madigan subcontractors, for fear it would provide Dominguez with ammunition against her. As Pramaggiore stated, if Dominguez was clued in fully to what had happened, he would do a "victory lap" because he had found another "mess" Pramaggiore had made. GX131. Rather than expressing alarm that subcontractors had been paid for doing no work for many years, Pramaggiore was concerned about damage control and her own reputation—and spinning a story that would allow the subcontractor arrangement to evade Dominguez's scrutiny for at least one more legislative session. *Id*. So what she proposed was that Marquez wait until session was over and then make up a story that "changes in the legislature" justified change to the Doherty contract. *Id*. As Marquez testified, this was a phony rationale to preserve the status quo, because Doherty did not work in Springfield— so a change in the legislature there would be of no consequence to his contract. Tr. 2022:11-15. In short, Pramaggiore's words on this call – particularly when considered with the evidence described herein – allowed a rational jury to conclude that she was a knowing, active leader in the scheme to corruptly influence and reward Madigan.

c. **Ample Evidence Established Pramaggiore's Awareness of the Connection between Madigan and Subcontractors.**

Pramaggiore claims that the government did not prove that she knew the subcontractors who were not referenced in the substantive § 666 counts (Olivo, Nice, Moody, or Acevedo) were connected to Madigan. She addresses each piece of evidence the government identified in response to Pramaggiore's Rule 29 motion at the conclusion of the government's case in chief. R. 264. at 29-37 (citing R. 221 at 18-19). To the contrary, these examples were more than sufficient to allow the jury to conclude that Pramaggiore knew the subcontractors were Madigan associates. Pramaggiore's incredible testimony that she did not know about the Madigan connection is further evidence of her guilt; her conversation with McClain made it abundantly clear that she had full knowledge of Madigan's connection to the subcontractors, and her absurd denial of knowledge on the stand drove home the fact that she was not to be believed.

*JDDA Contract.* The Doherty contract fell under Pramaggiore's budget as CEO of ComEd. Given the contract was under her budget, she approved the contract and invoices submitted for payment. Tr. 1889:18-1890:7; 3295:7-14. Pramaggiore argues that the fact that she approved the Doherty contracts and invoices says nothing about her awareness of the details regarding the subcontractors, and that she did not pay close attention to items falling under her budget. R. 264 at 29-30. But the jury heard that Pramaggiore was, on the contrary, very detailed oriented, and saw that she signed single source justification forms approving the contract on two occasions. Tr. 4294:16-17; GX484; GX868. The jury could reasonably infer that Pramaggiore knew

41

the details of a contract valued at several hundred thousand dollars coming out of her budget, including the contract's purpose; it did not have to credit Pramaggiore's testimony that she did not pay attention to what she was doing for years on end.

*June 2013 Moody Email*. In a June 2013 email, McClain asked Pramaggiore to consider removing Ed Moody from his contract, noting (1) that Pramaggiore and Hooker had previously discussed it, and (2) that Pramaggiore and McClain had talked about it but "wanted Session to be over first. Optics." GX229. Pramaggiore then directed Marquez to help move Ed Moody off of McClain's contract. *Id*. Pramaggiore points out that this email does not mention a connection between Moody and Madigan. Pramaggiore conveniently omits McClain's statements in the email that Pramaggiore had already discussed Moody's move multiple times, and that, importantly, it was important to time the move around the legislative "session" because of "[o]ptics." GX229. This email thus clearly linked Moody to ComEd's legislative success and made it clear that Pramaggiore was fully aware of the reasons for Moody's engagement. Based on this email alone, the jury could infer Pramaggiore knew Moody was associated with Madigan. Marquez testified that he spoke to Pramaggiore about this request, and that he did not believe she had any confusion about McClain's request. Tr. 1899:7-16.

Pramaggiore's testimony underscored that she clearly knew this; she implausibly claimed that she had no clue who Ed Moody was (despite receiving an email about him), and that she only had "fleeting" awareness in 2014 of the fact that Doherty had subcontractors. Tr. 4483:24-25; 4623:2-16; GX229; GX260. A jury could

readily conclude that Pramaggiore's testimony made no sense, given the evidence that Pramaggiore knew about the subcontractor "roster," GX22, together with her repeated interactions with McClain and others about the Madigan subcontractors.

*2018 Hooker/McClain Conversation*. In an April 2018 recorded call, McClain informed Hooker that he had a meeting scheduled with Pramaggiore and stated: "So, if you remember we have some people that are, um, recommendations from our friend that, um, are, are paid by us, but they work under Jay Doherty . . . he's asked for, to add an additional person . . . Alderman Mike Zalewski." GX12. McClain then told Hooker he would ask Pramaggiore about adding Zalewski at their upcoming meeting. *Id.* Pramaggiore argues that McClain did not specifically say that he would tell her about the subcontractors' connections to Madigan. R. 264 at 30. But McClain explained the proposed Zalewski arrangement to Hooker as an "additional person" recommended by "our friend" but paid for by ComEd, like the other subcontractors. Given the absence of any hint in this or any other call of a need to obscure this fact from Pramaggiore—and a host of other evidence demonstrating McClain's willingness to tell her about Madigan's interests in various hires—the jury had plenty of evidence to conclude Pramaggiore was fully informed. And, as discussed above, Pramaggiore was already read into the Madigan subcontractor arrangement (including by McClain), as demonstrated by other evidence, such as GX22, GX229, and GX268.

*2018 McClain/Pramaggiore Conversation*. The May 16, 2018 recorded call, in which Pramaggiore told McClain she had directed Marquez to hire Zalewski also

43

proves Pramaggiore's corrupt intent, as discussed above. GX22. The call expressly linked Zalewski and Madigan, demonstrating that Pramaggiore was well aware that Zalewski was a Madigan associate. When Pramaggiore confirmed she told Marquez to hire Zalewski, McClain responded, "I'll tell a friend of ours so he can call him," clearly linking Zalewski to Madigan. *Id.* Pramaggiore immediately replied, "you know when Dominguez comes in, he's gonna look at all this stuff and . . . You know, we got a lot of people hanging out there and so one question Fidel and I had was, is there anybody who, you know, we could sorta take off the roster?" *Id.* Viewed in the light most favorable to the verdict, this was not a mere request for advice about ComEd's lobbying lineup. R. 264 at 30-31. Rather, Pramaggiore expressed concern that Dominguez, the new CEO, would catch wind of *all* the Madigan subcontractors ("the roster"), who she knew were doing nothing ("hanging out there"). *See also* Tr. 1957:10- 1959:13 (Marquez testimony regarding GX22). This call shows that Pramaggiore associated the *other* subcontractors with Madigan, and that she knew it was an improper arrangement. Moreover, it demonstrated that Pramaggiore was asking for Madigan's authorization to remove someone from the roster—permission that was not granted at that time.

*2018 McClain/Marquez Conversation.* In a call recorded later in the day on May 16, 2018, Marquez and McClain discussed Zalewski. GX23. Marquez said, "So Anne, Anne mentioned your conversation with her about, about Mike. Um, what were you thinking numbers wise?" *Id.* When McClain responded, "Five, five," meaning five thousand dollars, Marquez pointed out their other obligations, including Ray Nice.

*Id.* McClain then walked Marquez through each subcontractor under the Doherty contract and his importance to Madigan. *Id.*

Pramaggiore argues that the fact that McClain told Marquez about the connections between the subcontractors and Madigan does not mean that he informed Pramaggiore. R.264 at 31. The jury did not have to see it that way. The recorded call—which immediately followed McClain's call with Pramaggiore (GX22)—was compelling evidence of an ongoing conversation between Marquez, McClain, and Pramaggiore about the subcontractors, payments, and their relationship with Madigan. After all, Marquez hired Zalewski *at Pramaggiore's direction.* Moreover, none of the calls in this or any other time frame suggested Pramaggiore was to be kept in the dark that requests came from Madigan. Indeed, the evidence was to the contrary. For example, Marquez testified that shortly after he became Vice President of Governmental Affairs in 2012, Pramaggiore and McClain showed him a "to do list" of people Madigan wanted the company to hire, which Marquez understood Pramaggiore felt was important. Tr. 1865:17-1866:23. Marquez testified that Pramaggiore would direct other Madigan-related requests to him, which Marquez was expected to "execute on." Tr. 1867:3-20. And he explained that he would update Pramaggiore on McClain's requests. Tr. 1875:20-1876:10. And of course, as noted above, McClain specifically linked this particular hire to Madigan in a direct call with Pramaggiore. GX22.

*Marquez's Testimony.* As described above, Marquez's testimony regarding his relationship with Pramaggiore and his conversations with her in 2018 and 2019 about

the Doherty subcontractors made clear that she knew about the Madigan subcontractors and that they did no work. *E.g.,* Tr. 1957:10-1961:20.[8]

Pramaggiore focuses on one line of questioning and complains that the government "asked an artful series of questions designed to create the false impression" that Marquez told Pramaggiore about the connection between the subcontractors and Madigan. R. 264 at 32-35 (quoting Tr. 1960:20-1961:20). Pramaggiore parses the wording in an effort to conjure up issues that do not exist. Marquez not only testified that he reminded Pramaggiore about the Doherty subcontractors (meaning this was not the first time they had discussed it), but also that he suggested terminating some of the subcontractors to her, and that Pramaggiore did not suggest he could remove them unilaterally. Tr. 1960:20-1961:20. He also testified that he never discussed with Pramaggiore any legitimate work performed by the subcontractors, that he understood Pramaggiore did not expect them to do any work, and that Pramaggiore told him to hire Zalewski without mentioning any skills he would bring to ComEd. Tr. 1958:5-1960:1. This is consistent with the calls involving hiring and firing decisions where Pramaggiore totally failed to discuss any work performed by the subcontractors. *E.g.,* GX22, GX131.

Marquez also testified that he spoke to Pramaggiore about McClain's request to move Ed Moody to another intermediary in 2013, after the legislative "session."

---

[8] Pramaggiore states that Marquez told the FBI it was only "possibl[e]" that she knew about the Doherty arrangement. R. 264 at 32. No such evidence exists in the trial record. When counsel for Pramaggiore asked Marquez about that statement, Marquez answered, "Yes, that's not inconsistent with what I said" (Tr. 2341:24-2342:2), but the Court then sustained Pramaggiore's request that that answer be stricken. Tr. 2342:4-5.

GX229. Marquez testified that he didn't believe Pramaggiore had any confusion about McClain's request. Tr. 1899:7-16. Based on this evidence, consistent with the recordings and emails, the evidence before the jury allowed them to conclude that Pramaggiore had known for years that the subcontractors were paid because of their connections to Madigan and were not expected to work.

Consistent with her failed effort to dissect the considerable evidence arrayed against her and suggest there was no evidence in the record whatsoever that the jury could rely upon to establish her guilt, Pramaggiore nitpicks one question the government asked Marquez concerning Government Exhibit 22: "And based on the fact that she never tasked them with work and told you to hire this person, what did you understand her to be doing?" R. 264 at 34 (Tr. 1959:6-8). The Court properly overruled defense counsel's objection to this question. Tr. 1959:9-10. This question did not improperly conflate Zalewski with the other contractors. Indeed, Marquez testified that he reminded Pramaggiore about the other Doherty subcontractors when they discussed Zalewski, as the recording itself corroborates. Tr. 1961:1-3; GX22. It was appropriate for the government to ask Marquez about his understanding of this conversation—and what he understood to be happening when he received orders to add someone to the payroll without any corresponding description of what honest work they would perform. The question also did not rest on a "false premise" that Pramaggiore had responsibility for assigning outside lobbyists work. R. 264 at 34. As stated above, the jury could reasonably infer that Pramaggiore knew the

47

subcontractors would not do work, given that the conversation about hiring decisions did not discuss *any* tasks or work performance.

Pramaggiore also argues that *she and Marquez* expected that Zalewski would perform valuable work for ComEd negotiating the City franchise agreement. *Id.* at 35. To the contrary, Marquez testified only that *he* thought Zalewski could be valuable for such an effort. Tr. 1955:11-23, 2408:18-20. There is no evidence he discussed this project with Pramaggiore. In fact, Marquez testified that Pramaggiore did not discuss "any skills that Mr. Zalewski brought to the table that would be a benefit to ComEd," (Tr. 1959:23-1960:1), and that Pramaggiore did not tell Marquez to hire Zalewski because of the franchise agreement. Tr. 2745:1-3. Marquez's account was corroborated by the recording of Doherty, a City of Chicago lobbyist, who admitted that the subcontractors—including Zalewski—did nothing. Even the false paperwork Doherty submitted to add Zalewski said nothing about a City franchise agreement.

Lastly, Pramaggiore misrepresents the government's response to the defendants' Rule 29 motions, in which the government wrote: "Marquez had suggested they check with McClain [before terminating any of the subcontractors] because they were hired as a favor to Madigan." R. 221 at 19. Contrary to Pramaggiore's argument (R. 264 at 34), this was consistent with Marquez's testimony that (i) he suggested to Pramaggiore they remove subcontractors; (ii) that he believed he needed to check with McClain before doing so, and (iii) that Pramaggiore did not suggest unilaterally removing people when that topic was raised with her. Tr.

48

1961:13-20. Pramaggiore clearly also knew she needed to check with McClain, because she asked McClain: "one question Fidel and I had was, is there anybody, you know, we could sorta take off the roster?" GX22. When viewed in the light most favorable to the verdict, this evidence permitted the jury to readily conclude that Pramaggiore knew McClain had to be consulted before letting Madigan subcontractors go given their connection to Madigan.

*2019 McClain/Marquez Conversation*. On February 7, 2019, after Marquez began cooperating with the government, he and McClain discussed new ComEd CEO Joe Dominguez's potential response to the renewal of the Doherty contract. GX123. McClain explained that Dominguez, a former prosecutor, might react negatively to the subcontractor arrangement, demonstrating that McClain knew of its illicit purpose. *Id.* McClain likewise indicated that Pramaggiore knew this illicit purpose, when he suggested that Dominguez might say, "Anne may have done that, but I don't feel good about this. Um, it, it, it looks raw to me." *Id.* Indeed, McClain's statement indicates concern that Dominguez would raise red flags about the arrangement once he had the same information that Pramaggiore had. This statement shows McClain's *and* Pramaggiore's knowledge that the arrangement was corrupt (or "raw"). McClain specifically linked his coconspirator Pramaggiore, demonstrating that Pramaggiore (unlike the new CEO) had been fully read in to the corrupt arrangement. *See, e.g., United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) (". . . evidence of [a] defendant's acts or statements may be provided by the statements of co-conspirators.").

49

*2019 McClain/Bradley Conversation*. That same day, McClain also discussed how he would explain the Doherty contract to Dominguez with lobbyist John Bradley, who acted as a conduit for payments to Ed Moody and Edward Acevedo. GX122; Tr. 1934:11-20; 1938:5-9. McClain told Bradley that Marquez has "to sit down with Joe Dominguez and explain it to him, and he wants to talk to me about how to do it (laughs). Cause Anne was all in, and he thinks now Joe will push back." GX122. Pramaggiore objects on the grounds that McClain was quoting Marquez, who was cooperating with the government at the time of the call. R. 264 at 36. The jury was not required to take the narrow view of this comment Pramaggiore now espouses, and given the standard of review this Court employs, this defense-friendly interpretation of the evidence is improper. Seen in the light most favorable to the verdict and given Pramaggiore's gung-ho attitude towards hiring the likes of Zalewski at Madigan's request, the jury could have easily decided that McClain's comment that "Anne was all in" was an assertion of McClain's *own* observations. This is thus highly probative evidence of McClain's *and* Pramaggiore's corrupt intent. Consistent with the Court's ruling on the government's *Santiago* motion (Dkt. 157), McClain's statement in furtherance of the conspiracy was admissible against his coconspirator, Anne Pramaggiore. *See, e.g., United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996) (a coconspirator's statements are admissible against other coconspirators where "the declarant and the defendant were involved in an existing conspiracy, and that the statement was made during and in furtherance of that conspiracy").

*2019 Pramaggiore / Marquez Conversation*. On February 28, 2019, in a recorded call, Pramaggiore told Marquez that ComEd should renew the Doherty subcontract to avoid "somebody getting their nose out of joint" in Springfield and the company being "forced" to give a five-year contract. GX131. Marquez testified that he understood Pramaggiore to be referring to Madigan and the risk that Madigan would force ComEd to renew or extend a contract at a time when the company was seeking legislation in Springfield. Tr. 2023:12-2024:7. Contrary to Pramaggiore's argument (R. 264 at 36), Marquez did not need to identify the subcontractors by name or by reference to their connection to Madigan, because there was ample evidence that Pramaggiore *already* knew of that connection, as discussed above. Indeed, Pramaggiore's immediate pivot to the impact of the arrangement on ComEd's legislation demonstrates that she knew exactly who Marquez was referring to and their relationships with Madigan.

Moreover, Pramaggiore proposed that Marquez lie to Dominguez, by telling him to change the Doherty contract due to changes in the legislature. GX131. As Marquez explained, Doherty did not work in Springfield, so that was not a legitimate reason to revise his contract. Tr. 2022:11-18. Pramaggiore suggested this lie to protect herself, because she believed the new CEO would do a "victory lap" over the "mess" she had made with it. GX131; *see also* Tr. 2024:14-16. Moreover, far from expressing surprise at the hires who did nothing but collect a check, Pramaggiore did not call for an investigation or complain about why she had not been told of the matter before. From all these facts, the jury could easily conclude that Pramaggiore knew about the

Madigan subcontractors and was doing her best to bury the issue so Dominguez could not exploit her malfeasance.

*Pramaggiore's Testimony*. As discussed in more detail in Section II.C.7, below, Pramaggiore's testimony provided additional reasons for the jury to discredit her defense. *Dyer*, 201 F.2d at 269. Pramaggiore clearly lied when she testified that she did not know that Doherty had subcontractors who were Madigan associates. Tr. 4627:2-12, 4631:5-24. And she lied when she claimed to have forgotten the February 2019 call when Fidel told her about the Doherty subcontractors, GX131. Tr. 4631:5-24.

Indeed, Pramaggiore testified on direct that she was "taken aback" when she learned about the subcontractors who were "just collecting checks" in February 2019. Tr. 4499:14-17 (discussing GX131, also identified as DX1156). But during the interview, just seven months later, Pramaggiore claimed to have no recollection that Jay Doherty employed *any* subcontractors and no memory of her February 2019 call with Marquez (GX131). Tr. 4631:18-24. The jury could readily conclude that Pramaggiore had blatantly lied when she claimed not to know about the no-work subcontractors.

Her lies about her failure of memory stood in stark contrast to her excellent memory regarding other hiring requests ComEd received from various public officials. Tr. 4631:25-4632:20. In short, the jury had ample opportunity to observe Pramaggiore and assess her credibility and had ample basis to conclude she was lying

about her knowledge of the subcontractors—and therefore, about her knowing participation in the charged offenses.

> ### d. Ample Evidence Established that Pramaggiore Joined a Conspiracy that Included the Solicitation of Bribes from ComEd.

In a short paragraph, Pramaggiore challenges the government's proof on just one object of the conspiracy charged in Count One, the conspiracy to solicit things of value in violation of 18 U.S.C. § 666(a)(1)(B). R. 264 at 37. Of course, the jury was only required to be unanimous as to one of the four objects of the conspiracy. R. 249 at 36 (unanimity instruction).

That said, there was substantial evidence that Pramaggiore joined a conspiracy that included as an object the solicitation of bribes for Madigan. R. 249 at 31. The government presented ample evidence of Madigan's intent to be improperly influenced, and Pramaggiore's knowledge of Madigan's intent. For example, McClain's told Pramaggiore and Hooker that Madigan would take adverse action if they cut Reyes Kurson's hours. GX318 (threatening that such a step would "provoke a reaction from our Friend"). Similarly, McClain relayed a conversation with Madigan to Pramaggiore and Hooker, in which Madigan asked for a "lead" person at ComEd who would "snap to" when Madigan made a demand. GX 136. In that call, McClain linked this request to legislation. GX136 ("if you want to pass this bill. . ."). Pramaggiore drew the same connection when explaining to Marquez why payments to the ghost payrollers had to continue in 2019—to avoid any obstacle to the company's legislative objectives in Springfield. GX131.

Pramaggiore described the link between the subcontractor payments and Madigan in a 2014 email to Doherty, in which she thanked him for his "help in creating an understanding with" Madigan. GX268. This email demonstrates that Pramaggiore knew the "understanding" with Madigan was mutual: ComEd made payments, Madigan took favorable action in terms of legislation.

These exchanges and others clearly showed Madigan's intent to corruptly receive bribes from ComEd, and Pramaggiore's knowledge that the conspiracy subsumed efforts to corruptly solicit benefits for Madigan.

### 3. Arguments Raised by Defendant McClain

#### a. Ample Evidence Established that McClain Joined the Conspiracy Charged in Count One.

McClain's primary argument regarding the conspiracy count boils down to one sentence—that the government failed to present sufficient evidence for a rational jury to convict him on Count One. R. 266 at 15. The Court can in summary fashion deny the motion as to Count One because undeveloped arguments are waived. *United States v. Collins*, 361 F.3d 343, 349 (7th Cir. 2004) (legal issues not raised or adequately developed are waived); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim."). Moreover, as described in detail above, there is ample evidence, when viewed in the light most favorable to the government, from which the jury could find that McClain joined the charged conspiracy.

McClain's also cursorily states: "nobody thought that they were: bribing Madigan by accepting job recommendations; falsifying ComEd books and records; or

54

circumventing internal controls." R. 266 at 15. The evidence discussed above demonstrated otherwise. He adds, "Defendants did not believe they were doing anything illegal. There is no conspiracy." *Id*. Again, the Court may dismiss such undeveloped arguments as waived. Moreover, the Seventh Circuit has held that mistake of law is not a defense to a charge under § 666. *Blagojevich*, 794 F.3d at 738.

### b. Ample Evidence Established that Actions McClain Took Were in Connection with Legislation.

McClain argues that the benefits provided to Madigan were not related to legislation and that no defendant expressly asked for Madigan's help with legislation. R. 266 at 4-6. As discussed above, there was ample evidence from which the jury could find that defendants intended to influence and reward Madigan in connection with ComEd legislation.

As another example, in an interception recorded while the so-called "Skinny Bill" that would extend the favorable formula rate was pending in the General Assembly in 2019 (Tr. 2028:3-5), Marquez asked Hooker how he believed "our friend"—a code word for Madigan—would react if ComEd refused to renew the Doherty contract. GX142. Hooker answered by referencing Madigan's control over ComEd's legislative agenda: "You're not going to do something for me, I don't have to do anything for you." *Id*. Marquez testified that he understood Hooker to mean that if ComEd did not continue with the subcontractor relationship, Madigan would retaliate by ending his support for ComEd legislation. Tr. 2027:1-1028:2.

Defendant Doherty echoed this theme when he told Marquez that the subcontractors should continue to receive payments even though they did no work

because ComEd's "money comes from Springfield" and it was therefore important "to keep Mike Madigan happy." GX129.

Finally, McClain is plain wrong that none of the defendants "received, asked for, or even discussed any actions by Madigan to help with ComEd legislation from 2011-2019" and that Madigan "did not take any special action to assist ComEd." R. 266 at 4-5. For example, when FEJA was up for a final vote in December 2016, just after the Reyes Kurson contract was renewed, Madigan helped secure the final votes needed to pass FEJA, as Will Cousineau testified and as emails and calls corroborated. *E.g.*, GX19, GX628 (McClain emailing Pramaggiore that Cousineau "on behalf of the Speaker [ ] was extremely helpful in us acquiring the necessary votes" for FEJA"); Tr. 1621:2-1625:16. The jury had ample evidence to find the bribes were connected to legislation, and that they paid off in spades.

### c. Ample Evidence Established McClain's Corrupt Intent.

McClain next argues that the government did not introduce evidence of his corrupt intent. R. 266 at 6-8.[9] Abundant evidence at trial—when viewed in the light most favorable to the verdict—proved otherwise, as discussed above.

Another example is the call between McClain, Pramaggiore, and Hooker on February 20, 2019. GX136. McClain expressed concern that new ComEd CEO Joe Dominguez would surmise that the company was bribing Madigan and would think

---

[9] McClain proposes a new definition of the word "corruptly," based on an incorrect reading of the Seventh Circuit's decision in *Snyder*, 71 F.4th at 579. R. 266 at 6. As discussed in Section II.B.1, below, the jury instructions were wholly consistent with the analysis in *Snyder*.

"that this is a *quid pro quo* and that he's wired." *Id.* McClain's choice of words—referring to the appearance of the subcontractor arrangement as a *quid pro quo* and indicating Dominguez could cause trouble with law enforcement—shows his corrupt intent.

In yet another conversation, Hooker bragged about having set up the subcontractor arrangement, which was "off the beaten path," because there's "just no flow through," and McClain agreed, "Right." GX12. In doing so, McClain agreed that the benefit of the subcontractor arrangement was that there was not a direct link between the illicit payments and ComEd. These, and many other recordings and emails demonstrated McClain acted with the requisite corrupt intent.

Government Exhibit 271 similarly demonstrated McClain's intent. In an email dated November 13, 2014, McClain told Marquez that Madigan had asked McClain "are there two Fidels?" GX271. McClain explained that Madigan expected more urgency in responding to requests: "I do not know how to respond to our friend who believes in his mind there should be a hard and quick favorable response." GX271.

McClain claims he made no effort to conceal the identity of the requestor in his many emails (R. 266 at 7), but McClain's many emails were to either his co-conspirators—John Hooker, Anne Pramaggiore, Fidel Marquez—or their subordinates, like Tom O'Neill. There was no need for McClain to be covert with individuals in the know or who were acting at the coconspirators' direction. In any event, the non-conspirators were not read into the full activities of the conspiracy.

57

McClain also argues that the people who received jobs from ComEd were qualified and provided value to the company. R. 266 at 7. The jury was not required to accept this claim based on the evidence before it. Moody described how he did minimal work for the checks he received—and no work for years on end—and that he understood the purpose of the payments were to "stay active in my politics." Tr. 3692:14-16. Moreover, although Reyes Kurson and Juan Ochoa performed actual work, they were not hired or appointed on the basis of their expertise or skillset. The jury had ample evidence to conclude that these were not bona fide fees paid in the ordinary course of business, and that the 18 U.S.C. § 666(c) exemption therefore did not apply. *See United States v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010) (quoting *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide.")).

Finally, McClain insists that he expected everyone, including subcontractors, to work, but the evidence at trial showed otherwise. In one call, McClain explained to Hooker the benefits of the subcontractor arrangement by saying, "We don't have to worry about whether or not . . . [the subcontractors are] doing any work or not," indicating he knew the subcontractors did not add value to ComEd. GX126. Moreover, McClain explained his practice to Bradley of having multiple individuals on the payroll as consultants (including those at the request of Madigan), and that all they did was give McClain pieces of paper, signifying that they did no real work at all. GX77.

58

McClain also argues that he could not have corrupt intent because others, primarily lawyers, did not raise a concern that the benefits to Madigan were illegal bribes. As discussed in Section I.C.2.b., above, it is no defense to point to another individual's state of mind; not only that, but ignorance of the law is no defense to violating § 666. Moreover, the jury had more than sufficient evidence to conclude that McClain acted with corrupt intent.

In short, McClain's suggestion that the record was devoid of any evidence from which the jury could conclude McClain possessed corrupt intent is frivolous.

### 4. Arguments Raised by Defendant Hooker

Hooker contends that there was insufficient evidence to convict him on Count One because there was no evidence that he did not expect the subcontractors to do work. R. 262 at 10. The jury was entitled to conclude that the evidence at trial proved otherwise.

In an intercepted conversation on February 11, 2019, Hooker and McClain discussed the renewal of the Doherty contract for 2019. Hooker not only bragged that he set up the contractor arrangement but consulted with McClain on how to sell the arrangement to Dominguez, demonstrating that he was still actively participating in the conspiracy. Specifically, McClain told Hooker that he had told Marquez to be "transparent" with Dominguez about the subcontractors: "We had to hire these guys because Mike Madigan came to us. That's it's that simple." GX126. Hooker agreed, "[t]hat's how simple it is." Hooker boasted that the Doherty subcontractor arrangement was "clean for all of us." GX126. Hooker also agreed with McClain when he said they did not have to worry about whether the newest subcontractor, Mike

Zalewski, was "doing any work or not." GX126. Hooker laughed in agreement, and said, "That's right." GX126. Contrary to Hooker's argument (R. 262 at 15-16), the jury had abundant evidence to conclude Hooker and McClain set up the subcontractors through Doherty because they knew the subcontractors would not work.

On the witness stand, Hooker confirmed that he never gave Frank Olivo or Ray Nice any assignments, that he was not aware of any work they ever did for ComEd, and that he did not even interview Olivo. Tr. 4882:14-24, 4904:1-5. He likewise testified that he never heard of Marquez giving assignments to the subcontractors. Tr. 4925:18-4926:4. In short, the jury had abundant evidence to find that Hooker knew the subcontractors would not and did not do any work.

Hooker also argues that the subcontractor payments were not corrupt because they were not a secret. R. 262 at 11. But Hooker recognized the importance of concealing the *reason* for the payments. He bragged about how the Doherty subcontractor arrangement was "off the beaten path" and created no "flow through," meaning no direct flow of money that would lead back to ComEd. GX12. Hooker attempts to spin this call, by saying that there was no information about whether the subcontractors Hooker added—Olivo and Nice—remained on the contract and whether they worked. R. 262 at 15. But McClain initiated the conversation by noting that "we have *some people* that are, um, recommendations from our friend that, um, are, are paid by us, but they work under Jay Doherty." GX12 (emphasis added). When McClain mentioned that Madigan asked for "an additional person" (referring to

60

Zalewski), Hooker's laughed, demonstrating that he knew Zalewski was being added at Madigan's request, just like Olivo and Nice.

Hooker similarly argues that the Doherty contract was not corrupt because subcontractors were commonplace at ComEd. R. 262 at 12. But the jury heard recordings where Hooker described the subcontractor arrangement as "creative." GX17. Hooker also described the reaction of Madigan to the arrangement, by noting Madigan thought it was "crazy." GX12. The jury could properly conclude that a typical subcontractor arrangement – where a subcontractor gets paid to do actual work – could hardly be described as either "creative" or "crazy." The jury could also reasonably conclude that such an arrangement was irregular because the hiring of subcontractors some eight years earlier would not be the subject of back-slapping phone calls between McClain and Hooker where they praised each other for their ingenuity. The jury was entitled to conclude that the arrangement was thought to be "creative" and "crazy" by those who formulated it precisely because it was a bribe disguised as a subcontractor agreement. Indeed, the jury could have easily concluded that Hooker's preposterous testimony confirmed the illegal nature of the payments. *Dyer*, 201 F.2d at 269 (jury may conclude, based on false testimony that the opposite of the false testimony is in fact true). Hooker told a number of whoppers during his stint on the stand, which included his testimony that the method of indirect payment was devised for purposes of streamlining his management responsibilities, Tr. 4900:25-4902:4, despite the fact he had specifically noted on a recording the plan had been run by Madigan and others who had considered it "crazy," and had guffawed

with McClain that the arrangement had "paid off" for "us" in the past. GX12. In this case, Hooker's absurd testimony was damaging and corroborated the government's evidence of his participation in the charged offenses. The jury necessarily found he perjured himself in convicting him on all counts.

Hooker also argues that it was not "'reasonably foreseeable" to Hooker, after he retired in March 2012, that the JDDA contract would be used as a conduit to bribe Madigan. R. 262 at 12. But Hooker continued to be involved in ComEd's affairs as an external lobbyist after he retired, and he remained involved in the subcontractor arrangement even after he retired. He had numerous conversations with McClain about the subcontractors, including in the calls discussed above. And Jay Doherty described Hooker's role in a meeting recorded in 2019; he said that Hooker would always call him and say, "I'm going to slug this guy on," and would check in with Doherty about the subcontractors every six to nine months. GX129. In that same call, Doherty told Marquez that the subcontractors did no work, so the jury could readily conclude that he had told Hooker the same thing. GX129.

Although Hooker maintained that Doherty's statements were false during his testimony (Tr. 4897:7-25), the jury was free to assess his credibility and conclude that it was Hooker who was lying. Not only had Hooker told tall tales on the witness stand about other matters, but the undercover recording of Doherty—made at a time when Doherty did not know he was under investigation—refuted Hooker's contrary testimony. The jury was under no obligation to credit Hooker as a truthful witness, and clearly concluded he was a liar.

The jury heard additional evidence that Hooker set up the subcontractor arrangement, continued to be involved, and knew of its corrupt purpose, even after his retirement in 2012:[10]

- During a meeting with Marquez on January 29, 2019, Hooker explained that "me and McClain was—I was the one that created it," which Marquez testified meant that Hooker and McClain had "created the mechanism or process by which the subcontractors were added." Tr. 2001:1-16; GX118. Hooker also agreed that new CEO Joe Dominguez might "push back" on the renewal of the contract, which also signaled his understanding of the illicit nature of the arrangement. GX118.[11]

- During an in-person meeting with McClain and Marquez on February 27, 2019, Hooker again consulted on the renewal of the Doherty contract and acknowledged its corrupt purpose. Marquez asked Hooker what he expected Madigan's response would be if the subcontractors were not renewed. Hooker replied that Madigan would respond as follows: "'Oh. Okay. You're not going to do it? You're not going to do something for me, I don't have to do anything for you.' He won't say it." GX142.[12] Marquez testified that he understood Hooker to mean that "if we don't continue with the subcontractors, that would signal to Michael Madigan, 'Since you're not going to continue with these subcontractors, I don't have to support your legislation.'" Tr. 2027:1-16. Marquez testified that Hooker's reference to "hurt[ing] us" meant that Madigan could hurt the company "in terms of our legislative effort." Tr. 2027:17-2028:5. Hooker thus directly connected the subcontractor payments with the success of ComEd's legislation. Hooker also stated that Dominguez would not be "amenable" to renewing the contract because he wouldn't "understand why it's in place and how it's in place." GX142. Had the contract been a simple contract entered in the

---

[10] Hooker recites Marquez's testimony at length, in an effort to minimize Hooker's involvement in the subcontractor arrangement. R. 262 at 13-14. But the jury had ample evidence of Hooker's *own words* to prove his intent.

[11] Hooker complains that Marquez did not specifically mention to Hooker that the subcontractors did not work. R. 262 at 17. But the jury could find that Hooker already knew this; there was no need for Marquez to spell it out. In addition, contrary to Hooker's argument (R. 262 at 16), Hooker's suggestion to Dominguez a "write up on each one. Who they are . . . what they do" does not demonstrate that Hooker thought the subcontractors did real work; the jury could find this was another effort to conceal the true nature of the payments.

[12] Hooker contends that, "The Government offered no evidence—direct or circumstantial— that Hooker expected anything in return form Madigan for hiring Olivo and Nice." R. 262 at 20. This recording is evidence on this point.

ordinary course, it would not have been difficult for Dominguez to appreciate its purpose.

- In an intercepted conversation with McClain on March 6, 2019, after McClain told Hooker that others were "scared" to discuss the Doherty contract with Dominguez, Hooker explained that "with the Jay Doherty stuff, you gotta little leg up," and "that which is understood need not be mentioned." GX148. Again, Hooker was referring to the connection between ComEd legislation and the subcontractor arrangement.

Based on this evidence, Hooker's claim that he had no involvement with the Doherty contract between 2012 and when he was recorded in 2018 and 2019 is implausible. R. 262 at 13-14.

Hooker next argues that the government presented insufficient evidence to demonstrate his involvement in the Reyes Kurson contract, hiring of interns and other Madigan job recommendations, and the appointment of Juan Ochoa to the ComEd Board of Directors. R. 262 at 17-20. But the evidence the jury had demonstrated Hooker's involvement in multiple aspects of the conspiracy's illegal activities.

Hooker was copied on emails regarding Reyes Kurson and was involved in the initial retention of the firm. General Counsel Tom O'Neill testified that he spoke to Hooker about Reyes Kurson before entering into the first contract with the firm in 2011. Tr. 1181:14-17. Hooker said something to the effect of: "Tom, you need to move on Victor Reyes. It's important we get this done. What do we need to do to get this done?" Tr. 1182:2-4. O'Neill testified that Hooker made it clear because "there was an interest from Speaker Madigan in this." Tr. 1182:5-10. Based on this evidence, coupled with the fact that Hooker was copied on later emails about Reyes Kurson (GX315, GX318), the jury could easily conclude that Hooker played a role in Reyes'

64

Kurson's hiring and retention. The same is true of other job recommendations about which Hooker was copied. *E.g.,* GX425.

Moreover, to find Hooker guilty of Count One, the jury need not have concluded that he was involved in every object and overt act that were part the conspiracy. Rather, the jury was instructed that it need only find that the conspiracy existed, that Hooker knowingly became a member of the conspiracy with an intent to advance it, and that one of the conspirators committed an overt act in an effort to advance a goal of the conspiracy on or after November 18, 2015. *See* R. 249 at 28.

Hooker argues that the government did not present sufficient evidence that anything of value was provided to Madigan in connection with ComEd legislation. Like McClain and Pramaggiore, Hooker argues that the government relied solely on timing to establish the bribes were connected with ComEd legislation. R. 262 at 20-21. As discussed above, it is clear that, while the timing of benefits was compelling evidence, the government's evidence was not limited to this evidence. As but one example, Hooker repeatedly linked the subcontractor payments to legislation, demonstrating that he was well aware of the connection. *E.g.,* GX12 ("that has paid off for us in the past."); GX148 ("little leg up").

Hooker, also like Pramaggiore, argues that the government failed to present evidence that he joined a conspiracy to solicit bribes for Speaker Madigan with the intention that *Madigan* have the necessary mental state for receiving such bribes. R. 262 at 21. The government presented ample evidence of Madigan's intent to be improperly influenced, and Hooker's knowledge of Madigan's intent. *See, e.g.,* GX136,

GX318. Indeed, Hooker demonstrated his understanding of Madigan's intent in receiving benefits from ComEd by explaining to Marquez what would happen if those benefits stopped. *See* GX142 ("You're not going to do something for me, I don't have to do anything for you."). As described in detail above, there was ample evidence that Hooker joined a conspiracy to bribe Madigan by bestowing on him a stream of benefits, of which the payments to the Doherty subcontractors were a part.

For the reasons discussed above, the jury had ample evidence to convict Hooker with respect to Count Eight, the only substantive bribery count in which Hooker was named, which was focused on the 2019 renewal of Doherty's contract. The evidence showed that Hooker remained involved in the subcontractor arrangement. Moreover, the jury could have properly found Hooker guilty on Count Eight as either an aider and abettor or under a *Pinkerton* theory, as discussed in Section II.D.3, above.

### 5.    Arguments Raised by Defendant Doherty

First, Doherty argues that he did not know about ComEd legislation because he was a lobbyist who worked in Chicago and Cook County rather than Springfield. R. 271 at 3-4. But this fact underscores the corrupt nature of the subcontractor arrangement. On February 13, 2019, when Marquez asked Doherty if the subcontractors should be renewed, even though they did not do work, Doherty himself pointed out the direct connection between the arrangement and ComEd's political fortunes in the state house: "ComEd money comes from Springfield, right?" GX129. He followed up: "[I]f it ain't broke, then don't fix it with those guys." GX129. Thus, Doherty's argument that he had no knowledge of ComEd's dealings in Springfield is frivolous. He knew Madigan's importance to ComEd's legislation, and he knew the

subcontractors were paid to ensure that legislative success. Indeed, the evidence at trial demonstrated that Doherty had worked for ComEd since 1985, and that he had done work for ComEd in connection with the passage of FEJA. Under these circumstances, there was plenty of reason for the jury to conclude that Doherty had a sufficient understanding of ComEd's business model and how it generated revenues.

Doherty argues that the subcontractor arrangement was not illegal because there is no evidence that anyone told him that the hirings were connected with legislation or that they should not do any work. R. 271 at 4-5, 17-18. But the jury heard Doherty explain the arrangement in his own words. In the same February 2019 conversation, addressed above, Marquez asked Doherty to about the work the subcontractors performed under Doherty. Doherty responded, "Not much . . . to answer the question. Not much."[13] GX129. Doherty added, "[T]hey keep their mouth shut . . . [D]o they do anything for me on a day to day basis? No." *Id*. Doherty's answer clearly shows he knew the subcontractors did not do any work and that the arrangement was illicit, because everyone involved knew not to say anything. And again, later in the conversation, when Marquez proposed changing the arrangement, Doherty advised Marquez not to make changes, to avoid causing any issues with "ComEd money" in Springfield. *Id*. Doherty even acknowledged that this type of

---

[13] Doherty attempts to frame the problems with the subcontractors as they "did not provide Doherty with a list of work performed month to month" and that "they did not perform consistent work from month to month." R. 271 at 18-19. These statements grossly mischaracterize the evidence. The evidence, as Doherty recognized in his February 2019 conversation with Marquez, was that the subcontractors did virtually no work.

arrangement would be difficult for someone outside of Chicago to understand—an observation that underlined the illicit nature of the ghost payroller arrangement was, for merely paying consultants to do honest work would not have been a difficult concept to understand. GX129.

Doherty knew that he had to keep the subcontractors quiet. He told Marquez, "this is just you and me talking," and that he didn't "even know who else knows this," and that the subcontractors "keep their mouths shut." GX129. And as Doherty told Marquez in January 2019, "the only people that even know about this are you and perhaps Anne, if she even remembers the particulars, John Hooker, and me." GX115. He promised Marquez that he had "never, ever, ever said a word as per conversation way back when." GX115. Consistent with these recordings, McClain also told Hooker that Doherty has been "wonderful" with the subcontractors and "doesn't even blink about it." GX 12. All of this was compelling evidence of Doherty's guilt.

Doherty contends that the government's evidence regarding the secrecy of the subcontractor arrangement was not persuasive (R. 271 at 9-10, 20), but that was for the jury to decide. To refute this compelling evidence, Doherty points out that the subcontractors revealed their relationship with ComEd in public filings and that Doherty never told his assistant—Janet Gallegos—to keep the subcontractors a secret. *Id.* at 10. But the public filings did not disclose that the subcontractors did no work for ComEd, or that they were hired to corruptly influence Madigan. And Gallegos testified she did not know why Doherty added the subcontractors to his

68

contract, so she had no secrets to keep. Tr. 2801:1-6; 2816:25-2817:15; 2848:8-13; 2894:19-22.

Doherty argues that his statement that ComEd should renew the subcontractor arrangement to "keep Madigan happy," meant little more than "we don't want to make waves." R. 271 at 8 (quoting GX129).[14] Yet again, the defendant fails to employ the correct standard of review to the juror's verdict. The evidence is not to be viewed in the light most favorable to defense counsel; Doherty enjoyed the presumption of innocence and was convicted. At this stage, the facts are viewed in the light most favorable to the government and the juror's verdict. Given Doherty's statements that the subcontractors did not work, his statements about Springfield being the source of ComEd's money, and the other evidence above, the jury could, and did, easily conclude otherwise.

Doherty argues that his statements are too general to establish guilt. R. 271 at 19. The jury was free to evaluate the meaning of Doherty's statements and draw reasonable inferences from those statements and the other evidence.

Doherty also argues that the subcontractor arrangement was legitimate because the subcontractors were qualified lobbyists. R. 271 at 5-6, 18. Whether someone is qualified for a position is of no import if the reason for the hiring was not those qualifications, but to corruptly influence a politician, as the evidence at trial

---

[14] Doherty also argues that his statement that the subcontractors "keep Madigan happy" is no different than testimony O'Neill gave about the decision to hire Reyes Kurson. R. 271 at 9. As discussed above, O'Neill's statement of mind has no bearing on the other defendants' state of mind.

showed. The jury was instructed on the 18 U.S.C. § 666(c) exception for bona fide wages paid in ordinary course of business, and properly found the exception inapplicable.

Doherty also acknowledges that Doherty received extra payments from ComEd, but he complains there was no evidence about the reason for this extra payment. R. 271 at 11, 21. Gallegos testified that extra payments from ComEd—to the tune of an additional $1,000 to $1,500 per month—started when ComEd added a new subcontractor. *See, e.g.,* Tr. 2810:17-2811:7; 2823:1-11; 2850:23-2851:13. This was not a random increase in payment to Doherty, as he suggests. *See* R. 271 at 11. Rather, the jury could reasonably infer that the timing of this increase in payment was compensation Doherty received for facilitating the illegal activity.

## D. The Government Presented Sufficient Evidence to Sustain Convictions on the FCPA Related Counts.

The government turns to the sufficiency arguments presented by each defendant as to the FCPA-related counts: Count One (in part); Three, Four, Seven, and Nine.

### 1. Arguments Raised by Defendant Pramaggiore

#### a. The Government Introduced Sufficient Evidence Pramaggiore Caused the Preparation of False Documents.

Defendant Pramaggiore contends the evidence was not sufficient for the jury to conclude that any of the documents relating to the renewal or amendment of the Doherty contract were false. R. 264 at 21-25, 38. The evidence at trial included numerous documents indicating that payments Doherty received were for legitimate

services rendered. For example, Doherty's 2017 contract—which was approved by Pramaggiore—specified that all the payments made under the contract were "as consideration for the monthly services of" Doherty, namely, advising "ComEd on legislative issues affecting ComEd and its subsidiaries." GX868; *see also* GX764; GX772. That was a lie; a substantial portion of the payments were destined to the Madigan subcontractors who did no such work.[15] Moreover, the jury heard that ComEd's motivation for paying these individuals was not so that they could assist Doherty, as Doherty told Marquez during a recorded conversation. GX129. Rather, as described in detail above, ComEd paid these individuals at Madigan's request, for the purpose of corruptly influencing Madigan. This improper purpose was not disclosed.

Indeed, Fidel Marquez testified that the contract was inaccurate precisely because it did not identify why the subcontractors were part of the contract, and that they were not providing any services to ComEd in return for payment. Tr. 1925:21-31:16.

The 2018 amendment to Doherty's contract to add Michael Zalewski was similarly false, as it described Doherty's "expanded role" in exchange for the additional payments he would receive. GX769. This was plainly false because Doherty did not have an expanded role concerning Cook County at all; rather, defendants

---

[15] Pramaggiore argues that, to the extent the documents are false because they omitted that the payments were intended to bribe Madigan, there is no evidence she knew that many of the subcontractors—Acevedo, Moody, Nice, or Olivo—were connected to Madigan and that she expected Zalewski to work. R. 264 at 24. As discussed above, the government introduced sufficient evidence for the jury to determine otherwise. *See* Sections I.B, I.C.2

71

arranged for Doherty to receive more money so that he could then pay Zalewski in exchange for no work. GX531; Tr. 2895:5-2896:7; 1956:2-4.

The single source justification forms supporting the renewal of the Doherty contract—including those approved by Pramaggiore in 2017 and 2018—were also false. GX868; GX484. Each provided a justification for why there was no competitive bidding process for the contract. Tr. 1929:5-9. Specifically, the forms explained that Doherty provided expertise as a consultant that could not be obtained elsewhere. GX868; GX484. That was a lie. Rather, Doherty's monthly fees were so high because a substantial portion of the payments went to the subcontractors and were intended to influence Madigan. ComEd did not pay these subcontractors for their expertise; indeed, they in reality did nothing.

Indeed, Carrie Bourque testified that it was important that the justifications in the single source justification form were accurate because those forms could be audited. Tr. 3297:2-13. This was equally true of midyear amendments, like the 2018 amendment to Doherty's contract, because "if all of a sudden they're giving out more money, then there must be something they're getting for that money, right." Tr. 3305:7-15. She also testified that she learned that vendor payments were actually made to benefit a public official, she would have called the ethics hotline. Tr. 3327:19-3328:9. This testimony alone demonstrates the importance of the false statements made on the single source justification forms and contract amendment.

Lastly, Pramaggiore argues that the contracts and other documents cannot be false because there was no requirement that subcontractors be listed. R. 264 at 24-

25.[16] This argument misstates the government's theory. The documents were false not merely for omitting a technical element of the contract, but because the contracts were written to purposefully obscure the true purpose of the payments and objectively false information was provided. The payments were not solely for Doherty's consulting services (or for consulting services to be rendered by the subcontractors) but were intended to influence and reward Speaker Madigan. When Doherty's invoices, month after month, claimed to be for "professional services," this was a lie. GX799 (Doherty invoices). When the contract amendment purported to be for an expanded scope, this was a lie. GX769. And when those payments were processed through ComEd's accounting software, purporting to be for consulting services when they were not, these lies littered ComEd's and Exelon's general ledger. Tr. 3487:17-3488:14; 3501:5-7; GX702 (ComEd / Exelon internal payment records).

### b. The Government Introduced Sufficient Evidence of Pramaggiore's Intent to Falsify Documents.

Pramaggiore challenges the sufficiency of the evidence of her intent to falsify documents. R. 264 at 25-27. First, she argues that the government cannot prove she intended to falsify the Doherty contracts for 2017 and 2018 (Counts Three and Four), because she did not personally sign these contracts, and the 2019 contract amendment (Count Nine), because she had already left ComEd CEO. R. 264 at 26. This argument fails for several reasons.

---

[16] Pramaggiore also points to contractual language saying, "The independent contracting relationship shall be established between such contractor and Consultant exclusively." R. 264 at 23. But the evidence showed that Pramaggiore made the decision to put Zalewski on Doherty's contract. *See, e.g.*, GX22.

73

First, as Pramaggiore acknowledges and as discussed above, she did sign false single source justifications for the Doherty contract in 2017 and 2018. GX868; GX484. Pramaggiore again argues that these "technical" documents did not require mention of subcontractors. R. 264 at 26. But the forms *did* require truthful justifications of the payments. As discussed above, the omission of the subcontractors misstated the reasons for the payments and hid the true reason why the Doherty payments were so high—to pay Madigan associates for no work.

Moreover, as Elizabeth Lynch (Director of Corporate Accounting at Exelon) testified, Pramaggiore was responsible not just for signing the single source justifications, but for approving payments under the contract on an ongoing basis. *See, e.g.*, GX702; Tr. 3497:4-3499:12. Accordingly, each payment under the contract generated a false entry in the general ledger of the company for which Pramaggiore was directly responsible. And while Pramaggiore did not personally sign each contract with Doherty, a reasonable jury could conclude that she caused their creation and authorized their scope, as demonstrated by, for example, her direction to Marquez to hire Zalewski. *See* GX22. And her involvement in pushing for the contracts continued into 2019, even when she had moved to Exelon. GX131. Such evidence established her liability as an aider and abettor. In addition, as discussed further below in response to the arguments presented by defendant Hooker, a reasonable jury could have found Pramaggiore guilty under a theory of *Pinkerton* liability as to the substantive counts of the indictment, including the books and records charges. *See* Section II.D.3.

74

### c. Ample Evidence Established that Pramaggiore Conspired to Circumvent Internal Controls.

Finally, the government presented ample evidence of an agreement to circumvent internal controls, as alleged as one of the objects of the Count One conspiracy. R. 264 at 39.

As a threshold matter, Pramaggiore is wrong that "[t]he only 'internal control' that the Government presented is Exelon's Corporate Code of Business Conduct" (the "Code of Conduct.") R. 264 at 39. Pramaggiore ignores the testimony of Elizabeth Lynch, who testified at length about Exelon's accounting processes, including ComEd's and Exelon's controls and processes designed to ensure that vendor payments were for proper purposes. These internal controls included requiring the submission of invoices before payment, the requirement that invoices be approved by someone "familiar with the charges," and the requirement that payments be for services actually rendered. Tr. 3513:20-3514:19. Ms. Lynch also testified about the importance of accurate invoices, and how payment justifications feed into ComEd's and Exelon's general ledgers. Tr. 3487:17-3488:14; 3501:5-7. Carrie Bourque testified that single-source justification forms – such as the two Pramaggiore signed – are necessary for contracts above $250,000 in part to ensure that the utility's money is properly spent. Tr. 3293:7-3294:20. Ms. Bourque emphasized the importance of accurate justifications in the single-source justification form, which are subject to auditing. In addition, as a public utility, ComEd is required to "bringing the best possible prices and using their money that they pay us for the utilities in a wise and competitive way" and to accurately explain any deviations from the "standard

75

process" of competitive bidding. Tr. 3297:4-13. These were all internal controls designed to ensure accurate financial reporting. *See* 15 U.S.C. § 78m(b)(2)(B).

Pramaggiore is also wrong that the Code of Conduct is not evidence of an internal accounting control. R. 264 at 39. The Code of Conduct relates directly to the ways management ensures accurate reporting of financial information and the proper authority to make financial commitments. Specifically, the 2015 and 2016 Code of Business Conduct describes internal controls related to ComEd's accounting systems, including: (i) "Never make an entry in any record that intentionally misrepresents, conceals or disguises the true nature of any transaction, event or condition," and (ii) "Record all business transactions, events and conditions accurately, completely, and in a timely fashion." GX739. There was more than sufficient evidence that Pramaggiore approved transactions that did not comply with these standards in order to circumvent these internal safeguards.

## 2. Arguments Raised by Defendant McClain

Defendant McClain raises essentially the same arguments as Pramaggiore. R. 266 at 8-14. Like Pramaggiore, McClain argues that the government did not prove a false book or record because the evidence at trial demonstrated that there was no requirement to list subcontractors on the forms the government identified. For the reasons explained above, this argument fails.[17]

---

[17] McClain also cites the testimony of former ComEd CEO Joe Dominguez, who said at trial that a single source justification form that omitted the names of subcontractors was not, "in [his] opinion," false. R. 266 at 10 (quoting Tr. 4193:7-14). In a footnote, McClain argues that Dominguez's testimony may be binding on ComEd as CEO (*id.* at n.3), but he fails to explain how Dominguez could bind ComEd as its *former* CEO or how binding ComEd has any relevance in the context of a motion for judgment of acquittal. In any event, the single source

McClain also contends that there was no evidence that he knowingly or willingly falsified a book or record, because he did not have responsibility or access to internal ComEd documents, did not have any role in creating, signing, approving, or reviewing JDDA contracts or single source justification forms, and was not aware of ComEd's internal accounting practices. R. 266 at 11-12. But, like Pramaggiore, McClain also is liable under *Pinkerton* and aiding and abetting law for these offenses. The falsification of the records was a key part of the conspiracy to funnel illicit payments to Madigan's associates and avoid detection. McClain played an integral party in this conspiracy as the conduit between ComEd and Madigan. McClain's liability does not depend on his personal signature on any of the false documents where, in many instances, he caused their creation by, for example, enlisting Shaw Decremer and John Bradley to act as intermediaries for payments to individuals such as Ed Moody. Tr. 1911:1-1913:4; 1934:11-1938:6. Invoices sent by both individuals to ComEd (as well as resultant payment records generated by the company) made it falsely appear that payments made to these individuals were for legitimate lobbying services, when in fact the payments were in large measure made to corruptly influence Madigan for no work. Tr. 3490:14-3491:22; 3492:7-3494:3.

McClain certainly knew that he was causing false documentation to be created as part of ComEd's books and records, and that this was part and parcel of the plan

---

justifications were not false simply because they omitted subcontractors, but because they affirmatively mispresented why payments were being made to Doherty. Moreover, Dominguez's testimony is nothing more than an impermissible legal opinion offered by an attorney. *See* Section II.C.5.a.

to funnel bribes to Madigan's associates through intermediaries. McClain explained to Bradley that he had routinely arranged for the creation of false records to camouflage payments that were made to benefit Madigan: "at one point in time I had uh, maybe five consultants working for me . . . and all they ever really did is give me pieces of paper." GX77. One of those consultants was Ed Moody, who was indirectly paid by ComEd. This call showed that McClain knowingly caused the creation of false documents to avoid detection and was well aware that the Madigan hires necessitated the falsification of books and records. Indeed, at one point, McClain instructed Bradley, who was paying Moody on behalf of ComEd, that he should still pay a holiday "bonus" to Moody after his payments were terminated. GX111. This, of course, was a lie, because Moody never did any work for Bradley that would entitle him to a "bonus." Tr. 3762:1-12.

McClain is also liable for these offenses as an aider and abettor. As described above, the jury heard considerable evidence reflecting that for years, McClain facilitated the continued payment of Madigan's associates through the Doherty contract. By promoting and counseling the continued creation of contracts, invoices, and other documents that falsely described the intended recipients of payments and the purpose of such payments, McClain aided and abetted the substantive books and records offenses. In addition, as discussed further below as to the arguments made by defendant Hooker, McClain has *Pinkerton* liability as to the substantive counts of the indictment, including the books and records charges. Section II.D.3.

### 3. Arguments Raised by Defendant Hooker

Hooker argues that the government failed to present any evidence of an agreement to commit the crime of falsifying documents and circumventing internal controls. R, 262 at 21-22. As a member of this conspiracy and a former high-level executive at ComEd, the generation of false contracts and invoices that masked the true purpose of the subcontractors was reasonably foreseeable to Hooker.

Hooker argues that he cannot be held liable for violating the books and records provisions of the FCPA because he had retired as a full-time employee from the company. R. 266 at 24-25. But it was Hooker who created the illegal payment arrangement in 2011 and set it in motion when he was head of the company's legislative affairs department. *See* GX126 (Hooker: "We came up with this plan"); GX118 ("me and McClain was—I was the one that created it"); Tr. 2001:1-11 (Marquez explaining that Hooker meant that he and McClain had "created the mechanism or process by which the subcontractors were added"). Hooker continued to play a role in the contract after he became an exclusive consultant for the company and continued to monitor the subcontractors as described by Doherty in a recorded conversation throughout the existence of the conspiracy. *See* GX129 (Doherty stated that Hooker would call to check on the subcontractors and report back to Madigan). Moreover, Hooker continued to monitor and give fellow conspirator McClain advice about how to have the contract renewed in 2019, when Dominguez became ComEd's CEO. GX126; GX148. Even though he had retired, Hooker was still very much involved in ComEd affairs. Moreover, even if he had abandoned an active role as to this object of the conspiracy, he was still liable for his participation in the conspiracy

79

at its inception as described above, because "one cannot avoid liability for conspiracy simply by ceasing to participate" in the conspiracy. *United States v. Schiro*, 679 F.3d 521, 528-29 (7th Cir. 2012) (citations omitted).

The jury also had sufficient evidence before it to find Hooker guilty under *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946), in that the evidence showed that Hooker joined the conspiracy, and the falsification of records were reasonably foreseeable acts taken in furtherance of the conspiracy by his fellow conspirators. *See, e.g., United States v. Rachel*, No. 16 CV 7631 (N.D. Ill.) (Leinenweber, J.) [ECF # 12 at 4] (describing court's earlier decision to convict defendant after bench trial on substantive count based on *Pinkerton* theory of liability). Given his previous role as a senior executive within the company, and his role in creating the subcontractor arrangement and taking steps to conceal the true purpose of the arrangement, it was reasonably foreseeable to Hooker that his fellow conspirators would continue to falsify internal records over the years that followed. Indeed, in ruling on the government's motion to admit conspirator statements, the Court rejected the defendants' argument that there was not a concerted effort to falsify documents, by noting that the evidence proffered by the government reflected that the act of falsifying records was "part and parcel" of the charged conspiracy to influence Madigan. R. 157 at 4 (citing *Nye & Nissen v. United States*, 336 U.S. 613, 617 (1949)).

In addition, Hooker is liable for the books and records violation charged in Count Nine as an aider and abettor. Title 18, United States Code, Section 2 provides "[w]hoever commits an offense against the United States, or aids, abets, counsels,

commands, induces or procures its commission, is punishable as a principle." As the Supreme Court has explained, an accomplice is liable as a principal when he gives assistance or encouragement with the intent thereby to promote or facilitate commission of the crime. *Rosemond v. United States*, 572 U.S. 65, 71 (2014) (citations omitted). Once knowledge of an aider and abettor is established, it "does not take much to satisfy the facilitation requirement." *United States v. Woods*, 148 F.3d 843, 848 (7th Cir. 1998) (quoting *United States v. Bennett*, 75 F.3d 40, 45 (1st Cir. 1996)). Here, Hooker advised and counseled how to secure approval for the renewal of the Doherty contract for 2019, which was a necessary prerequisite to the continued creation of false documentation that Hooker initiated eight years earlier, in 2011. This is sufficient to establish Hooker's liability as an aider and abettor as to Count Nine.

Hooker contends he is not liable as an aider and abettor because he did know the subcontractors did not work. R. 262 at 25-26. For the reasons discussed above, the jury's contrary conclusion was supported by evidence in the record. *See* Section I.C.4. Accordingly, Hooker's involvement setting up and advancing the unlawful underlying scheme shows his knowledge of the falsification of documents related to that scheme.

### 4. Arguments Raised by Defendant Doherty

Doherty argues that the evidence is not sufficient as to the books and records charges because he had no knowledge of ComEd forms or accounting processes. R. 271 at 11-12, 21-22. In addition to the fact that Doherty is subject to *Pinkerton* and aiding and abetting liability, as discussed above, the jury also heard evidence reflecting that

Doherty was a long-time businessman who was in a position to understand that falsely describing the nature of payments would cause the creation of false entries in the books and records of a company. *See, e.g.*, Tr. 2790:17-2791:22. Here, Doherty provided false justifications to ComEd, in his invoices and in the contract requisition process, and was intimately involved in the contracting process. *E.g.,* GX399, GX544, GX630, GX799. Indeed, the jury could easily conclude that Doherty was familiar with ComEd's business practices, because he had been working for the company for more than thirty years, beginning in 1985. Tr. 2709:10-12. Moreover, Doherty was aware that he was being asked to provide accurate information so there could be an internal justification as to why the payments under the contract were being increased. *See, e.g.*, Tr. 2887:17-2889:21. Indeed, Doherty kept submitting false invoices to the company after conceding in a recording with Marquez that the Madigan subcontractors were not performing any work. In these circumstances, there is sufficient evidence for the jury to determine that Doherty was aware of the likely consequences of his actions.

## II.     The Defendants' Motions for a New Trial Should Be Denied.

### A.     Legal Standard for a New Trial

A court may vacate a judgment and grant a new trial upon a defendant's motion "if the interest of justice so requires." FED. R. CRIM. P. 33; *see also United States v. Berg*, 714 F.3d 490, 500 (7th Cir. 2013); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012). A new trial is in the interest of justice where "the substantial rights of the defendant have been jeopardized by errors or admissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989).

"[A] defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006). Rule 33 motions are generally disfavored, and courts should only grant them in "the most extreme cases." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (quotation marks and citation omitted). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quotation marks and citation omitted).

A failure to make a prompt objection during trial results in forfeiture. *See United States v. Olano*, 507 U.S. 725, 731 (1993). Courts apply plain error review to claims that have been forfeited. *E.g., United States v. Diggs,* No. 18 CR 185-1, 2022 WL 615033, at *21 (N.D. Ill. Mar. 2, 2022), *aff'd,* No. 22-1502, 2023 WL 5688801 (7th Cir. Sept. 5, 2023). Plain error review requires a new trial only if "(1) an error occurred, (2) the error was plain, (3) it affected the defendant's substantial rights, and (4) it seriously affected the fairness, integrity, or public reputation of the proceedings." *United States v. Gan*, 54 F.4th 467, 475 (7th Cir. 2022). In addition, errors that are harmless do not merit a new trial under any circumstance. *Id.* at 475; *see also Neder v. United States*, 527 U.S. 1, 7 (1999).

## B.   The Court Committed No Error in The Jury Instructions.

### 1.   A *Quid Pro Quo* is Not an Element of § 666.

Defendants argue that the jury instructions regarding the elements of 18 U.S.C. § 666 were deficient for failing to require the jury to find a *quid pro quo. E.g.,* R. 264 at 41-46. As this Court has repeatedly ruled, there is no basis to import a *quid*

*pro quo* requirement onto § 666. *E.g.*, R. 83; Tr. 3885:10-25.[18] The plain text of § 666, and the Seventh Circuit's case law, reflects no such requirement, whether the case is charged under the intent to influence (bribery) or the intent to reward (gratuity) provision of § 666.[19] As the Seventh Circuit recently reiterated, and as discussed in detail below, the Seventh Circuit has "refused to import an additional, specific *quid pro quo* requirement into the elements of § 666." *United States v. Snyder*, 71 F.4th 555, 579 (7th Cir. 2023) (quoting *Agostino*, 132 F.3d at 1190).

A statute must be interpreted consistent with its plain meaning. *See, e.g.*, *Salinas v. United States*, 522 U.S. 52, 56 (1997) (interpreting § 666 based on its plain text, and recognizing "[t]he enactment's expansive, unqualified language, both as to the bribes forbidden and the entities covered"). By its plain text, § 666(a)(2) makes it a crime to offer, give, and agree to give, things of value to another person, where the giver acts "corruptly, with the intent to influence or reward" an agent of a State or local government agency in connection with some business, transaction, or series of transactions of the government agency. 18 U.S.C. § 666(a)(2).

Relying on the statute's plain language and structure, the Seventh Circuit repeatedly and unequivocally has held that no *quid pro quo* agreement or understanding is required to establish a violation of § 666. *See, e.g.*, *United States v.*

---

[18] The government incorporates its prior briefing on this issue.

[19] The distinction between a bribe and a gratuity has been described as follows: "If the payer's intent is to influence or affect future actions, then the payment is a bribe. If, on the other hand, the payer intends the money as a reward for actions the payee has already taken, or is already committed to take, then the payment is a gratuity." *United States v. Agostino*, 132 F.3d 1183, 1195 (7th Cir. 1997). Pramaggiore concedes that the Seventh Circuit has expressly held that § 666 applies to gratuities. R. 264 at 43.

*Mullins*, 800 F.3d 866, 871 (7th Cir. 2015) (holding that evidence of *quid pro quo* is not necessary to establish a violation of § 666(a)(1)(B)); *United States v. Boender*, 649 F.3d 650, 654 (7th Cir. 2011) (noting that "it is clear that our circuit, like most others, does not require a specific *quid pro quo*" in cases involving charged violations of § 666(a)(2)); *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005) (holding that a *quid pro quo* is sufficient but not necessary to violate § 666(a)(1)(B)); *United States v. Agostino*, 132 F.3d 1183, 1190-91 (7th Cir. 1997) (§ 666(a)(2), "by its statutory language, requires that the defendant act '*corruptly . . . with intent to influence or reward*,'" and on that basis "declin[ing] to import an additional, specific *quid pro quo* requirement into the elements of § 666(a)(2)").

The Seventh Circuit recently reaffirmed its past precedent, and recognized that "we have refused to 'import an additional, specific *quid pro quo* requirement into the elements' of § 666." *Snyder*, 71 F.4th at 579 (quoting *Agostino*, 132 F.3d at 1190). The defendants made incessant assurances to this Court before, during, and after trial that the Seventh Circuit was poised to hold that § 666 did not cover gratuities. But not only did the panel in *Snyder* unanimously conclude that its prior precedent on this matter was correct and that § 666 does indeed cover gratuities, but a grand total of *zero* judges in regular active service on the Seventh Circuit thought the panel's decision affirming Circuit precedent deserved *en banc* review. *See United States v. Snyder*, No. 21-2986 (7th Cir. July 14, 2023) [ECF #65].

Having lost yet again in *Snyder* with their argument that prosecutions under § 666 require proof of a *quid pro quo*, the defendants nonetheless make the frivolous

85

argument that *Snyder* completely reworked § 666 jurisprudence in the Seventh Circuit and that the case somehow stands for the proposition that a *quid pro quo* must be proved for bribery cases under § 666. R. 264 at 51. That conclusion would come as somewhat of a surprise to the defendant in *Snyder*, whose conviction was affirmed based on the pattern instructions given in that case and who unsuccessfully sought rehearing *en banc*. Unsurprisingly, Pramaggiore fails to cite any portion of *Snyder;* in fact, the language of *Snyder* clearly affirmed prior decisions that affirmed jury instructions that reject the idea that the government must prove a *quid pro quo*. In short, the defendants' argument is not to be taken seriously. *Snyder* made no change to the pattern jury instructions that would affect this case.[20]

Pramaggiore further argues that references in the jury instructions to gratuities or rewards should have been stricken because the government relied exclusively on a bribery theory at trial. R. 264 at 42-43. This is incorrect. Although the government often described the benefits Madigan received as bribes, the government also characterized a number of them as gratuities. Tr. 5147:15-25; 5175:9-14; 5198:18-19; 5199:1-22; 5207:1-4; 5219:1-8 The evidence at trial showed that defendants conferred benefits on Speaker Madigan over a period of 8 years, both before and after key legislation was passed. Indeed, when McClain thanked

---

[20] Because the government proved *quid pro quo* bribery, even in the absence of a specific *quid pro quo* instruction, as discussed above, any instructional error was harmless. *See, e.g., United States v. Jordan*, No. 22-40519, 2023 WL 5521059, at *7-8 (5th Cir. Aug. 25, 2023) (finding harmless error even though jury instructions did not include *quid pro quo* as required in the Fifth Circuit, because "[a] review of the record in this matter establishes that there was sufficient evidence of a *quid pro quo*").

Pramaggiore for her efforts to secure the appointment of Juan Ochoa to the ComEd Board of Directors, Pramaggiore's response explicitly linked the appointment to past efforts Madigan had taken to benefit ComEd: "[Yo]u take good care of me and, and so does our friend and I will do the best that I can to, to take care of you." GX90. And just two days after FEJA passed in early December 2016, Pramaggiore told McClain that she would work to renew Reyes Kurson's contract, which is consistent with a gratuity theory. GX393.

In addition, Pramaggiore challenges the instruction defining "corruptly." The court instructed the jury that the government was required to show that the defendants acted "with the intent that something of value is given or offered to reward or influence an agent of State government in connection with the agent's official duties." R. 249 at 37. This instruction paralleled the one approved by the Seventh Circuit in *United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015); in that case, the Seventh Circuit explained that the Circuit's pattern instruction was the source for its explanation of what "corruptly" meant: "This definition of 'corruptly' comes from the Seventh Circuit's Pattern Criminal Jury Instructions (2012 ed.) for § 666," which tracks the pattern instruction given in this case. Far from requiring a *quid pro quo*, *Hawkins* held that a public official need not agree or even intend to perform an official act to be convicted under § 666. *Id.* at 882.

*Snyder* cites *Hawkins's* discussion of the term "corruptly" (and its reference to the pattern instruction on this term) with approval, 71 F.4th at 580 (citing *Hawkins*, 777 F.3d at 882); in other words, the Seventh Circuit has just reiterated that the

definition of corruptly that is found in the Circuit's pattern instructions correctly conveys the concept to the jury. That formulation parallels the instruction the Court gave in this case and indicates that the Seventh Circuit intended no change to the pattern jury instructions.  Insofar as the defendants suggest that the Seventh Circuit intended to add to or change the pattern instruction on the term "corruptly," they are mistaken.

### 2.    The Court Correctly Declined to Give Defendants' Proposed "Goodwill" Instruction.

Pramaggiore argues the Court erred by refusing to give defendants' proposed "goodwill" instruction. R. 264 at 46-48. Specifically, defendants requested the Court instruct the jury that "[i]t is not a crime to give a thing of value to a public official to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." R. 140, Proposed Instruction No. 31.1.

The Court properly rejected this instruction, which deviates from the Seventh Circuit pattern instructions. This is not the first public corruption case in this district, and yet, defendants point to no Seventh Circuit case involving § 666 finding it necessary to give a "goodwill" instruction. Defendants cite *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999). In *Sun-Diamond*, the Supreme Court considered the extent to which a gratuity required a connection between the act and the thing of value conferred and concluded that the Government must reference a particular "official act" that the gratuity was intended to reward. 526 U.S. at 405. But *Sun-Diamond* relates to 18 U.S.C. § 201, which defines and uses the phrase "official

88

act" in its prohibition of illegal gratuities. *Id.* at 406 (citing 18 U.S.C. § 201). Section 666 contains no analogous definition or provision.

Pramaggiore insists that the omission of a goodwill instruction deprived her of a fair trial because it permitted the jury to convict her without knowing that it is legal to give things of value to public officials if the intent is to build goodwill. R. 264 at 47. But the proposed "goodwill" instruction was essentially the mirror image of the pattern corrupt intent instruction the jury received and was therefore unnecessary and redundant. The Court properly instructed the jury that it must find a defendant acted "with the intent that something of value is given or offered to reward or influence an agent of State government in connection with the agent's official duties." R. 249 at 37. Thus, the jury was required to find that the defendants' efforts were specifically intended to influence or reward Madigan *in connection with his official duties*. The Court likewise instructed the jury that it must find a connection to a "business, transaction, or series of transactions involving legislative activity involving a thing of value of $5,000 or more." *Id.* These instructions sufficiently guarded against a finding that token gifts were given simply to build generalized goodwill. Indeed, courts have held that a finding of corrupt intent necessarily excludes a finding of goodwill. *See United States v. McNair*, 605 F.3d 1152, 1195 (11th Cir. 2010). Thus, a "goodwill" instruction would have been redundant and would have risked confusing the jury. *See, e.g., United States v. Lunn*, 860 F.3d 574, 580 (7th Cir. 2017) (affirming denial of theory-of-defense instruction that would have stated that defendant lacked the intent to defraud if he acted in good faith and honestly believed

the accuracy of financial statements, because the instruction was "at best redundant" of the intent instruction given by the court); *United States v. James*, 464 F.3d 699, 707 (7th Cir. 2006) (affirming denial of theory-of-defense instruction, where "this theory of defense was intrinsically part of the charge and the failure to provide these instructions did not deny James a fair trial"); *United States v. Hill*, 252 F.3d 919, 923 (7th Cir. 2001) ("Unless it is necessary to give an instruction, it is necessary not to give it, so that the important instructions stand out and are remembered."); *United States v. Allegretti*, 340 F.2d 254, 259 (7th Cir. 1965) (en banc) (district court need not give cumulative or repetitious instructions simply because the defendant prefers the language in one instruction over the language in another).[21]

### 3. The Court Correctly Declined to Give Defendants' Proposed "Good Faith" Instruction.

Pramaggiore complains that the Court refused to give her proposed instruction regarding her purported good faith defense with regard to the false books and records counts. R. 264 at 48 (citing R. 140 at Proposed Instruction No. 35.1). This instruction was unnecessary because the "willfulness" definition adequately instructed the jury on the *mens rea* requirement in this context; the good faith instruction did not add anything. *Cf. United States v. Chanu*, 40 F.4th 528, 543 (7th Cir. 2022); *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008).[22] Moreover, the proposed instruction,

---

[21] Because the "goodwill" instruction was redundant of the instructions given to the jury, any failure to give this instruction was harmless error. *See Neder*, 527 U.S. at 17 (error in jury instruction was harmless).

[22] For this reason, any incorrect failure to give this instruction was harmless error. *See Neder*, 527 U.S. at 17. The government maintains its objection to the "willfulness" instruction given

while ostensibly limited to the books and records allegations, did not make it sufficiently clear that it did not apply to the charges under § 666, as it referred broadly to Count One. The Court properly rejected this instruction.

### 4. The Court Correctly Declined to Give Defendants' Instruction Concerning Vicarious Liability as Proposed.

Pramaggiore challenges the Court's decision to give Pattern Instruction 5.02, rather than defendants' significantly modified and misleading proposed version. R. 264 at 49-51.

Pattern Instruction 5.02 provides, "A person who acts on behalf of a corporation also is personally responsible for what he does or causes someone else to do. However, a person is not responsible for the conduct of others performed on behalf of a corporation merely because that person is an officer, employee, or other agent of the corporation." William J. Bauer Pattern Jury Instructions (2022) at 87. Defendants' proposed version of this instruction strategically omitted the first sentence of the pattern. R. 140 at 42. Without the first sentence, this instruction reads as if a person cannot be responsible for actions their subordinates completed—for example, at that person's direction—and therefore would have risked confusing the jury. Indeed, during the jury instructions conference, counsel for Pramaggiore argued: "[T]he modification from the pattern, we dropped language suggesting that a person cannot hide behind a corporation, cannot say, 'I'm not guilty because I'm part of a

---

by the Court (R. 237 at 6-9), which improperly increased the government's burden of proof for the FCPA counts. This further renders a good faith instruction unnecessary.

corporation.'" Tr. 4990:11-14. But this is exactly the language that defendants *kept* as part of the instruction.

Pramaggiore's arguments that this sentence should have been omitted lack merit. First, she argues that the instruction would have prevented the jury from concluding that she, as ComEd's CEO, should have known about the subcontractors. R. 264 at 49. But the Court read to the jury the second sentence of the pattern—"a person is not responsible for the conduct of others performed on behalf of a corporation merely because that person is an officer, employee, or other agent of the corporation"—which protected against conviction on the basis of Pramaggiore's title alone.

Pramaggiore argues that this instruction risked the jury convicting her because she "cause[d] someone else to do something" without finding she had corrupt intent. *Id*. But the jury received a separate instruction requiring that it find corrupt intent. R. 249 at 32. Instructions are considered as a whole, not in piecemeal fashion. *United States v. Grady*, 746 F.3d 846, 848 (7th Cir. 2014) (citation omitted). These two instructions are not inconsistent, nor did the pattern instruction reduce the *mens rea* to a negligence standard, as Pramaggiore suggests.

Pramaggiore likewise insists the Court should have added a sentence: "You may not convict a person on the basis that he or she should have known that he or she was participating in wrongdoing, rather than on the basis of his or her actual knowledge," drawing from *United States v. Vallone*, 698 F.3d 416, 465 (7th Cir. 2012). R. 264 at 49-50 (discussing R. 140 at 42). The Seventh Circuit discussed this principle

in the context of an ostrich instruction. There was no ostrich instruction in this case. Pramaggiore claims such an instruction was necessary to prevent the jury from convicting based on a negligence standard. *Id.* at 50. Since the pattern instruction did not reduce the *mens rea* of the offense to negligence, this additional sentence would have been redundant and plainly was unnecessary. And as discussed above, the jury was properly instructed on the applicable *mens rea.*[23]

### 5. The Court Did Not Err by Giving a *Pinkerton* Instruction.

Pramaggiore challenges the Court's decision to give the pattern *Pinkerton* instruction. R. 264 at 50-52. She does not suggest that the Court misstated the law or argue that such an instruction was inapplicable in this case. Rather, Pramaggiore contends that the *Pinkerton* instruction may have confused the jury by inserting "gratuitous . . . complexity." *Id.* at 51. On the contrary, the pattern instruction provided was relatively straightforward in explaining the *Pinkerton* theory of liability, which has been a fixture of criminal law for almost 80 years. None of the defendants offered any proposed language in an effort to clarify the *Pinkerton* instruction (R. 140 at 80), and thus their complaint that the instruction was too complex is waived or forfeited.

Pramaggiore cites *United States v. Manzella*, where the Seventh Circuit disapproved of a so-called *Pinkerton* instruction, which was so compressed that it did not even "state clearly that a defendant can be convicted of a substantive crime

---

[23] Because this instruction was redundant of the instructions given to the jury, any failure to give this instruction was harmless error. *See Neder*, 527 U.S. at 17 (error in jury instruction was harmless).

committed by his coconspirator in furtherance of the conspiracy" and "failed to present the *Pinkerton* doctrine in an intelligible form." 791 F.2d 1263, 1268 (7th Cir. 1986). Insofar as Pramaggiore suggests the Seventh Circuit Pattern Committee failed to correctly explain *Pinkerton* liability, she is incorrect, and in any case failed to contemporaneously explain how the pattern instruction is incorrect. Indeed, the defendants objected to a non-pattern *Pinkerton* instruction being provided to the jury. This case was not uniquely complicated such that a *Pinkerton* instruction injected undue complexity, as Pramaggiore suggests; an indictment with a conspiracy charge often involves multiple objects, substantive offense, and defendants, as in this case.

The Seventh Circuit has ruled that, for a *Pinkerton* instruction to be adequate, it must "advise the jury that the government bears the burden of proving all elements of the [*Pinkerton*] doctrine beyond a reasonable doubt." *United States v. Stott*, 245 F.3d 890, 908 (7th Cir. 2001) (citing *United States v. Sandoval-Curiel*, 50 F.3d 1389, 1394-95 (7th Cir. 1995)). The pattern instruction, which the Court provided to the jury, does exactly that. Bauer Pattern Jury Instructions (2022) at 110-112; R. 249 at 48-49. There was no error.

Pramaggiore points to a jury question, which she claims demonstrates that this instruction did, in fact, confuse the jury. R. 264 at 51. Specifically, the jury asked, "If on instructions pg 43 (Instruction #39) [the books-and-records instruction] you don't believe the government proved 'beyond reasonable doubt, can pg 48 of the instructions [the *Pinkerton* instruction] still be applied? Yes or No … P.S. This includes the burden of proof by the government." Tr. 5516:17-22.

94

The defendants have waived this claim of error, because they collectively insisted that the Court take no steps to clarify the matter in spite of the government's request that the Court do so. Tr. 5524:9-5526:16. Having resisted any effort to clarify the application of the *Pinkerton* instruction, the defendants cannot complain about their own handiwork.

The objection is misplaced in any case. Contrary to Pramaggiore's assertion, this question does not imply that the *Pinkerton* instruction resulted in an erroneous conviction. Rather, the question merely suggests that the jury was asking for clarification on the applicability of *Pinkerton* as an alternative theory of liability on the books-and-records counts. Indeed, the jury need not have found a particular defendant committed all elements beyond a reasonable doubt specified in Instruction No. 39, provided that the jury found the government proved all elements beyond a reasonable doubt set forth in Instruction No. 44, precisely as the question implies.

### 6.  The Instructions for 18 U.S.C. § 666 Did Not Need to Specify Madigan or Limit the "Things of Value" to "Legislation."

Pramaggiore complains that the Court did not modify the pattern instructions for § 666 to identify Madigan or limit the "things of value" to "legislation." R. 264 at 52-53. First, defendants cite no support for their argument that the Court should have inserted the term "Michael Madigan" or "Mr. Madigan" in the instructions. Indeed, there is none. Pramaggiore argues that inserting Madigan's name was important to prevent the jury from convicting defendants for influencing or rewarding a person who was not Madigan. *Id.* at 52. Neither in their briefing or in argument before the Court, however, did defendants name any person the jury could reasonably

have confused with Madigan, who was clearly the public official accused of being bribed. *Id.*; *see, e.g.,* Tr. 5008:21-5009:11. This argument is frivolous. Indeed, the closing arguments of all parties, both government and defense, made clear that Madigan was the individual in question.[24]

Moreover, as pertains to Instruction No. 31, the purpose of this instruction was to describe the objects of the conspiracy alleged in Count One of the Indictment. R. 249 at 32. Inclusion of a specific agent in this instruction may have led the jury to believe that the government was required to prove the commission of the offense. Therefore, identifying Madigan in the instruction could have caused juror confusion about what was required to convict on that count.

Likewise, the use of the term "legislative activity" as opposed to "legislation" did not constructively amend the indictment, as Pramaggiore suggests. R. 264 at 53. Activities like committee assignments, for example, are instrumental to the ultimate passage or defeat of bills in the legislature. The use of the phrase "legislative activity" in the jury instructions thus properly clarified that the jury was not limited to bills that passed.

Doherty similarly argues that the statutory reference to "business, transaction and series of transactions" should have been amended to instead include only EIMA, Senate Bill 9, and FEJA. R. 270 at 8-9. The jury heard evidence about other ComEd-related legislation, including a House Resolution that Madigan sponsored and advocated for, which was favorable to Exelon in 2014 (HR 1146); a bill proposed by

---

[24] This is a trivial edit, and any error is therefore harmless. *See Neder*, 527 U.S. at 17.

Lisa Madigan that ComEd successfully defeated in 2018 (HB 5626); an extension of the formula rate that ComEd supported in 2015 (HB 3975); and another proposed extension of the formula rate in 2019 (which has been referred to as the "Skinny Bill" or SB 2080). Moreover, witnesses, testified that ComEd monitored thousands of bills in the General Assembly each year and took an interest in many that did not involve energy legislation. Tr. 1818:9-22. For these reasons, the Court properly declined to limit the jury instructions to specific pieces of legislation.

### 7. The Court Properly Declined to List the Documents Alleged to Be False.

Pramaggiore insists the Court erred by failing to give defendants' Proposed Instruction No.31.1, which would have listed all the specific exhibit numbers of the books and records the government alleged defendants falsified. R. 264 at 53-54. Pramaggiore cites no case in which a district judge has instructed the jury as to the specific exhibit numbers of records the government alleges to be false. Defendants' proposed instruction was unnecessary and would have been unduly complicated and burdensome. There simply was no need to separately identify each of the hundreds of false documents the government presented at trial in the jury instructions.

Pramaggiore contends that the instructions left open the possibility that the jury could find a defendant falsified or caused to be falsified any sort of document. As Pramaggiore acknowledges, Instruction No. 39 informed the jury that the government must prove "defendant falsified, or caused someone else to falsify the books, records, or accounts of ComEd or Exelon as specified in the particular count of the indictment." R. 259 at 44. The indictment, in turn, outlined various categories of

such documents. *See, e.g.,* R. 1 at 44 ¶ 2 (documents "in connection with the renewal of JDDA's contract for 2018"); 28 ¶ 2 (documents "in connection with the amendment of JDDA's contract for 2018"); 50 ¶ 2 (documents "in connection with the renewal of JDDA's contract for 2019"). The government likewise identified the false documents by category during closing argument. *See, e.g.*, Tr. 5222:7-12 (focusing on the Doherty invoices, the single-source justifications that Pramaggiore signed, the Exelon contracts that Doherty signed, and the Asset Suite records); Tr. 5222:13-16 (focusing on "[i]nvoices, the 2018 amendment [that] has to do with a change in the description of the services rendered, as well as the contracts and the Asset Suite records"). Moreover, as Pramaggiore admits, the Court instructed the jury it was required to unanimously agree on the specific book, record, or account that was falsified. R. 249 at 45. Pramaggiore fails to explain how, in light of these instructions, the jury could have found a defendant falsified a document that was not specified in the indictment. *See, e.g., United States v. Marchan*, 935 F.3d 540, 548 (7th Cir. 2019) (noting presumption that juries follow the instructions given by court).

### 8. The Court Properly Instructed the Jury Regarding § 666(c).

Doherty contends the Court erred by refusing his proposed non-pattern instruction regarding the burden of proof for § 666(c). R. 270 at 5-7. Specifically, Doherty requested an instruction that "[t]he government must prove, beyond a reasonable doubt, that the subcontractor jobs Doherty provided were not bona fide wages given in the normal course of business." R. 236 at 4. The Court properly rejected this instruction.

Critically, § 666(c) defined the term "thing of value," which is an essential element of the offense that the jury was instructed the government bears the burden of proving. *See* R. 249 at 38.[25] The pattern instruction for § 666(c)—which the Court read to the jury—provides that: "Bona fide salary, wages, fees, or other compensation paid in the usual course of business do not qualify as a thing of value given, offered or agreed to be given by a defendant." Bauer Pattern Jury Instructions (2022) at 306; R. 249 at 41. This instruction, read in conjunction with the elements instruction for § 666, does not deviate from the fundamental principle that the government bears the burden of proving each element of the offense, including whether "defendant offered or agreed to give, or caused ComEd to offer or agree to give, a thing of value to another person." *Id.* at 38. The government's burden is not addressed in every definitional instruction, and it was likewise not required to be addressed in the definitional instruction for § 666(c). Indeed, the instructions provided, "The burden of proof stays with the government throughout the case." R. 249 at 4. The jury heard no argument that suggested the defendants bore a special burden with respect to this issue, and there was no possible risk the jury mistakenly believed otherwise.[26]

---

[25] Doherty argues in a footnote that, because § 666(c) defines a "thing of value," the government should have presented language tracking this provision to the Grand Jury. R. 270 at 5 n.2. As this Court previously ruled, the government presented all the elements of the offense to the Grand Jury. R. 83 at 4. In any event, as pertinent here, it is well established that claims of error before the grand jury are rendered harmless by conviction at trial. *United States v. Mechanik*, 475 U.S. 66, 72-73 (1986) (errors before grand jury rendered harmless by petit jury's verdict); *United States v. Falls*, No. 22-1545, 2023 WL 2473369, at *3 (7th Cir. March 13, 2023) (petit jury guilty verdict renders harmless any error in grand jury charging decision).

[26] Even if there was error, it was harmless, precisely because the instructions as a whole clearly communicated the government's obligation to prove its case beyond a reasonable doubt. *See Neder*, 527 U.S. at 17.

To the extent Doherty contends that the government presented insufficient evidence that the subcontractors did no real work (R. 270 at 7), the ample evidence the government introduced to the contrary is described in detail in Sections I.B and I.C, above.

### 9. The § 666 Instructions Properly Instructed the Jury as to the Requisite Intent.

For the first time before this Court, Doherty argues that the *mens rea* of the § 666 instructions were inadequate because (1) the instructions only required "some indicia of understanding" that the subcontracts were connected to legislation and connected to Madigan's official duties, when a higher standard is required, and (2) the instruction regarding § 666(a)(2) provided no *mens rea* requirement. R. 270 at 7-8. Doherty has forfeited these arguments and in any event they are wrong.[27]

The instructions given came from the newly revised pattern instructions for § 666. First, the Committee Comment to 18 U.S.C. § 666(a)(1)(B) explains that the definition of "corruptly" derives from Seventh Circuit case law, including *United States v. Mullins*, where the Court held that, "An agent acts corruptly when he *understands* that the payment given is a bribe, reward, or gratuity." 800 F.3d 866, 870 (7th Cir. 2015) (emphasis added). Indeed, Seventh Circuit case law uses the terms "understand" and "know" interchangeably when reciting the definition of "corruptly" in the § 666 context. *See Hawkins*, 777 F.3d at 882; *Mullins*, 800 F.3d at 870 (citing *Hawkins*, 777 F.3d at 882, when using the term "understands"). The instructions in

---

[27] Because Doherty has forfeited these arguments, they do not survive plain error review.

no way suggest that defendants needed only "some indicia" of understanding that the subcontracts were connected to legislation, as Doherty suggests.

Second, contrary to Doherty's assertion, the instructions for § 666(a)(2), also drawn from the pattern instructions, informed the jury of the appropriate *mens rea*: that the defendant must act "corruptly with the intent to influence or reward an agent of State government in connection with" legislative activity. R. 249 at 33, 38.

> **10. The Court Properly Rejected Defendants' Proposed Revisions to the Pattern Instructions Regarding Speculation.**

Doherty argues the Court erred by refusing instructions he contends guarded against improper speculation. R. 270 at 9-10. Rather than protect the integrity of the verdict, defendants' proposed modifications to Pattern Instruction 2.02 and Pattern Instruction 2.03 would have improperly downplayed the consideration the jury could give to circumstantial evidence. *See* R. 140 at 20-22. Specifically, defendants proposed to add to Pattern Instruction 2.02: "However, you may not rely on speculation, gut feelings, or a strong suspicion. Circumstantial evidence that leads only to a strong suspicion that someone is involved in criminal activity is not a substitute for guilt beyond a reasonable doubt." *Compare* Bauer Pattern Jury Instructions (2022) at 32, *with* R. 140 at 20. Regarding Pattern Instruction 2.03, Defendants' version would have deleted the sentence pertaining to direct versus circumstantial evidence that reads, "The law does not say that one is better than the other." Defendants also proposed adding, "However, any inferences hat you make must be reasonable and logically connected to the evidence—you must not speculate or guess." *Compare* Bauer Pattern Jury Instructions (2022) at 33, *with* R. 140 at 21.

It is well established that "[c]ircumstantial evidence is not less probative than direct evidence and, in some cases is even more reliable." *United States v. Rodriguez*, 53 F.3d 1439, 1445 (7th Cir. 1995) (internal citations and quotations omitted). Indeed, circumstantial evidence standing alone may be sufficient to support a conviction for conspiracy. *See United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017). Defendants' proposed instructions would have misled the jury by improperly conflating circumstantial evidence and mere "speculation," "gut feelings" and "suspicion." They likewise would have encouraged the jury to minimize the import of circumstantial evidence in their deliberations. There was no error in refusing these modifications to the jury instructions.

Moreover, defendants' proposed addition to Pattern Instruction 2.03 would have interjected a definition of "proof beyond a reasonable doubt," by suggesting to the jurors what it is not. The Seventh Circuit has clearly and consistently held that "reasonable doubt" is a term that should not be defined by the trial court or counsel. *See, e.g., United States v. Hatfield*, 591 F.3d 945, 949 (7th Cir. 2010); *United States v. Blackburn*, 992 F.2d 666, 668 (7th Cir. 1993) (noting that definitions of reasonable doubt have a likelihood of "confus[ing] juries more than the simple words themselves"); *United States v. Bardsley*, 884 F.2d 1024, 1029 (7th Cir. 1989); *United States v. Glass*, 846 F.2d 386, 387 (7th Cir. 1988) (explaining that "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury") (citations omitted); *United States v. Hall*, 854 F.2d 1036, 1039 (7th Cir. 1988) ("An attempt to define reasonable doubt presents a risk without any

real benefit."); Bauer Pattern Jury Instructions (2022) at 26 (collecting cases). The court properly rejected the instruction on this basis.[28]

### 11. The Court Correctly Declined to Give Defendants' Proposed Definition of "Official Duty."

Doherty contends the Court should have instructed the jury on the meaning of "official duty." R. 270 at 10. Specifically, defendants proposed an instruction that read: "Things such as setting up a typical meeting, calling another public official, or hosting a meeting, without more, are not uses of one's official duty." R. 140 at 65. With this instruction, defendants attempted to import the definition of "official act" from *McDonnell v. United States*, 579 U.S. 550, 567 (2016) (holding that "setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'").

As this Court has held, in a prosecution under § 666, the government is not required to prove any specific "official act," as that term is defined in *McDonnell*. R. 83. Whereas *McDonnell* involved a prosecution for honest services fraud and extortion under color of official right, which require proof that charged bribes were paid in exchange for an "official act' of the bribed official (§ 1346), and that the bribed official was acting under "color of official right" (§ 1951), § 666 does not use the term "official act" or "official right." Instead, § 666 requires that the thing of value being given or offered be in connection with "any business [or] transaction" of the government entity. Consistent with the statue's text, every federal court of appeals

---

[28] Defendants' proposed instruction would have been extraneous, and thus any error in declining to give the instruction was harmless. *See Neder*, 527 U.S. at 17.

to address the issue has concluded that an official act is not required to find a defendant guilty of § 666. *See United States v. Roberson,* 998 F.3d 1237, 1247, 1251 (11th Cir. 2021) (holding, "[c]onsistent with the views of our sister Circuits," that *McDonnell's* "official act" requirement does not apply to § 666 and that a bribery conviction also does not require a "specific act"); *United States v. Ng Lap Seng*, 934 F.3d 110, 131-33 (2d Cir. 2019), *cert. denied,* 141 S. Ct. 161 (2020) (holding that § 666 is "more expansive" than § 201, so "the *McDonnell* standard" does not apply); *United States v. Porter,* 886 F.3d 562, 565 (6th Cir. 2018) (finding defendant's "reliance on *McDonnell* is misplaced," because "[i]n *McDonnell,* the Supreme Court limited the interpretation of the term "official act" as it appears in § 201, an entirely different statute than [§ 666]"); *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017) (same); *United States v. Maggio,* 862 F.3d 642, 646 n.8 (8th Cir. 2017) ("*McDonnell* had nothing to do with § 666."). The Court properly declined to impose an "official act" requirement.

Moreover, there was no likelihood of any confusion in the juror's minds on this issue. The government's theory of the case was that Madigan was the target of corrupt influence owing to his ability to pass and block legislation within the General Assembly. There was no suggestion that a simple meeting or something akin to it was the intended target of the conspirators—indeed, the defendants do not point to any plausible risk this occurred. Accordingly, the instruction was unnecessary in any event and would have only served to clutter the instructions. *Hill*, 252 F.3d at 923

("Unless it is necessary to give an instruction, it is necessary not to give it, so that the important instructions stand out and are remembered.").[29]

### 12. The Verdict Forms Did Not Create Error.

Pramaggiore complains that the Court did not issue special verdict forms. R. 264 at 54-56. Defendants' proposed verdict forms were unduly complicated and would have undoubtedly confused the jury. Among other deficiencies, there is no need for the jury to identify which overt act was committed (the indictment contained dozens of them) because the Seventh Circuit has held that juries are *not* required to unanimously agree on an overt act for a § 371 conspiracy. *United States v. Griggs*, 569 F.3d 341, 343-44 (7th Cir. 2009) ("We don't think the judge was required (or indeed permitted) to tell the jury that, to convict Moor, it had to agree unanimously on an overt act that at least one of the conspirators had committed.").[30]

While jurors must be unanimous as to the object (or objects) of the conspiracy they find were committed, a special verdict form is not necessary. In fact, the Seventh Circuit "has embraced the principle that special verdicts are disfavored in criminal cases because they conflict with the basic tenet that juries must be free from judicial control and pressure in reaching their verdicts." *United State v. Sababu*,

---

[29] Even if such an instruction were appropriate, any error was harmless. *See Neder*, 527 U.S. at 17.

[30] Pramaggiore cites an April 26, 2023, question for the jury, asking for the definition of "overt," to argue that the jury was confused about what constitutes an "overt act." R. 264 at 56. This request for definitional clarification has no bearing on whether defendants were entitled to a special verdict form. Moreover, as it turns out, the jury had mistakenly not been provided with a copy of the indictment when they posed this question, which may have at least in part prompted the inquiry.

891 F.2d 1308 (7th Cir. 1989) (absence of special verdict forms requiring jury to make special findings concerning each of alleged objects of conspiracy did not create error; unanimity instruction as to objects was sufficient); *see also United States v. Warner,* No. 02 CR 506, 2006 WL 2583722, *32 (N.D. Ill. Sept. 7, 2006) (Pallmeyer, J.) (in prosecution of former Governor Ryan, in light of general disfavor of special verdict forms, court decided against using cumbersome special verdict form), *aff'd,* 498 F.3d 666 (7th Cir. 2007). Because special verdict forms are disfavored, there was no prejudicial error.

### C. The Court Did Not Commit Any Evidentiary Error Warranting a New Trial.

#### 1. The Court Properly Excluded Expert Lee Drutman.

Doherty challenges the Court's decision to exclude the testimony of his proposed lobbying expert, Lee Drutman. R. 270 at 2-5. Drutman's proposed testimony would have duplicated testimony from many other witnesses about lobbying and would have merely put an expert gloss over testimony on that subject—which the Court rightly concluded was not so "'enigmatic' as to require navigation by an expert." Tr. 3887:21-23; *see also United States v. Lundy,* 809 F.2d 392, 395 (7th Cir. 1987) ("Courts agree that it is improper to permit an expert to testify regarding facts that people of common understanding can easily comprehend.").

Doherty cites numerous topics about which Drutman would have testified, but these topics were all the subject of testimony from government witnesses on both direct and cross examination. For example, the jury heard about how a client can sometimes hire a lobbyist on retainer even if there is no immediate work available,

(*e.g.*, Tr. 1309:2-22, 2347:12-25), and about lobbyists building goodwill with elected officials and influence their attitudes towards their clients. Tr. 2427:20-2430:5. Moreover, when lay witnesses knowledgeable about these topics were on the witness stand, counsel for Doherty sometimes opted *not* to elicit testimony on any of these points. For example, despite counsel for other defendants posing questions about lobbying to government witness Will Cousineau, former Political Director for the Democratic Party of Illinois and a registered lobbyist, counsel for defendant Doherty chose to not conduct *any* cross-examination. Tr. 1712:12. Doherty provides no support for why "another perspective from outside of Illinois" would have helped the jury, beyond the ample testimony the jury heard over the course of six weeks of testimony. When cross examination, argument, and jury instructions are sufficient to allow the jury to assess the evidence, expert evidence is unhelpful and improper. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591-92 (1993); *United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999); *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004).[31]

### 2.    The Court Properly Excluded Evidence that Pramaggiore Requested an Investigation of ComEd Lobbyists.

Pramaggiore argues that the Court erred by excluding evidence that she previously requested an investigation into company lobbying activity in 2012, as discussed in Defense Exhibit 1135. R. 264 at 57-58. Defense Exhibit 1135 discusses a *Chicago-Sun Times* article which in turn discussed an investigation of a ComEd

---

[31] Even if was error to exclude Mr. Drutman's testimony, it was harmless precisely because other witnesses testified about the same subjects.

lobbyist's ownership interest in an entity that was under scrutiny for its connections to a company whose owners had previously been convicted of fraud. In Defense Exhibit 1135, Pramaggiore stated that "We need a more aggressive approach" and "We need a full investigation," and that Exelon General Counsel Darryl Bradford be "fully briefed" on this issue. This scandal had no connection to the charged conduct. Therefore, Defendant Pramaggiore's acts as to this matter constituted impermissible evidence of a prior good act under Rule 405(a). "Evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment." *United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012); *United States v. Heidecke*, 900 F.2d 1155, 1162 (7th Cir. 1990) (same); *United States v. Rainone*, No. 09 CR 206, 2013 WL 389004, at *2 (N.D. Ill. Jan. 31, 2013), *aff'd*, 816 F.3d 490 (7th Cir. 2016) (Leinenweber, J.) (quoting *United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985) (stating "[e]vidence that the defendant frequently performs lawful or laudable acts does not often establish that some subsequent act is also lawful or laudable.")).[32]

Moreover, as the Court reasoned, introducing Defense Exhibit 1135 and related testimony would have greatly expanded the scope of the trial on a narrow sub-issue. Tr. 4551:22-4552:4. To the extent Pramaggiore called for a broader investigation in to other ComEd lobbyists, the email communication contained in

---

[32] In addition, Pramaggiore's out-of-court statements—"We need a more aggressive approach" and "We need a full investigation"—offered for their truth in her case-in-chief against her would have been inadmissible hearsay. *See United States v. Gray*, No. 11-CR-13-BBC, 2011 WL 2414551, at *2 (W.D. Wis. June 10, 2011), *aff'd sub nom. United States v. Johnson*, 729 F.3d 710 (7th Cir. 2013).

Defense Exhibit 1135 provides no further detail.[33] Accordingly, permitting evidence on this topic would have opened the door not only to testimony about the nature of the allegations that preceded the e-mail communication—which were irrelevant to the charges—but also the scope of any investigation, its thoroughness, its results, and any ensuring consequences. This would have created a mini-trial regarding these irrelevant issues—sidetracking and confusing the jury. *See generally United States v. Carson*, 870 F.3d 584, 598 (7th Cir. 2017) (district court properly excluded evidence that might confuse a jury by creating a "trial within a trial" on ancillary issues). The Court properly excluded this evidence under Rule 403.[34]

### 3. The Court Properly Excluded Evidence that Defendant Pramaggiore Denied Speaker Madigan's Request for Polling Questions.

Pramaggiore challenges the Court's exclusion of testimony that Pramaggiore denied McClain's request that ComEd ask some polling questions on behalf of Madigan and Defendants' Exhibit 1072. R. 264 at 59-60 (citing Tr. 4549:18-23). The Court properly excluded this testimony as improper evidence of good acts pursuant to Federal Rule of Evidence 405(a). Pramaggiore sought to introduce her denial of Madigan's request for polling questions for an impermissible propensity purpose:

[33] Pramaggiore argues that, if she had corrupt intent, she would not have suggested that non-conspirators Tom O'Neill and Darryl Bradford be involved in an investigation of ComEd lobbyists. R. 264 at 58. But Defense Exhibit 1135 reveals that she directed Marquez, a co-conspirator prior to his cooperation with the government, to evaluate whether a broader investigation was necessary. *Id*. And in any event, this is email has no relationship to the Madigan hires at issue in this case.

[34] Pramaggiore was given ample leeway to elicit that she was a rule-follower. Tr. 4472:20-22. This was precisely the type of evidence she sought to elicit with Defense Exhibit 1135. Thus, any error was harmless owing to the cumulative nature of this evidence on a collateral matter.

namely, that if she behaved ethically on one occasion when evaluating a request from Madigan, that she must have behaved ethically on other occasions.

Pramaggiore argues that the evidence instead would have negated a finding of her corrupt intent. R. 264 at 59-60. But denying a request to issue polling questions for Madigan—a highly visible action that would have been susceptible to public scrutiny—has no bearing on her intent regarding the stream of benefits that ComEd covertly provided to Madigan over the course of the eight-year conspiracy.

Moreover, to the extent such evidence had any bearing on Pramaggiore's intent, it was cumulative. Indeed, on multiple occasions, the jury heard testimony that ComEd declined to hire individuals recommended by, or that were otherwise affiliated with, Speaker Madigan. *See, e.g.*, Tr. 1384:18-24 (ComEd did not hire Will Cousineau as a full-time employee); Tr. 2190:18-2191:5 (ComEd was unable to hire Jim D'Amico); Tr. 2191:22-2194:3 (ComEd did not hire Illinois State Senator Elgie Sims); Tr. 2224:1-2226:6 (ComEd did not hire Ryan Aderman and Frank Glass); Tr. 2541:10-23 (ComEd did not hire Jordan Matyas); Tr. 2566:12-22 (ComEd did not hire some of the Speaker's recommendations). Nothing would have been served by this tangential information. Because it was cumulative and tangential, any error in excluding this evidence was harmless. *See Tober v. Graco Children's Prod., Inc.*, 431 F.3d 572, 577 (7th Cir. 2005).

For these reasons, the Court properly excluded evidence that ComEd denied Magian's request for distribution of certain polling questions.

###    4.    The Court Correctly Barred Pramaggiore from Defining Bribery.

Pramaggiore argues that the Court erred by precluding her from explaining her understanding of bribery during her testimony. R. 264 at 60-61. The Court, however, properly sustained the government's objection that counsel was attempting to elicit an impermissible legal conclusion.

As a threshold matter, mistake of law was no defense to the § 666 charges. *Blagojevich*, 794 F.3d at 738. Accordingly, Pramaggiore's opinion of what bribery entails is irrelevant, and was properly excluded under Rule 401 and 403.

In addition, under settled law, "lay testimony offering a legal conclusion is inadmissible." *United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009) (collecting cases). Legal conclusions offered by lay witnesses fail to meet the requirements of Federal Rule of Evidence 701, in that they are not helpful to the jury. *Id.* Indeed, they invite mistakes and confusion: to the extent such legal conclusions are based on misunderstandings of the law, the jury may rely on those misunderstandings, rather than on the legal instructions provided by the Court. "[A] lay witnesses' purpose is to inform the jury what is in evidence, not to tell it what inferences to draw from that evidence." *Id.*

Based on this principle, courts have barred testimony concerning whether conduct was, or was believed to be, legal or illegal, legitimate or illegitimate, or proper or improper, or whether certain conduct satisfied an element at issue in the case. *See*, *e.g.*, *United States v. Baskes*, 649 F.2d 471, 478 (7th Cir. 1980) (affirming prohibition of cross-examination of co-conspirator witness regarding the witness's views of

whether he or the defendant "conspired" or otherwise engaged in conduct that was "unlawful" or "wilful"). Likewise, courts have barred testimony concerning whether defendants believed their own actions were legal. *United States v. Wantuch*, 525 F.3d 505, 512-15 (7th Cir. 2008) (holding that it was improper for government to ask witness to opine whether the defendant believed his conduct to be "legitimate" or legal). The Court rightfully prevented Pramaggiore from making a camouflaged mistake-of-law argument to the jury by injecting her definition of bribery into the proceedings.

The cases Pramaggiore cites have no bearing on whether she should have been permitted to define bribery. Pramaggiore points to a half-century-old Second Circuit case—*United States v. Kyle*, 257 F.2d 559, 563 (2d Cir. 1958)—for the proposition that testimony by a defendant as to "belief and motive was material" and may "repel inferences of fraudulent intent revealed by his activities." R. 264 at 60-61. Likewise, Pramaggiore cites *Crawford v. United States*, 212 U.S. 183 (1909), a century-old case where the Supreme Court determined that it was an error to prohibit defendant from testifying as to his intent. R. 264 at 61 (citing *Crawford*, 212 U.S. at 202-203). But the government did not object to testimony about her motive, belief, or intent concerning, for example, whether she intended to influence Madigan. To the contrary, Pramaggiore denied on the stand that she bribed Madigan on multiple occasions. Tr. 4392:3-9, 4403:7-13, 4446:4-5, 4519:19-22, 4527:24-4528:2, 4529:9-15. None of the cases Pramaggiore cites state that a defendant may give the jury her own personal preferred legal definitions of the charged offense. Any error was harmless because

Pramaggiore was given free reign to deny that she had done anything to corruptly influence Madigan, which necessarily entailed her understanding of what it meant to bribe somebody.

### 5. The Court Properly Excluded Improper and Irrelevant Lay Opinion Testimony.

Pramaggiore argues that the Court erred by precluding attorney witnesses from testifying about what she characterizes as "*fact* questions about their own perceptions and mental state." R. 264 at 61-62 (emphasis in original). Pramaggiore fails to accurately describe the testimony she sought to introduce. Rather than fact testimony, she sought to introduce testimony regarding attorney opinions about the legality of defendants' actions. Such testimony would have been lay opinion testimony that ran afoul of Rule 701, and it was irrelevant to the issues in the case. Indeed, the ruling about which Pramaggiore complains is that "witnesses for ComEd that are attorneys will not be allowed to say that actions were either legal or illegal." R. 264 at 62 (citing Tr. 1050:18-25). But the Court gave defendants latitude by permitting attorney witnesses to testify about "what they understood the actions to be and . . . whether they did or did not communicate any opinion or any advice as to those specific actions." Tr. 1050:21-23.[35]

---

[35] Pramaggiore cites a specific government objection the Court sustained during the questioning of Tom O'Neill: "Q: Okay. And so when you made the decision to go ahead and hire them did you have a *corrupt intent* to bribe Mr. Madigan by hiring Reyes Kurson. MS. STREICKER: Objection, Your Honor. The Court: Objection Sustained." R. 264 at 62 (citing Tr. 1409:11-15) (emphasis added). By using the specific phrase "corrupt intent," the question defense counsel posed to Mr. O'Neill went directly to an element of the offense under § 666. *See* R. 249 at 33, 37. Moreover, as noted elsewhere, the jury's duty was to determine Pramaggiore's and the other defendants' intent, not the intent of uncharged individuals.

###### a. Attorney Testimony on Legality Would Have Run Afoul of Rule 701.

Under Rule 701, lay witness opinion testimony must be: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Here, a lawyer's testimony about legality would certainly be based on specialized knowledge and thus improper under Rule 701, and the testimony of attorney witnesses about the legality of defendants' conduct would confuse or mislead the jury.

Importantly, the arguments and questioning pursued by defense counsel risked suggesting to the jury that an expert (lawyer) weighed in on the ultimate issue of the defendants' guilt or innocence. Such questioning or argument would improperly invite the jury to give such opinions unwarranted weight. Questioning on this topic would therefore have been unduly prejudicial and would have confused or misled the jury under Rule 403. The Court correctly prohibited defendants from essentially putting before the jury purported opinions as expert testimony on criminal bribery laws.

###### b. Attorney Opinions on Legality Would Have Been Irrelevant and Prejudicial.

This Court's ruling was proper for the additional reason that only the defendants' intent was at issue in the trial.

Defendants argue that "it is more likely that Ms. Pramaggiore did not act with corrupt intent if other individuals in similar positions and with similar knowledge did not have corrupt intent when taking similar actions." R. 264 at 61. Simply put,

114

"the knowledge or mental state of one person or entity has little or no probative value as to the knowledge or mental state of another person or entity." *Kelley as Trustee of BMO Litigation Trust v. BMO Harris Bank N.A.*, 634 F. Supp.3d 619, 633 (D. Minn. 2022) (excluding evidence of knowledge and state of mind of federal investigators as irrelevant to determine state of mind of other parties). Other witnesses' mental states shed no light on what the *defendants* believed. *See Benalcazar*, 2011 WL 4553027, at *11 (barring "evidence of other witnesses' lack of knowledge as to the legality of the scheme to serve as circumstantial evidence that he also lacked the necessary knowledge," because "one person's state of mind is irrelevant to what another person actually believed").[36] Thus, witnesses' perceptions and opinions were only relevant to the extent they were communicated to the defendants. The Court's ruling properly drew that line, by permitting attorney witnesses to testify about what they communicated to defendants.

Pramaggiore wrongly claims that Joe Dominguez, her successor as ComEd's CEO, was "told more about the Doherty subcontractor arrangement than" she was told. R. 264 at 62. Pramaggiore provides no support from the record for this assertion. Indeed, the record demonstrates that attorney witnesses were *not* privy to all of defendants' criminal conduct and communications. *See, e.g.*, Tr. 1302:8-10 (O'Neill did not know if Doherty had subcontractors); Tr. 4255:24-4256:25 (Dominguez was

---

[36] *Cf. United States v. Van Eyl*, 468 F.3d 428, 437 (7th Cir. 2006) (district court acted within its discretion in excluding lay opinion testimony from coworkers regarding the legality of the defendant's conduct—to avoid the jury inappropriately using those witnesses' opinions to determine the defendant's state of mind—and then granting a new trial when the government violated this ruling in its closing argument).

not privy to conversations between Pramaggiore and Marquez about subcontractors); Tr. 4261:17-19; Tr. 4263:18-4264:25.

Moreover, Pramaggiore's argument is an improper effort to raise a mistake of law or good faith defense, which is not permitted for the § 666 counts. Such a defense is only permitted where the charged statute contains a term such as "willful" that makes knowledge of the law essential. *See* Bauer Pattern Jury Instructions § 6.10 (2022). Section 666 does not require willfulness, and as a result, mistake of law is not a defense to § 666 charges, as discussed above. *See Blagojevich*, 794 F.3d at 738. Accordingly, any evidence or implication that Pramaggiore or the other defendants believed their conduct was legal is irrelevant to the § 666 charges. *Id*. And, without *any* probative value, such evidence would have been highly and thus unduly prejudicial, as it risked confusing the jury about the requisite state of mind.

The opinion of any witnesses regarding the legality of defendants' conduct is irrelevant and unfairly prejudicial. This is particularly true of attorney witnesses, whose testimony may improperly be given extra weight by the jury. The Court properly limited this testimony under Rule 401 and Rule 403.

### c.    Any Error Was Harmless.

Even though the Court properly limited attorney opinion testimony, the Court gave defendants latitude to elicit testimony about related topics, making any error harmless. The Court permitted attorney witnesses to testify about "what they understood the actions to be and . . . whether they did or did not communicate any opinion or any advice as to those specific actions." Tr. 1050:21-23. The Court also gave defendants wide latitude to highlight the criminal experience of Tom O'Neill, Joe

116

Dominguez, and high-level Exelon executive Bill Von Hoene. For example, Pramaggiore testified on direct that each of these individuals had former criminal law experience, and none of them raised an issue with the appointment of Juan Ochoa. Tr. 4528:5-22; *see also* Tr. 1307:18-1308:5 (O'Neill's testimony about his and Von Hoene's white collar work). And other witnesses were permitted to testify that they did not believe ComEd was bribing Madigan. Tr. 1684:9-13 (Cousineau); Tr. 2345:23-2346:4 (Marquez); Tr. 2373:16-18 (Marquez); Tr. 4175:20-23 (Dominguez). Because defendants were given extensive leeway to elicit testimony from other witnesses that they did not view the conduct as criminal, any error in declining to permit attorneys' testimony about the legality of the charged conduct was harmless. *See Gan*, 54 F.4th at 475.

### 6.   Evidence of Campaign Contributions was Proper.

Pramaggiore argues that evidence of campaign contributions improperly amended the indictment, allowed conviction without requiring a *quid pro quo*, and was unduly prejudicial. R. 264 at 62-66. These arguments lack merit.

In her opening argument, Pramaggiore contended that Madigan distrusted ComEd, and kept ComEd at arms' length—the purpose of this strategy was to suggest that ComEd and Madigan were effectively adversaries, not joined in a criminal conspiracy together. Tr. 360:4-5 ("Anne knew that Mike Madigan was not a friend of ComEd, never was and never would be, and she was right."); Tr. 365:11-13 ("In fact, you're going to find out that Madigan didn't particularly like utilities like ComEd, and that never changed."). Evidence concerning campaign contributions was relevant because it demonstrated that there was indeed a close alliance between ComEd and

Madigan; this close and cozy relationship Madigan cultivated with ComEd refuted the defense claims that Madigan did not trust or wish to associate with ComEd. On the contrary, the evidence of ComEd's campaign contributions and events hosted for Madigan's benefit illustrated the close relationship Madigan maintained with ComEd and demonstrated that Madigan did not keep the company at arms' length.

Moreover, the jury received an instruction about the proper purpose for which it could consider (and the improper purposes for which it could not consider) evidence regarding campaign contributions. That instruction stated:

> You have heard evidence concerning campaign contributions made by ComEd and others to various public officials. This evidence was introduced to show relationships, not as evidence of a crime. There are no allegations that such campaign contributions were illegal or intended to bribe Michael Madigan.

R. 249 at 43. This instruction squarely addresses the concerns Pramaggiore raises in her brief. Indeed, her attorney mentioned this instruction in his closing argument. Tr. 5305:3-4. Indeed, defense counsel suggested that the company's ability to legally give campaign contributions was proof that no crime occurred, because legal campaign contributions were much more value that honoring a job request. *Id.* And the government never hinted or suggested in its summation to the jury that the campaign contributions were illegal or evidence of a crime. Pramaggiore nevertheless contends that evidence of campaign contributions "unfairly inflamed the jury and allowed it to believe that [the evidence of campaign contributions] was part of the charged crime long *before they heard the jury instructions*." R. 264 at 66 (emphasis added). But the Seventh Circuit has held, "There is a rebuttal presumption that juries

118

follow the instructions given by the court." *Marchan*, 935 F.3d at 548. Accordingly, the jury is presumed to have followed the instruction that the campaign contributions were not evidence of a crime, illegal, or intended to bribe Michael Madigan. Pramaggiore offers no support to rebut this presumption. [37]

### 7. The Court Properly Permitted Questioning About Pramaggiore's Interview.

The Court properly permitted questioning about Pramaggiore's September 2019 interview with the government. This evidence was probative and not unfairly prejudicial, and the government was permitted to explore these relevant areas after Pramaggiore volunteered during cross examination that she had been interviewed.

### a. Background

During the government's cross examination of Pramaggiore, the prosecutor questioned her about a recorded meeting she had with cooperator Fidel Marquez in on February 18, 2019 (admitted as GX 131), which Pramaggiore claimed she did not recall. The following exchange occurred:

> Q. So you didn't recall the conversation with Fidel Marquez?
>
> A. No. And I think I shared that with you when I came in for the interview.

Tr. 4627:10-12. Pramaggiore was referring to an interview she had with the government in September 2019, more than a year before she was indicted. This was

---

[37] Because of this instruction, the fact that the government never referenced campaign contributions in its closing, and the fact that evidence of campaign contributions was limited in the course of the seven-week trial, any error was harmless.

the first the jury heard about the interview; the government had not elicited any information about the interview during its case-in-chief.

At sidebar, the government requested permission to ask additional questions about the interview because Pramaggiore had volunteered the interview. Tr. 4627:20-4629:17. The government argued: "it's not fair for the government now that she's mentioned she came in for an interview and said 'I told you something during the interview' for us not to be able to explore it." Tr. 4629:14-17. The Court agreed and ruled that the government could "explore it." Tr. 4629:14-17.

After this ruling, Pramaggiore confirmed that the September 2019 interview occurred just four or five months after she was served a search warrant in May 2019, that she was represented by counsel for the interview, and that she prepared for the interview. Tr. 4630:7-4631:4. She testified that she told the government that she did not recall that Doherty employed subcontractors during the September 2019 interview. Tr. 4631:5-21. Pramaggiore testified that she had forgotten the February 2019 recorded conversation with Marquez when she was interviewed in September 2019. Tr. 4631:22-24; 4633:15-17. This testimony was inconsistent with her testimony on direct that she was "taken aback" during the February 2019 conversation with Marquez, when she claimed to have first learned about the subcontractors who did no work. Tr. 4634:16-4635:6.

Towards the end of this line of questioning, Pramaggiore testified that the February 2019 recording was played during her interview. Tr. 4639:3-6. The prosecutor then asked: "And after that call was played, the interview was over, wasn't

it?" Tr. 4639:7-8. Pramaggiore's counsel objected on the grounds that the question infringed on attorney client privilege. Tr. 4638:9-16. The objection was overruled, based on the government pointing out:

> Your Honor, I asked whether the interview concluded at that point. I didn't ask about any advice of counsel. It's a fact that after this call was played, the interview concluded. And that was the question I asked. I'm not getting into reasons why.

Tr. 4638:19-25. The prosecutor then asked whether the interview concluded after the call was played, which Pramaggiore confirmed, adding: "It was the end of the day, yes. The interview was over." Tr. 4640:5-10. Finally, the government asked: "You and your counsel ended the interview?" Tr. 4640:13. Pramaggiore's objection to that question was sustained. Tr. 4640:13-20.

## b. The Court Properly Permitted Questioning about Pramaggiore's Lies During Her Interview.

During cross examination, the government asked Pramaggiore whether she recalled her February 2019 call with Marquez (GX131) and Pramaggiore volunteered, unprompted: "No. And I think I shared that with you when I came in for the interview." Tr. 4627:10-12. By first mentioning the September 2019 interview, Pramaggiore sought to inaccurately suggest that she had been truthful both during her testimony and during an earlier interview with the government (and also to suggest she had cooperated with the government's investigation prior to trial). The government was entitled to elicit relevant, probative evidence about that interview,

121

after she brought it up, from which the jury could readily conclude that she was lying.[38]

A defendant's prior statements about the crime under investigation were clearly relevant, particularly here, where the defendant attempted to use those prior statements to her advantage. Contrary to Pramaggiore's argument, the fact that she prepared for the September 2019 interview, was represented by counsel, and yet claimed during the interview that she forgot the February 2019 call about the Madigan subcontractors – even though this call took place just four or five months after she learned about the government's investigation in May 2019 – was highly probative, because it demonstrated that Pramaggiore lied about her lack of memory. Tr. 4630:4-4631:24. Indeed, Pramaggiore testified on direct that she was "taken aback" when she learned about the subcontractors who were "just collecting checks" during her February 2019 call with Marquez. Tr. 4499:14-17 (discussing GX131, also identified as DX1156). But during her interview just several months later—before Pramaggiore knew that call had been recorded—Pramaggiore claimed she had no recollection that Jay Doherty employed *any* subcontractors and no memory of her February 2019 call with Marquez at all. Tr. 4631:18-24. This fact demonstrated that her testimony that she was "taken aback" by the call was a lie. Tr. 4634:16-4635:19. Had she truly been surprised to learn about the no-work contractors, as she said, she

_____

[38] While Pramaggiore obtained a proffer letter before her interview, it did not bar questioning her concerning the interview, as it only restricted the government's use of the statements during the government's case-in-chief. It provided: "In the. event that your client is prosecuted, anything related to the government by you or your client during the proffer cannot and will not be used against your client, Anne R. Pramaggiore, in the government's case-in-chief, or in aggravation of your client's sentence. . . .

would have remembered the call and done something about it. She did nothing. The jury could readily infer from this inconsistent testimony that Pramaggiore lied when she testified that she did not know about the no-work subcontractors, both during her direct examination *and* when she interviewed with the government. Moreover, her efforts to conceal her knowledge concerning the Doherty subcontractors was powerful evidence of her attempt to cover up her crimes and her consciousness of guilt.[39] As a statement of a party opponent, the government was well within its rights to elicit this evidence.

### c. The Government Properly Questioned Pramaggiore About Her Actions After Learning About the Subcontractors.

Pramaggiore claims that the Court should have *sua sponte* struck any questions about actions Pramaggiore could have taken after she claimed to have first learned of the subcontractors during her February 2019 call with Marquez. R. 264 at 69. As a threshold matter, defense counsel did not object to any of these questions and has therefore forfeited any objection. Tr. 4635:15-4636:20.[40]

In any event, the government's questions were highly probative. Pramaggiore's state of mind was the key issue in dispute at trial, and the jury was charged with

---

[39] While this was powerful evidence, the government presented abundant other evidence, in the form of recordings in which Pramaggiore participated, that demonstrated her participation in the conspiracy and that flatly contradicted her testimony. Accordingly, any error in admitting the interview was harmless. Indeed, Pramaggiore does not appear to be concerned that the answers she provided in response to the questions about the interview were incriminating at all, and maintains that she was truthful. This further demonstrates any error was harmless.

[40] Because there was no objection, plain error review would apply. Given the obvious relevance of these questions, there is no error, and certainly no plain error.

assessing Pramaggiore's credibility. The government was entitled to explore whether Pramaggiore was truly "taken aback" when she learned there were no-work subcontractors on ComEd's payroll by inquiring about her subsequent actions. Had she really been "taken aback," as she claimed, it was appropriate to point out that she did absolutely nothing to address her purported discovery of ghost payrollers. She admitted that she did none of those things, which demonstrated that she was lying. Tr. 4635:15-4636:20.[41]

### d. The Government Properly Questioned Pramaggiore About Whether She Wanted To Be Interviewed.

Pramaggiore claims that a question that was sustained somehow prejudiced her. R. 264 at 69. The government asked: "you [didn't] want to come in for the interview with the government, did you?" Tr. 4633:6-7. The Court sustained defense counsel's objection. Tr. 4633:9-10. A lawyer's question is not evidence, as the jury was instructed. Tr. 5451:10-18. Thus, Pramaggiore could not have suffered prejudice from a simple question.

Moreover, contrary to Pramaggiore's contention, the government most assuredly had a good-faith basis for asking this question. During an interview prior to trial, the government had been informed that Pramaggiore had called Exelon's CEO approximately two nights before her scheduled interview with the government to ask if she would be fired if she refused to attend her interview with the government, as summarized in the interview report below, which was tendered in discovery:

---

[41] Contrary to Pramaggiore's argument, Pramaggiore had no idea that Marquez was cooperating, so that fact could have no bearing on her state of mind during this call.

> PRAMAGGIORE never said anything to CRANE about the search warrants, subpoenas or interviews that occurred in May of 2019. Prior to her scheduled interview at the USAO, PRAMAGGIORE asked CRANE if she had to go to the interview. CRANE told PRAMAGGIORE that the company was going to fully cooperate with the government's investigation. On the Sunday prior to her interview, PRAMAGGIORE called CRANE and asked if she would be fired if she did not go to her interview at the USAO. CRANE advised PRAMAGGIORE that he could not discuss that with her.

This question clearly contemplated that she was looking to avoid attending the interview and provided the government with a good faith basis to pose the question. Indeed, government attorneys were also aware that prior to that point in time, Pramaggiore had refused to be voluntarily interviewed by the government. The government had ample basis to ask the question it did. And given that the objection to the question was sustained, any error was harmless.

### e. The Government's Questions About the End of the Interview Were Proper.

Contrary to Pramaggiore's argument, the fact that the interview ended after the February 2019 recording was played is also probative. Pramaggiore testified that prior to the interview, she did not know that the government had any recordings. Tr. 4633:13-15. The fact that the September 2019 interview abruptly ended after she first learned of, listened to, and denied remembering Government Exhibit 131 was highly probative, because it demonstrated that Pramaggiore was unable to offer any plausible explanation of the call in the interview, mere months after the recording. This was particularly probative in response to Pramaggiore's testimony about the same recording: "If I had remembered the conversation with Fidel of February of 2018

or 2019, I would have shared it with you because it proves my innocence." Tr. 4633:15-17. This was yet another example of Pramaggiore attempting to paint an inaccurate picture of the September 2019 interview. The government was entitled to explore this misleading testimony. The fact that the interview ended shortly after the February 2019 call was played, without Pramaggiore offering any explanation, contradicts Pramaggiore's claim that Government Exhibit 131 proves her innocence.

Pramaggiore argues that "[v]oluntary interviews may be terminated for a multitude of reasons." Dkt. 264 at 67. This generalization has no bearing on why *Pramaggiore's* interview terminated. To the extent Pramaggiore's counsel was concerned that cross examination left an inaccurate impression with the jury, counsel could have asked follow-up questions on redirect. Counsel opted not to do so.

Pramaggiore argues that juries should not be permitted to draw an adverse inference from a defendant's decision not to voluntarily answer the government's questions. R. 264 at 67.[42] But the jury was permitted to draw an adverse from what Pramaggiore *did* say after she voluntarily came in to interview: she stated that she did not recall anything about subcontractors or her February 2019 call with Marquez, and after that the interview abruptly ended.

As to the government's question about whether Pramaggiore and her counsel ended the interview, the objection to that question was sustained, and the jury was

---

[42] In addition, Pramaggiore did not request any such instruction be given to the jury, thereby forfeiting this argument. Indeed, on the contrary, the pattern instructions provide for the exact opposite instruction to be given, concerning silence in the face of accusation. R. 249, Instruction No. 8.

instructed to disregard it.[43] Lawyers' statements are not evidence, as the Court instructed the jury. Tr. 5451:10-18. "There is a rebuttable presumption that juries follow the instructions given by the court." *Marchan*, 935 F.3d at 548. Pramaggiore presents no evidence that this presumption has not been rebutted here.

Pramaggiore argues that the "Government's question gave the improper impression that Ms. Pramaggiore was guilty because her attorneys supposedly ended the interview after the portion of the February 18." R. 264 at 68. Although the government had represented that it would not get into the reasons why the interview concluded (Tr. 4638:19-25), Pramaggiore's testimony in response to questions on cross opened the door. When asked whether her interview ended soon after Government Exhibit 131 was played, she sought to paint a misleading picture by testifying: "It was the end of the day, yes. The interview was over." Tr. 4640:8. That was a blatant lie; the interview did not end because it was the "end of the day," as Pramaggiore well knew. Based on this response, the government properly asked follow-up questions to clarify that the interview ended not because the day was over, but because Pramaggiore and her counsel wanted time to consider how to respond to the call. It was a permissible question: had Pramaggiore been permitted to answer, the inference to be drawn was that Pramaggiore had lied to the jury about why the interview ended—it wasn't because the day was over.

---

[43] Pramaggiore complains that the Court instructed the jury to "disregard that answer," instead of saying the jury should "disregard that question." The Court's meaning was clear, given the objection was sustained and no answer had been given, and in any event Pramaggiore's counsel said, "Thank you," rather than requesting any clarifying ruling by the Court, thus waiving, or at a minimum forfeited, any challenge to the particular language.

Pramaggiore claims that the question was inaccurate. R. 264 at 68. But her own counsel's summary of the interview shows that the government agreed to end the interview only *after* Mr. Lassar told the government he needed time to discuss the February 2019 call with his client. R. 264 at 68 n.9. Of course, the defendant fails to note that after asking for additional time to discuss matters with Pramaggiore, she never returned to complete her interview. Thus, the government's question about Pramaggiore's and her attorney's decision to end the interview after hearing the recording was accurate. To the extent Pramaggiore's counsel was concerned that the question gave the jury an inaccurate impression, counsel could have asked follow-up questions on redirect. Counsel opted not to do so; doing so would have exposed the fact that Pramaggiore—after being confronted by a devastating recording laying out her wrong-doing—decided to clam up, hightail it out of her interview, and (contrary to the narrative that she just needed to collect her thoughts) never return prior to being charged.

### 8. The Government Did Not Threaten Joe Dominguez.

Pramaggiore claims that the prosecutor threatened defense witness Joe Dominguez during cross examination, somehow depriving her of testimony favorable to her case. R. 264 at 79. This claim has no merit.

Joe Dominguez was not threatened. Dominguez took over as ComEd's CEO after Pramaggiore. During cross examination, the prosecutor questioned Dominguez about a conversation Dominguez had with cooperator Marquez in which he discussed the Madigan subcontractors (this call was recorded by the government, although that recording was not admitted into evidence). As the prosecutor asked about a statement

Dominguez (who was himself a former federal prosecutor) had made during that recorded conversation, Dominguez (the defendant's witness) interrupted the prosecutor:

> Q.   And then later in the call you said in the light of day, you know, things, you know, need to—
>
> A.   Right. We discussed this. And you said, you said a lot of good things on this tape, didn't you?

Tr. 4281:16-19. Dominguez thus interjected and tried to introduce the Assistant United States Attorney's opinion of how Dominguez had behaved during the recorded conversation—in other words, to elicit the prosecutor's opinion about whether Dominguez had acted lawfully by implying the prosecutor thought Dominguez had "said a lot of good things on this tape." Indeed, Pramaggiore's witness went so far as to try and ask the prosecutor a question ("didn't you?") about the prosecutor's opinion from the witness stand.

Initially confused by the Dominguez's non-responsive answer, his effort to inject the prosecutor's supposed opinion about a recorded conversation that was not in evidence, as well as his attempt to ask the prosecutor a question, the prosecutor asked, "Sorry?" Tr. 4281:20. Dominguez, instead of responding to the question posed (which simply had sought to elicit what *Dominguez had said* during his recorded conversation with Marquez), pressed on by instead trying to describe how the prosecutor allegedly viewed the recorded conversation and Dominguez's conduct as expressed during an earlier interview at the United States Attorney's Office: "The meeting I had with you in the office, you [meaning the prosecutor] portrayed this

conversation slightly different." Tr. 4281:21-22. The prosecutor responded by advising the witness not to make unsolicited comments about the prosecutor's opinion of Dominguez's conduct: "Wait a second. Wait a second. If you are going to start talking about what I said, you might to not (sic) do that. . . because that might not work out well for you, okay. Tr. 4280:23-4281:1. Pramaggiore's counsel objected, and the prosecutor explained in response to a question from the Court on the objection that the defendant's witness was trying to refer to comments the prosecutor had made at a prior meeting, and that "obviously whatever I say during a meeting is not admissible. That's not fair." Tr. 4281:10-18.[44] There was no definitive ruling on the objection (nor was one sought), and thereafter, the questioning resumed and moved on.

Dominguez's statement that the prosecutor felt there were "good things" that Dominguez had said in the recorded call—a clear effort to avoid answering a simple question about the substance of a recorded conversation and elicit improper and inaccurate testimony about the prosecutor's opinion—was clearly not admissible and was designed by Pramaggiore's witness to leave a misimpression with the jury that the prosecutor somehow harbored a favorable personal opinion of his conduct and that it was lawful.

The prosecutor's effort to bring the witness's non-responsive and improper testimony to a close did not amount to a threat. The cases cited by the defendant

---

[44] It was also unfair because Pramaggiore's witness had misrepresented the prosecutor's opinion about his conduct—particularly when no such question on that subject had been put to the witness.

relate to situations in which prosecutors were accused of making threats that deterred a witness from testifying on a defendant's behalf. *See, e.g., United States v. Johnson*, 437 F.3d 665, 678 (7th Cir. 2006) (prosecutor's letter accurately conveying risks defense witness faced in testifying was not improperly intimidating); *United States v. Jackson*, 935 F.2d 832, 846 (7th Cir. 1991) (prosecutor's warnings to a potential witness of risk of incriminating testimony were not threats that barred witness from voluntary choosing whether to testify); *United States v. Linder*, No. 12 CR 22, 2013 WL 812382, at *52 (N.D. Ill. Mar. 5, 2013) (dismissing indictment because government agents substantially impaired witnesses' decision to testify on behalf of the defense). Here, by contrast, the witness *did* testify on behalf of the defense. Accordingly, there can be no claim that a defense witness was somehow prevented a defense witness from testifying.

Pramaggiore cannot show that her ability to present witness testimony was impaired. Pramaggiore does not explain what Dominguez might have said that could have helped her case that he had not already said on direct examination. And had anyone wanted to explore Dominguez's prior interview with government (or what the prosecutor thought about Dominguez's own conduct), four separate defense attorneys had the opportunity to ask questions during re-direct. Not a single one followed-up on Dominguez's irrelevant, non-responsive testimony concerning his prior interview,

which demonstrates that this topic was not critical to the defense and could not have prejudiced any of the defendants.[45]

### 9. The Government's Brief Misstatement During Closing Was Immediately Cured.

During his direct examination, O'Neill testified about Government Exhibit 318, which was an email that McClain had originally sent to Pramaggiore and others concerning renewing Reyes Kurson's contract because he was "valuable … to Our Friend" and failing to do so "will provoke a reaction from Our Friend." GX318. Pramaggiore forwarded that email to O'Neill, without comment. *Id.* Government counsel asked about the forwarded email: "What did you understand Ms. Pramaggiore to be communicating to you?" Tr. 1206:5-6. Pramaggiore's counsel objected to "speculating on what saying nothing means," and the Court sustained the objection. Tr. 1206:7-9. Government counsel then asked: "What did you take from this email in terms of what Ms. Pramaggiore wanted you to do with regard to the Reyes Kurson?" Tr. 1206:11-13. The Court initially overruled the objection to that question. Tr. 1206:14-15. O'Neill answered: "What I took from it is that Mike McClain had sent the note to Anne and Anne had sent the note to me, and I read into it a message to–" Tr. 1206:17-19. At that point, Pramaggiore's counsel once again objected, and the Court sustained the objection. Tr. 1206:20-24.

In referring Government Exhibit 318 during closing argument, the prosecutor stated: "Anne Pramaggiore sent that e-mail immediately to two people, O'Neill,

---

[45] Because Pramaggiore fails to explain how her case was prejudiced or what information she could not elicit from Dominguez, any error is harmless.

without any message at all, which O'Neill said, to him, meant it was simply word from the boss in stark terms, or lack thereof, get this done." Tr. 5195:25-5196:4. Pramaggiore's counsel objected, and the Court overruled the objection. Tr. 5196:5-7. The prosecutor continued: "O'Neill testified that this no-message e-mail, simply forwarded to him, was a clear signal from the boss to get it done." Tr. 5196:9-11.

Just minutes after the statements concerning O'Neill's understanding during closing, the prosecutor corrected the misstatement:

> Let me go back for just a moment and talk about the Reyes Kurson contract and correct something that I ***just said.*** I had mentioned something that O'Neill said in his testimony about what he understood the no-message forwarding of the e-mail to him. I don't believe he did testify about that, at least in putting it into so many words. But you can take your own interpretation from the fact that Anne Pramaggiore did not include any words, nothing to soften or buffer what it is that she said, to understand that it was an immediate signal from her to O'Neill to get it done.

Tr. 5204:24-5205:8 (emphasis added). This was a clear, unequivocal correction, followed by argument as to what inferences the jury could reasonably draw based on the fact that Pramaggiore had forwarded the email without comment. And that argument was fully supported by the evidence; in an email on January 30, 2016, Pramaggiore made clear what she meant when she forwarded the email to O'Neill a few weeks' prior; she told McClain: "I asked Fidel and Tom [O'Neill] to address this." GX321.

"Misstatements of evidence during closing argument can be improper, but it is rarely reversible error." *United States v. Mullins*, 800 F.3d 866, 872 (7th Cir. 2015)

(citations omitted). To prevail on her motion, Pramaggiore must establish that the misstatement was improper and that it prejudiced her by "so infect[ing] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Johnson*, 655 F.3d 594, 602 (7th Cir. 2011) (affirming denial of motion for new trial when prosecutor immediately corrected a single misstatement during opening). To determine whether a new trial is required as a result of a misstatement during closing, the Court considers factors such as whether (1) the judge offered curative instructions, (2) the defense could have rebutted the misstatement, and (3) the weight of the evidence. *Mullins*, 800 F.3d at 872.

Although the prosecutor made a brief, inadvertent misstatement during the government's closing, the prosecutor immediately corrected the mistake. Because the misstatement was promptly corrected, the original misstatement could not have prejudiced Pramaggiore. *See Johnson*, 655 F.3d at 602; *United States v. Nelson*, 958 F.3d 667, 671 (7th Cir. 2020) (misstatement by prosecutor during closing argument did not warrant new trial because prosecutor instantly corrected mistake). In addition, Pramaggiore had the opportunity to, and did, address the claimed mischaracterization in her closing argument, further curing any potential prejudice. Tr. 5324:19-5325:4.

If that were not enough, the Court also instructed the jury that it must decide guilt or innocence based on the evidence, and that closing arguments were not evidence. Tr. 5451:10-18. This instruction further cured any potential prejudice. *Nelson*, 958 F.3d at 671.

Finally, the statement (which was promptly corrected) concerned one email that was introduced during the course of a trial that stretched on for seven weeks. For all the reasons discussed above, the weight of the evidence against Pramaggiore was strong. Based on the voluminous evidence against Pramaggiore, presented over the course of nearly seven weeks, it simply cannot be that one brief factual misstatement during closing argument – which was promptly corrected – could have had any impact on the jury's decision.

### 10. The Government's Rebuttal Argument Was Entirely Proper.

Contrary to defendant Pramaggiore's argument (Dkt. 264 at 74-76), the government's rebuttal argument did not improperly introduce a new theory of the case or mischaracterize evidence.[46]

### a. The Government's Tollway Analogy Was Proper.

During closing, multiple defendants argued that Madigan did not help ComEd, but that ComEd's legislative success was instead the result of coalition building. *See, e.g.* Tr. 5296:20-24 (McClain's counsel, arguing that ComEd legislation passed "[n]ot because of some jobs spread over a decade, but because they worked their heads off, because they boxed him in, because they built coalitions, because they spent millions and millions of dollars."); Tr. 5312:11-20 (Pramaggiore's counsel, arguing that ComEd legislation passed because of strong coalitions, "[n]ot based on the fact that we're

---

[46] The primary decision that Pramaggiore relies upon does not address rebuttal arguments, but focuses on expert testimony presented during the government's rebuttal case. *United States v. Filer*, No. 19 CR 565, 2021 WL 5906068, at *6 (N.D. Ill. Dec. 14, 2021), *appeal dismissed*, No. 22-1061, 2022 WL 1223717 (7th Cir. Feb. 10, 2022). This decision has no bearing here.

hiring people"). During rebuttal, the prosecutor responded to these arguments by comparing the corruption scheme to a "corruption toll," in which a driver pays the toll. Tr. 5442:20-5443. The prosecutor stated, "There was also a lot of discussion about strategy and coalitions, this idea of like, 'Hey, how can it be that we're bribing Mike Madigan if we're taking all of these efforts to convince people to vote for our legislation?'" Tr. 5441:22-25. The tollway analogy explained why the defendants could have simultaneously been bribing Madigan *and* working to build coalitions in support of legislation:

> You still need a car, you still need gas, and you still need to drive to make your way down that road; but you have to pay that toll. It's an obstacle that you have to overcome.
>
> And in many ways, the money that was paid to Mike Madigan through the subcontractors and others was like a corruption toll where they paid that toll to make sure that Mr. Madigan was not an obstacle to their legislative agenda. And they paid that toll every month from 2011 to 2019 when they were caught.

Tr. 5442:20-5443:8. No defendant objected to the tollway analogy.

"It is settled in this circuit that, in their summations to the jury, prosecutors are entitled to respond to arguments articulated by defense counsel." *United States v. Taylor*, 728 F.2d 930, 936 (7th Cir. 1984); *accord United States v. Reagan*, 694 F.2d 1075, 1081 (7th Cir. 1982). Here, the tollway analogy was plainly a proper response to defendants' closing arguments, in which they argued that the bribes paid to Madigan's allies had no effect on ComEd legislation and had no purpose in light of the efforts that were undertaken to advance the legislation in the General Assembly.

Indeed, the tollway analogy wasn't a new theory at all, but was simply "[a]nother way to think about" the case, as the prosecutor observed. Tr. 5442:20. The tollway analogy was consistent with the theory presented throughout the case. *See, e.g.,* Tr. 290:3-8 (government's opening, describing theory that "defendants conferred a stream of benefits on Madigan over a long period of time," intending to influence Madigan's actions regarding ComEd's legislation); Tr. 5132:13-4 (government's closing). Here, the prosecutor simply presented an analogy to explain the "stream of benefits" theory and that Madigan only needed to have influence, but not sole control over the passage of legislation (as the jury instructions provided). Tr. 5466:16-21. This was an appropriate subject of rebuttal argument.

Because no defendant objected, the objection was forfeited, and the standard of review would be plain error. Accordingly, the Court is limited to considering whether "the remarks were so egregious that the district judge was obliged, upon pain of reversal, to step in even without a defense objection." *United States v. Carswell*, 996 F.3d 785, 796 (7th Cir. 2021) (citation omitted). Pramaggiore does not come close to satisfying this standard.

### b. The Government Accurately Characterized the Evidence During Rebuttal Argument.

Pramaggiore incorrectly contends that the prosecutor mischaracterized evidence during its rebuttal argument and that the Court should have sustained a related objection.

The prosecutor argued that "other people were saying that Anne Pramaggiore knew about the subcontractors," and listed Government Exhibits 122 and 123 as two

examples. Tr. 5439:8-9. Defense counsel objected, claiming that this was a "new argument," and the Court properly overruled the objection. Tr. 5439:14-16.

This argument was a direct response to Pramaggiore's counsel's closing, in which he repeatedly argued that Pramaggiore was not aware that any Madigan associates were paid by ComEd as subcontractors. Below are just a few examples from Pramaggiore's closing:

- "Anne Pramaggiore did not know that Olivo . . . had been hired and never knew that" (Tr. 5318:20-22);

- "If Anne had known about the Doherty subs, she certainly would have had to tell Marquez when she hired him to be the head of legislative affairs" (Tr. 5319:13-15);

- "Dominguez is now the CEO of ComEd. None of them, neither Doherty or McClain or Hooker, say, well, tell Joe to talk to Anne, she knows all about this." (Tr. 5320:2-4);

- "She has no idea that Madigan subs are under Doherty." (Tr. 5320:18).

- "Anne doesn't know about Doherty's roster." (Tr. 5328:11-12).

- "So Anne doesn't know about the Doherty subs." (Tr. 5329:10)

One of Pramaggiore's main defenses was that she had no idea about the Madigan subcontractors. The government was permitted to respond by pointing to probative evidence that Pramaggiore did, in fact, know about the subcontractors.

As described in Section I.C.2.c., above, Government Exhibits 122 and 123 are powerful evidence of Pramaggiore's knowledge of the Madigan subcontractors, even though she did not participate in those calls. Contrary to Pramaggiore's argument, the jury could have easily concluded that McClain's comment that "Anne was all in" (GX122, ln. 10) was an assertion of McClain's *own* observations of his coconspirator,

138

Pramaggiore, and her willingness to pay the subcontractors at Madigan's request. This is highly probative evidence of her guilt. As the prosecutor observed in rebuttal, "Why would he say that if it was a secret from her or she had no idea?" Tr. 5439:21. This statement is plainly admissible against Pramaggiore as a coconspirator. *See, e.g., Lindemann*, 85 F.3d at 1238.

Similarly, McClain's musings concerning what Dominguez might say about the subcontractors are relevant to McClain's *and* Pramaggiore's intent. McClain said: "Anne may have done that, but I don't feel good about this. Um, it, it, it looks raw to me." GX 123, ln. 305-06. This statement shows McClain's knowledge that this deal was corrupt, or "raw," and also demonstrated that Pramaggiore (unlike the new CEO) was fully read into the scheme and did not express hesitation with the illegal arrangement. This comment is thus highly probative as to McClain's and Pramaggiore's knowledge of the "raw" nature of the arrangement. *See, e.g., Loscalzo*, 18 F.3d at 383.

Pramaggiore advances different interpretations of these calls, but the prosecutor was certainly permitted to argue otherwise based on the evidence. The jury had ample evidence to accept the prosecutor's interpretation, particularly when viewed in the light most favorable to the government. *United States v. Souffront*, 338 F.3d 809, 819 (7th Cir. 2003).

Even assuming that the government's characterization of these two exhibits was incorrect (and it was not), the Court correctly instructed the jury that it must decide guilt or innocence based on the evidence, that evidence consisted only of

witness testimony, exhibits admitted into evidence, and stipulations, and that closing arguments were not evidence. Tr. 5451:10-18. It beggars belief that these brief comments in the government's rebuttal "was significant enough to impact the fairness of the trial, taking the record as a whole[.]" *United States v. DeSilva*, 505 F.3d 711, 719 (7th Cir. 2007) (no plain error resulting from government's closing argument, where jury was instructed similarly). Pramaggiore thus fails to establish that the Court erred in overruling her objection during the government's rebuttal. [47]

### 11. The Court Properly Admitted Marquez's Statement to Doherty Regarding Rate Legislation.

Doherty challenges the admission of a certain statement made by Fidel Marquez to Doherty after Marquez began cooperating with the government. R. 270 at 11. In particular, Doherty challenges the below bolded statement, which was recorded by Marquez on February 13, 2019.

> DOHERTY: Here's how, here's how I might. Uh, number one, your money comes from Springfield. ComEd money, right? I mean, for the most part.
>
> MARQUEZ: You mean, that's how we make our money.
>
> DOHERTY: Yeah.
>
> MARQUEZ: **Yeah, yeah. Through our rates, yes, regulated.**
>
> DOHERTY: And, you know, I would, if it were me, and again, Mike Madigan's not my best friend, but if I called him right now, he'd call or he'd say, "Jay," if I want to go see him, I'd go see

---

[47] If there was any error, it was harmless.

> him.But, my bottom line advice would be, 'if it
> ain't broke, don't fix it' with those guys-

MARQUEZ: Okay.

GX129. Marquez's reference to regulated rates, immediately after Doherty observed that ComEd's money "comes from Springfield," was admissible not for its truth but as context and to show its effect on the listener, Doherty.

Out-of-court statements are not hearsay when they are offered for background or context and not for the truth of the matter asserted. *United States v. Van Sach*, 458 F.3d 694, 701-2 (7th Cir. 2006); *United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002); *United States v. Akinrinade*, 61 F.3d 1279, 1283 (7th Cir. 1995). The Seventh Circuit has routinely affirmed the admission of out-of-court statements as necessary non-hearsay "context" in the very situation presented here: consensual recordings involving a cooperating witness and a defendant. *See*, *e.g.*, *United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008) ("Meneghetti's statements, as a government informant during these conversations, were not admissible for their truth, but were admissible for the context they provided for [defendant]'s statements."); *United States v. Nettles*, 476 F.3d 508, 517 (7th Cir. 2007) (cooperating witness's recorded statements admissible because "they were merely used to provide context to Nettles's admissions"); *United States v. Van Sach*, 458 F. 3d 694, 701-02 (7th Cir. 2006); *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006) ("[informant]'s statements were admissible to put [defendant]'s admissions on the tapes into context, making the admissions intelligible for the jury"); *United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002); *Gajo*, 290 F.3d 922, 930 (7th Cir. 2002) (admitting cooperating witness's

141

recorded statements because "they are offered for context and not for the truth of the matter asserted"); *United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989) (upholding admission of entirety of tape recorded conversations because informant's statements "are necessary to place the defendant's statements in a proper context" and "mak[e] them intelligible to the jury and recognizable as admissions").

In addition, "[a]n out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay." *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993); *see also United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ( "[A] statement offered to show its effect on the listener is not hearsay."); *United States v. Malik*, 345 F.3d 999, 1001 (8th Cir. 2003) ("When the out-of-court statement has relevance when we only consider the effect it had on those who heard (or read) it— not whether the statement was true or not, but just its effect on those who heard it— then the statement is not hearsay.") (citations omitted).

Lastly, "a statement of which the party has manifested an adoption or belief in its truth is not hearsay." *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988) (quoting Fed. R. Evid. 801(d)(2)(B)). A party need not expressly state, "I adopt [this person's] statements as my own," for a statement to be admissible as an adoptive admission. *Id.* Instead, an adoption can occur during a normal conversation when a defendant manifests a belief in the truth of another person's statements. *See United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002) (holding informant's side of telephone conversations with defendant admissible because they were adopted by the defendant during the course of the conversation when the defendant either led or

142

responded to the informant's statements and at no time contradicted the informant's comments or questions).

Here, the government did not offer Marquez's statement to prove that ComEd's rates were, in fact, regulated. Rather, the Court properly admitted the statement to show that Doherty knew that ComEd's rates depended on favorable legislation in Springfield, as evidenced by the fact that Doherty said "yeah" in the middle of Marquez's description of how ComEd made money. This in turn demonstrated that Doherty knew the importance of keeping Madigan happy. *See United States v. Gaytan*, 649 F.3d 573, 580 (7th Cir. 2011) (recording of a confidential informant's conversation with defendant was not hearsay, because "government offered the challenged statements not for their truth but to put [defendant's] own words in context and to help the jury make sense out of his reaction to what [the CI] said and did"). In short, Doherty's suggestion that he did not adopt Marquez's comment about regulated rates is misplaced. Marquez's statement was plainly admissible.[48]

### 12. The Court Properly Admitted Doherty's Text Message to Ray Nice.

Doherty complains that the Court improperly admitted a single text message. R. 270 at 11. Specifically, Government Exhibit 314 contained a text message, in which Doherty texted Ray Nice—a longtime Doherty subcontractor and Madigan ally— "Fabulous. Thank you so much, Ray. *Now I know why The Speaker thinks so highly of you*." (emphasis added). This last statement was highly probative as to Doherty's

---

[48] Given the overwhelming amount of evidence against Doherty, including in the rest of Government Exhibit 129, any error was harmless.

knowledge of Nice's connection to Madigan, which was a critical issue in dispute in the trial. Further, as a statement of a party opponent, Doherty's statement was plainly non-hearsay. Fed. R. Evid. 801(d)(2).[49]

Doherty's text message to Nice was particularly relevant given that Doherty's counsel argued in opening statement that Doherty "stayed in his lane" and focused on city politics, not Springfield politics. Tr. 403:1-7. Doherty's attorney also argued that the subcontractors (including Ray Nice, who was the recipient of the text message) brought "value to ComEd." *See* Tr. 406:4-10. Doherty's comment about Nice's connection to Madigan showed the jury that he was attuned to Springfield politics and knew why Nice was hired: his value to Speaker Madigan. Because Doherty's intent was the key issue in dispute, the Court properly admitted this highly probative evidence.[50]

### 13. The Court Properly Admitted Emails from Janet Gallegos.

Hooker challenges the admission of Government Exhibits 627 and 217—emails from Doherty's administrative assistant, Janet Gallegos—on the basis that these emails were inadmissible hearsay. R. 262 at 30-33. This argument fails.[51]

---

[49] The government agreed to redact the surrounding text messages at Doherty's request. Tr. 2200:13-14.

[50] Given the overwhelming amount of evidence against Doherty, any error was harmless.

[51] Pursuant to Rule 803(6) records of regularly conducted activity are an exception to hearsay. Specifically, a document qualifies when it is "made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record data compilation, all as shown by the testimony of the custodian or other qualified witness." Consistent with this rule, courts in this district have held that emails may qualify as "business records" if created in the normal course of business and properly authenticated. *See, e.g., Komal v. Arthur J. Gallagher & Co.,* 833 F.Supp.2d 855, 859 (N.D. Ill. June 13, 2011) (Feinerman, J.); *Campbell v. Whobrey,* 16-cv-4631, 2020 WL

Government Exhibit 627 is an email from December 14, 2012, between Janet Gallegos and Mamie Takagi, a ComEd employee, in which Doherty is copied. In that email, Gallegos states: "Yes, Jay spoke to John Hooker and he approved the $31,000 per month Contract for the entire 2013." (Doherty confirmed the accuracy of Gallegos' statement in Government Exhibit 630, which was properly admitted at trial; he wrote: "Confirmed.") Hooker complains that Government Exhibit 627 contains "multiple levels of hearsay—*e.g.,* that Gallegos told Takagi what Doherty told Gallegos that Hooker told Doherty." R. 262 at 30-31. Unpacking each of these "levels," however, reveals that the statement was properly admitted.

First, as Doherty's administrative assistant, Gallegos was Doherty's employee and agent. Rule 801(d)(2)(D) of the Federal Rules of Evidence provides that "[a] statement is not hearsay if . . . the statement is offered against a party and is . . . (D) a statement by the party's agent or employee on a matter within the scope of that relationship and while it existed." This statement, as imputed to Doherty (and as "confirmed" by Doherty in Government Exhibit 630), is admissible against Hooker as the statement of a coconspirator in furtherance of the conspiracy pursuant to Rule 801(d)(2)(E). Indeed, Gallegos sent the email to Takagi at Doherty's direction and Doherty confirmed its accuracy. GX627, GX630. By confirming the email (GX630),

---

1330661, at *2 n.7; (N.D. Ill. Mar. 22, 2020) (Chang, J.); *SkyBluePink Concepts, LLC v. WowWee USA, Inc.,* 12-cv-7573, 2013 WL997458, at *3 n.1 (N.D. Ill. Mar. 13, 2013) (St. Eve, J.); *Holmes v. Godinez,* 11-cv-2961, 2016 WL 4091625, at *5 (N.D. Ill. Aug. 2, 2016) (Aspen, J.).

Doherty was taking action in furtherance of the conspiracy, because it facilitated the continued payments of the subcontractors.

In the next purported "level," Doherty's statements to Takagi and Hooker's statements to Doherty are both admissible as statements of a party opponent and coconspirator statements and are plainly non-hearsay. Fed. R. Evid. 801(d)(2).

Government Exhibit 217 is a December 17, 2012, email between Gallegos and Doherty, in which Gallegos tells Doherty about a conversation she had with Takagi concerning John Hooker. As with Government Exhibit 627, Gallegos was acting as Doherty's employee or agent on a matter within the scope of her employment, and thus her statements are not hearsay under Rule 801(d)(2)(D). Moreover, Doherty responds, "verrrrry important," to Gallegos, just six minutes later. GX217. This statement is admissible as a statement of a party opponent, which demonstrated that Doherty knew Gallegos was talking to Mamie Takagi regarding the subcontractor arrangement. Fed. R. Evid. 801(d)(2). As to John Hooker, he was a coconspirator of Doherty's, and thus Doherty's statement ("verrrrry important") made during and in furtherance of the conspiracy is admissible against Hooker. *See Loscalzo*, 18 F.3d at 383 (". . . evidence of [a] defendant's acts or statements may be provided by the statements of co-conspirators."); *Lindemann*, 85 F.3d at 1238 (a coconspirator's statements are admissible against other coconspirators where "the declarant and the defendant were involved in an existing conspiracy, and that the statement was made during and in furtherance of that conspiracy"). The Court properly admitted this exchange on this basis.

Even if there were error, it was harmless. To begin, the jury heard ample evidence that Hooker stayed intimately involved in the bribery scheme after his 2012 retirement, including through 2019. *See, e.g.*, GX12; GX17; GX129; GX148. Even if Hooker ceased his participation following his retirement in 2012, that would not have insulated him from liability. *See Schiro*, 679 F.3d at 528-29.

Further, the admission of these exhibits was harmless because the jury also saw Government Exhibit 630, which (as discussed above) builds on the same email exchange that is contained in Government Exhibit 627. In Government Exhibit 630, Doherty responds to Gallegos' email simply saying, "Confirmed." GX630. This statement was properly admitted as the statement of a party opponent. And by that statement, Doherty adopted Gallegos's statement that "Jay spoke to John Hooker and he approved the $31,000 per month Contract for the entire 2013." Fed. Rule of Evid. 801(d)(2)(B). Doherty clearly was seeking to facilitate not only his payment, but the continued payment of the ghosts as well. That adoptive admission is, in turn, admissible against Hooker as a statement of a coconspirator in furtherance of the conspiracy. *See Loscalzo*, 18 F.3d at 383; *Lindemann*, 85 F.3d at 1238. Therefore, any argument that the admission of Gallegos' statement about Hooker's approval of the 2013 contract prejudiced Hooker lacks merit. *See Jordan v. Binns*, 712 F.3d 1123, 1138 (7th Cir. 2013) ("As a general rule, errors in admitting evidence that is merely cumulative of properly admitted evidence are harmless."); *United States v. Johnson*, 127 F.3d 625, 631 (7th Cir. 1997) (holding that the erroneous admission of hearsay that is "cumulative to other testimony already presented" was harmless because of

its "limited (or nonexistent) prejudicial effect on the defendant"); *United States v. Carter*, 720 F.2d 941, 948 (7th Cir. 1983) (erroneous admission of hearsay was "harmless error due to the cumulative nature of the testimony"). These were two emails out of hundreds of emails and recordings that implicating Hooker in the conspiracy.

In addition, counsel for Hooker confronted Gallegos with Government Exhibit 627, and elicited both that Takagi never sent her a contract from Hooker, and that, after Hooker retired from ComEd in 2012, she needed someone employed by ComEd to approve the contract. Tr. 2984:4-21. Counsel for Hooker likewise confronted Gallegos with Government Exhibit 217, and Gallegos again confirmed that, per that email, an internal ComEd employee needed to authorize approval of the contract. Tr. 2984:23-2985:25. The jury therefore heard that Hooker did not have ultimate authority to approve the Doherty contract, minimizing any possible error from the admission of these emails.

### 14. Considering the Trial Record as a Whole, Any Error Was Harmless.

The jury considered approximately seven weeks of evidence, including more than 100 recordings, hundreds of emails, and dozens of witnesses. Considered all together, this evidence established defendants' guilt beyond a reasonable doubt. None of the supposed errors defendants have identified would have affected the trial's outcome, either individually or cumulatively. To the extent there were significant errors at the trial—and there were none—they were harmless.

## **CONCLUSION**

For the reasons set forth above, defendants' motions for judgment of acquittal and for a new trial should be denied.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:    /s/ *Amarjeet S. Bhachu*
       AMARJEET S. BHACHU
       DIANE MacARTHUR
       SARAH STREICKER
       JULIA K. SCHWARTZ
       IRENE SULLIVAN
       Assistant United States Attorneys
       219 South Dearborn Street
       Fifth Floor
       Chicago, Illinois 60604
       (312) 353-5300